GLICKMAN & HUGHES, L.L.P.
909 Fannin, Suite 3800
Houston, Texas 77010
713.658.1122
Julius Glickman
(Texas State Bar No. 08030000)
Ashton Bachynsky
(Texas State Bar No. 24001673)

Attorneys for Plaintiff
Robert P. "Skip" Cummins

SNITOW KANFER HOLTZER
& MILLUS, L.L.P.
575 Lexington Avenue
New York, NY 10022-6102
212.317.8500
Alan Heblack (AH 1219)

Attorneys for Plaintiff
Robert P. "Skip" Cummins

07 CV 4633

JUDGE KOELTL

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT P. "SKIP" CUMMINS | § | |
| Plaintiff | § | |
| | § | |
| -Against- | § | |
| | § | COMPLAINT |
| | § | |
| | § | JURY DEMAND |
| | § | |
| SUNTRUST CAPITAL MARKETS, INC., | § | |
| AMIT HAZAN, AND JONATHAN BLOCK | § | |
| | § | |
| Defendants | § | |

JUN 0 1 2007

Plaintiff, by and through his attorneys, Glickman & Hughes, L.L.P. and Snitow Kanfer

Holtzer & Millus, LLP, files this Complaint against the Defendants, alleging as follows:

## I. JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction of the claims asserted in this cause under

diversity of citizenship pursuant to 28 U.S.C. § 1332 and the amount in controversy is well in excess

of $75,000, exclusive of interest.

2.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because the unlawful

practices alleged in this complaint were committed in whole or in part in the Southern District of

New York, Defendants SunTrust Capital Markets, Inc. and Amit Hazan reside in this District, Defendants are doing substantial business in this District, Defendant Hazan is domiciled in this District, and Defendants can be found in this District.

## II. PARTIES

3.    Robert P. "Skip" Cummins ("Mr. Cummins") is an individual who resides in Houston, Harris County, Texas.

4.    SunTrust Capital Markets, Inc. ("SunTrust") is a Tennessee corporation with a principal place of business in Georgia and a principal place of business in New York, New York. SunTrust may be served with process by serving its registered agent C.T. Corporation System, 111 Eighth Avenue, New York, New York 10011.

5.    Amit Hazan ("Hazan") is an individual who based on information and belief resides and works in New York, New York. Amit Hazan may be served with process at his place of business CIBC World Markets, 300 Madison Avenue, New York, New York 10017.

6.    Jonathan Block ("Block") is an individual who based on information and belief resides in New York and works in New York, New York. Jonathan Block may be served with process at his place of business SunTrust Robinson Humphrey, 711 Fifth Avenue, 14th Floor, New York, New York 10022.

## III. FACTUAL BACKGROUND

### The Genesis of Defamatory Statements About Mr. Cummins

7.    This suit is necessary because the Defendants' false and disparaging comments about Mr. Cummins have caused him substantial harm, professionally and personally. Defendants Hazan and Block, while employed by the Defendant SunTrust Capital Markets, Inc., wrote two public

2

reports, each of which was defamatory as a whole and contained individual defamatory statements about Mr. Cummins. Hazan and Block wrote these reports on June 8, 2006, (*Exhibit A*) and June 12, 2006 (*Exhibit B*). Defendants publicized and widely disseminated these reports. Defendant Hazan made additional defamatory and false accusations about Robert P. "Skip" Cummins to the *New York Times* (*Exhibit C*) published on June 9, to the *Houston Chronicle* (*Exhibit D)* published on June 14, and to *Bloomberg* (*Exhibit E*) published on June 9, 2006.   In all likelihood, other injurious statements were made to others not yet known to Mr. Cummins. These reports and articles are attached to show the statements made, their context and the defamatory nature of the statements.

8.      At all times pertinent to this lawsuit, Defendants Hazan and Block were employees, agents, and representatives, working in the course and scope of their employment and acting with actual and apparent authority, for their employer Defendant SunTrust Capital Markets, Inc.

9.      At the time these defamatory comments were made, Mr. Cummins was the Chairman and Chief Executive Officer of Cyberonics, Inc. ("Cyberonics"). Cyberonics is a company that designs, develops and brings to market innovative, one-of-a-kind implantable medical devices for the treatment of patients with chronic illnesses that have not responded to traditional drug and other therapies.

## Cyberonics Made Significant Progress Under Mr. Cummins' Leadership

10.      In September 1995, Mr. Cummins was hired as CEO of Cyberonics and in June 2001 he was elected by the Cyberonics Board of Directors to the additional position of Chairman of the Board. Mr. Cummins remained Chairman and CEO until events precipitated by Defendants' false and defamatory statements caused him to resign in November 2006.

11.    At the time Mr. Cummins became Chief Executive Officer ("CEO") of Cyberonics in late 1995, Cyberonics was on the brink of failure. It had some technology but little else. The year before Mr. Cummins became CEO, the Food and Drug Administration ("FDA") had denied approval of Cyberonics' VNS Therapy System for the treatment of drug-resistant epilepsy. Cyberonics had little cash and inadequate resources to complete its clinical trials, obtain its first FDA approval, and begin selling and marketing its first product in the United States. Under the leadership of Mr. Cummins, Cyberonics raised over $225 million of private and public equity and debt capital.

12.    While Mr. Cummins was CEO and Chairman of the Board, the mission of Cyberonics was more clearly defined and focused upon improving the lives of people touched by life-ruining, chronic, and treatment-resistant illnesses. Against great odds, including a highly skeptical and conservative U.S. Food and Drug Administration ("FDA"), and medical and third-party payer communities, Cyberonics succeeded in providing Americans with drug-resistant epilepsy their first and only implantable device-based treatment option and their first new epilepsy treatment modality, other than drugs and surgery, in over 100 years.

13.    Within three years after Cyberonics obtained FDA approval of the VNS Therapy System for the treatment of drug resistant epilepsy, Cyberonics once again, against great odds, obtained favorable coverage policies and reimbursement rates from Medicare, all the major state Medicaid programs and private insurers to give Americans with drug-resistant epilepsy – in essence universal access to VNS Therapy.

14.    Under Mr. Cummins' leadership, Cyberonics also developed and implemented unique medical and patient education and assistance programs to create awareness, acceptance, and demand

4

for VNS Therapy among physicians, surgeons, hospitals, patients and third-party payors, and insure that qualified patients would receive Cyberonics' VNS Therapy.

15.    While Mr. Cummins was Chairman and CEO, Cyberonics also developed and obtained FDA approval for the first treatment of any kind for chronic or recurrent treatment resistant depression ("TRD"). In order to obtain FDA approval, Cyberonics first conducted six years of long-term clinical trials and then obtained a favorable Advisory Panel recommendation after a very contentious debate among panel members, FDA and Cyberonics representatives. After notice that the FDA had decided to deny approval of Cyberonics' treatment for TRD absent additional information, Cyberonics and Mr. Cummins met with FDA management, launched a formidable campaign to rally support and provided FDA with additional long-term data and analyses. These efforts resulted in FDA approval in July 2005.

16.    Despite having to overcome substantial obstacles associated with the pioneering of unique device-based therapies for two separate and distinct groups of patients with severe, chronic, treatment-resistant illnesses (epilepsy and depression), Cyberonics, under Mr. Cummins' leadership, achieved important financial objectives. Among other things, sales during Mr. Cummins' first year as CEO (FYE 6/30/96) were $1.4 million; sales in Mr. Cummins' last year as CEO (FYE 4/28/06) were $123.4 million – a compound annual growth rate over ten years of more than 55%. Cyberonics broke even in fiscal year 2003 (6 years after FDA approval) and made a profit in 2004. Cyberonics' market capitalization using the highest stock prices for the year increased from $79 million in calendar 1996, Mr. Cummins' first year as CEO, to $1.2 billion in calendar 2005, his last full year as CEO – a compound annual growth rate in shareholder value of 35%. Cyberonics' market capitalization using the lowest stock prices for the year increased from $31 million in Mr. Cummins'

first full calendar year as CEO to $477 million in 2005 his last full calendar year – a compound annual growth rate over ten years in shareholder value of 36%. Cyberonics' compound annual growth rate in market capitalization from 1996 to 2005 exceeded the compound annual growth rates of the 52-week high and low S&P 500 index values and the average market capitalizations of the companies in the Mid-Cap Medtech Composite.

### The Defendants Made the June 15, 2004 Stock Options The Basis of the Defamation

17.     Cyberonics was positioned to continue its move forward. Then the Defendants intervened. The Defendants made defamatory and false statements about Mr. Cummins which were circulated to the investment community and the public. Defendants made these statements about Mr. Cummins in the June 8 and June 12 public reports and to the *New York Times*, the *Houston Chronicle*, and to *Bloomberg* (*Exhibits A-E*). The June 8, 2006 report, June 12, 2006 report, and the public statements of Hazan and SunTrust in the *New York Times*, the *Houston Chronicle,* and *Bloomberg* were mainly about 150,000 stock options granted to Mr. Cummins by Cyberonics' Board of Directors some two years earlier, on June 15, 2004, at a Cyberonics' Board meeting following an FDA Advisory Panel meeting.

18.     The exact language of the defamatory statements will be laid out verbatim later in this pleading but the Defendants, among other things, claimed that because of the granting and timing of the June 15, 2004 option grants made to Mr. Cummins, Mr. Cummins either committed or may have committed illegal acts such as "backdating," that Mr. Cummins was "unethical," "manipulative," and not "credible," and that Mr. Cummins had breached his fiduciary duty. The Defendants published words to the effect that (i) Mr. Cummins tried to cover up his acts, (ii) made questionable, if not illegal, profits, (iii) that Mr. Cummins granted the options to himself, (iv) that

the granting of the June 15, 2004 options to Mr. Cummins was an abuse of options by Mr. Cummins, and that (v) Cyberonics stock was discounted due to the conduct of Mr. Cummins in the granting and timing of these options. Defendants' allegations falsely portrayed what really happened in the issuance and granting of those June 15, 2004 options, falsely described the nature of the options granted and as a result were severely damaging to Mr. Cummins professionally and personally.

### Mr. Cummins' June 15, 2004 Stock Options Vested Over 5 Years, Were Legal, And Properly Disclosed and Accounted For

19.    There was nothing unethical or illegal about the approval, pricing, disclosure or accounting for the options issued to Mr. Cummins on June 15, 2004. The granting of these stock options to Mr. Cummins was legal. The exercise price of $19.58 for the June 15 stock options was the price required by Cyberonics' 1997 Stock Option Plan on file with the Securities and Exchange Commission from which the options were granted. The options were issued, priced and vested over five years in accordance with the 1997 Stock Option Plan.

20.    Consistent with Securities and Exchange Commission regulations, Mr. Cummins' June 15, 2004 grant was fully disclosed to the Securities and Exchange Commission and made public in Form 4s filed with the Securities and Exchange Commission on June 17, 2004 within 48 hours of the grant. Lastly, the options were properly accounted for. None of the June 15, 2004 options of Mr. Cummins were exercised or sold in 2004 or 2005 or have been exercised to date. Mr. Cummins made no profit on these June 15, 2004 options. Mr. Cummins could not have exercised or sold any of the options when he received them because they vested ratably over 60 months as publicly disclosed in the Form 4s filed on June 17, 2004 and the options did not fully vest until June 15, 2009.

## The Board of Directors Made the Decision to Postpone
## and Grant the June 15, 2004 Options – Without the Participation of Mr. Cummins

21.    It was the date of the June 15, 2004 option grant which the Defendants seized upon to attack and defame Mr. Cummins in their June 8 and June 12 reports and in their repeated statements to newspapers. Mr. Cummins, however, did not decide that June 15th would be the date of his option grant and wanted an earlier date than June 15, 2004. Mr. Cummins believed that May 2004 was the appropriate date that the Board should have granted his options. On May 25, 2004, the Compensation Committee and Board of Directors voted to approve the annual stock option grants for all officers and outside Board members except for Mr. Cummins. After learning of those decisions, Mr. Cummins objected to the Compensation Committee's and Board's failure to award him his annual grant at the same time the other annual grants were awarded. The Compensation Committee of Cyberonics' Board of Directors met again on May 28, 2004 to discuss awarding to Mr. Cummins on that day his 2004 annual option grant. Three members voted to award Mr. Cummins a 150,000 share annual option grant and one member voted no. The Compensation Committee decided to refer the decision of Mr. Cummins' 2004 annual option grant to the Board of Directors to decide. Mr. Cummins was not present during the annual option grant discussions and voting at the Compensation Committee meetings on May 25 or May 28, 2004.

22.    On June 1, 2004, the Board of Directors met to discuss the 150,000 share 2004 annual stock option grant to Mr. Cummins recommended by the Compensation Committee. At that meeting, the Board of Directors decided to defer the decision on Mr. Cummins' 2004 annual grant until a Board meeting scheduled for June 15, 2004, at which time the Board could consider the outcome of the FDA Advisory Panel meeting as part of Cummins' fiscal 2004 performance.

23.    At the Board meeting on June 1, 2004, Mr. Cummins was not present, and he did not vote on the decision to defer his annual options grant until June 15, 2004.

24.    On June 15, 2004 after the Advisory Panel's recommendation (which did not occur at "about 4 p.m." as Defendants claim), the Board unanimously approved the 150,000 share option grant recommended by the Compensation Committee on May 28, 2004 and postponed by the Board on June 1, 2004. Mr. Cummins did not vote on his option grant and was not present at that Board meeting during the discussion or voting on his option grant. The Board also approved a bonus pool of options to be granted to other officers and employees who played key roles in obtaining the Panel's favorable recommendation.

25.    Incredibly, even though Mr. Cummins was never in favor of and did not participate in either the Compensation Committee's or Board's decision to postpone the decision about his stock options to June 15, 2004 and even though Mr. Cummins did not participate in the Board's decision to ultimately approve his option grant on June 15, 2004, the Defendants blamed and defamed Mr. Cummins for what the Board did. Astonishingly, the Defendants defamed and accused Mr. Cummins of illegal, unethical, and improper conduct for simply having received options which were properly approved, accounted for, and publicly disclosed.

26.    The following are among the defamatory and false statements in the June 8, 2006, June 12, 2006 reports by Defendants and the comments of Hazan to the *N.Y. Times*, *Houston Chronicle*, and to *Bloomberg*:

9

## The Defamatory and False Statements in the June 8, 2006 Report
## Written by Hazan and SunTrust

### Defamatory Statement No. 1

27.    The Defendants claimed that "While it may be disputable whether 'backdating' of options or other violations occurred under SEC regulations, we do note the grants resulted in 'in the money' options that would require an immediate recording of compensation expense (which could possibly necessitate a restatement of the FY05 results)."

28.    It was, among other things, false to claim directly or suggest indirectly that Mr. Cummins "backdated" the June 15, 2004 options, that he had participated in granting himself "backdated" options on June 15, 2004, that backdating of the June 15, 2004 options might have been a "disputable" issue, or that "backdating" was illegal under SEC regulations in the context of the June 15 options granted to Mr. Cummins. The June 15, 2004 options were not "backdated." It is false to claim that it was "disputable" that the options were backdated. It is indisputable that the options were not backdated. "Backdating" is a highly inflammatory and derogatory term, implying, among other things, illegal and improper conduct. Nevertheless, the Defendants deliberately and repeatedly chose to suggest that Mr. Cummins was "backdating" with respect to the June 15, 2004 options. The Defendants knew and should have known the repercussions such a charge would likely have upon the media, the public, the investment community, the Securities and Exchange Commission, the Department of Justice, and Mr. Cummins.

29.    The Defendants publicly claimed that the stock options to Mr. Cummins yielded him an overnight paper profit of $2.3 million on June 16, 2004. That was false, as more fully set forth below. Immediately after making that statement, Defendants make the misrepresentation that the

10

"in the money" options of Mr. Cummins "would require an immediate recording of compensation expense (which could possibly necessitate a restatement of fiscal year 2005 results)." It is defamatory and false to link the $2.3 million of non-existent paper profit to an amount to be expensed. It is further false and defamatory to say that the options grant to Mr. Cummins "require[d] an immediate recording of compensation expense." Mr. Cummins' June 15, 2004 stock option grant was publicly disclosed, properly approved, priced and accounted for by Cyberonics; no expenses needed to be recognized; and no restatement of those options was required.

<u>Defamatory Statement No. 2</u>

30.    Defendants' June 8, 2006 report stated in relevant part:

**"Increasing Concern Over Option Grant**.

. . . .

"Because a <u>back-dated option</u> results in the award of an 'in the money' option, a compensation expense should be recorded at the time of the grant. . . . . While it may <u>be disputable whether 'backdating' of options or other SEC violations occurred under</u> this scenario for CYBX (it appears to us <u>that even if backdating by definition did not occur, the effect was exactly the same</u>) it does seem clear these grants resulted in 'in the money' options <u>that would require an immediate recording of compensation expense</u> (which could possibly necessitate a restatement of FY05 results)." (emphasis supplied)

The Defendants' statements and innuendoes that Cyberonics or Mr. Cummins engaged in illegal and wrongful conduct from a "backdated" June 15, 2004 option are false. Among other reasons, there was no illegal or wrongful conduct. The June 15, 2004 options were not "backdated." It is false to claim that it was "disputable" that the options were backdated. It is indisputable that the options were not backdated. The statement that even if backdating by definition did not occur, the "effect was exactly the same," is likewise false. The "in the money" options they claim Mr. Cummins

11

received could not be sold on June 16, 2004 because they had not vested.   It was not required that the 2004 option grant be recorded as an immediate expense.

Defamatory Statement No. 3

31.    The Defendants claimed that the issuance of stock options to Mr. Cummins on 6/15/04 "yield[ed] an overnight paper profit of ~$2.3 million for CEO Cummins . . . ." on June 16, 2004.

32.    This inflammatory, headline-grabbing statement was false.  The stock options granted to Mr. Cummins on June 15, 2004 yielded no profit on June 16th in theory or practice since the options as disclosed in the Form 4s filed on June 17, 2004 vested ratably over 60 months; none had vested in June 2004 and they could not and had not been exercised or sold on June 16, 2004.

33.    To further mislead the public and exaggerate their false claim of profit, Hazan and Block intentionally failed to disclose in their report that two months after the June 2004 stock grant, Cyberonics received a not-approvable letter from FDA and its stock price declined to $13.55 per share, some $6.00 per share less than the exercise price for Cummins' June 15, 2004 options.

Defamatory Statement No. 4

34.    After stating that the June 15 stock options yielded "an overnight paper profit of ~$2.3 million for CEO Cummins . . . ," Defendants then immediately state that "[a]s for Mr. Cummins, he subsequently sold ~350,000 options in Feb. '05 at ~$40-$45 per share ( . . . just days after CYBX received an FDA approvable letter for the same device)."  Among other things, the Defendants falsely link Mr. Cummins' June 15, 2004 150,000 share option grant to his sale of 350,000 options in February 2005.  The 350,000 options sold at $40-$45 per share in February 2005 had nothing whatsoever to do with the June 15, 2004 options.  It is false and misleading to tie the

12

two together. These 350,000 options shares sold in 2005 were from fully-vested options granted to Mr. Cummins in 1997, 1999, and 2001 – not June 15, 2004. The Form 4s, properly filed with the SEC and publicly available in February 2005, clearly show that the 350,000 options shares sold in 2005 were from vested options granted to Mr. Cummins in 1997, 1999, and 2001 – not June 15, 2004. It is not only false and misleading for Defendants to tie the June 15, 2004 grant to the February 2005 sales but it is false and misleading to imply that in February 2005 Mr. Cummins wrongfully realized up to $3.8 million of real profit in only eight months on an alleged improper June 15, 2004 options grant. Defendants knew that they were falsely accusing Mr. Cummins. The Form 4s on file with the Securities and Exchange Commission demonstrate there was no $3.8 million profit from the June 15, 2004 stock options. In the face of actual knowledge, they chose to mislead the public, the media, the investing and financial communities and others, and to defame Mr. Cummins.

<u>Defamatory Statement No. 5</u>

35.    <u>The Defendants stated "... [W]e were unable to locate all of the electronic Form 4s for the quarter in question (ending July 2004), as the 10Q says 481,000 were granted, but only 304,000 were on Form 4s for that period. We are continuing to do diligence surrounding this issue."</u> The inferences and statements that include that Mr. Cummins or Cyberonics was trying to cover up options grants, that there was impropriety in the Form 4s, that not all required Form 4s were on file, or that SEC disclosure requirements were violated for the options granted in the quarter ended July 2004 are false.

36.    There was no "issue" "surrounding" the Form 4s. Mr. Cummins timely filed with the Securities and Exchange Commission his Form 4 for the June 15, 2004 options grant on June 17,

2004. Form 4s are public documents and may be obtained from the Securities and Exchange Commission by anyone. All Form 4s for the officers and Board members' grants that occurred in the quarter ended July 2004 were filed within 48 hours of the actual grants as required by SEC regulations. When Defendants' wrote their June 8, 2006 report, all of the public Form 4s required for the options granted in the quarter ended July 2004, including the grant to Mr. Cummins on June 15, 2004, had been on file with the Securities and Exchange Commission and available to the public for review for approximately two years.

37.     The Defendants admitted in their June 8, 2006 report that they had read the Form 4s. They knew that Mr. Cummins had publicly disclosed his stock options and that his options vested over 60 months – not on the date they were granted. Defendants chose to ignore the facts revealed in the public Form 4s of Mr. Cummins and made statements as though Mr. Cummins had made millions in profits from the June 15, 2004 options when, in fact, they knew he had not made a penny and could not sell his stock immediately at one time but only over a 60-month period.

38.     To infer further impropriety and a coverup by Mr. Cummins because stock grants to other non-officer employees did not have a Form 4 on file is false since those individuals who had not filed Form 4s were not required to file Form 4s. SEC regulations require Form 4s to be filed only for option grants to Section 16 officers and Board members. Mr. Cummins timely filed his Form 4s, as did all the Section 16 officers who received option grants in the quarter ended July 2004.

<u>Defamatory Statement No. 6</u>

39.     "[I]t seems almost indisputable that management has been its own Achilles heel, drawing continued criticism over credibility." The Defendants' made their "credibility" attacks on Mr. Cummins a self-fulfilling prophecy because they publicized unfounded and inflammatory

falsehoods in their reports and statements to the press. Impugning the "credibility" of management (referring principally to the untrustworthiness of Mr. Cummins), stating management has been "its own Achilles heel," and that a statement is "indisputable" are unwarranted and false. Among other things, Mr. Cummins has been instrumental in the progress of Cyberonics. Defendants ignore Mr. Cummins' substantial contributions and attack his credibility and trustworthiness based on properly approved, priced, disclosed and accounted for options granted to him by a unanimous vote of Cyberonics' Board of Directors, excluding Mr. Cummins, at a time chosen not by Mr. Cummins but by the Board of Directors.

### Defamatory Statement No. 7

40.    "[W]e feel it is unfortunately another clear hit to this management's credibility." Among other things, it is false and highly injurious to state, because of the June 15, 2004 options and their timing (which the Board chose, not Mr. Cummins), that it is "clear" that Mr. Cummins is untrustworthy and that he acted illegally or unethically.

### Defamatory Statement No. 8

41.    "Legal or not, we are hard pressed to find a justifiable reason for the events that unfolded above." The inference of illegality and lack of a "justifiable reason" for the "events" is false.

### A Self-Executing Statement

42.    The June 8, 2006 report states that "the company stock options grants in 2004 may face meaningful scrutiny in the current environment surrounding option grants . . . ." Among other things, this statement became a self-fulfilling prophecy because Defendants' defamation brought about the "scrutiny." The SEC began an investigation of Cyberonics on June 9, one day after this

15

June 8 report written by Defendants and after the Defendants made defamatory statements to the *New York Times*.

43.    Defendants continued their assault on Mr. Cummins by publishing a second report on June 12, 2006 that confirmed their previous false and disparaging statements and added new ones.

### The Defamatory and False Statements Written by SunTrust and Hazan In the June 12, 2006 Report

### Defamatory Statement No. 9

44.    "With a full understanding of the materiality of the event (this was undoubtedly the single greatest event in the company's history), this management and board of directors granted the options with a prior day's (June 14th) exercise price of $19.58.  The stock rose 78% on June 16, yielding the executives a combined overnight paper profit of ~$2.5M."  Despite being previously informed that no member of management participated in the approval of these options, Hazan and Block falsely state that "this management" (including Mr. Cummins) "granted the options . . ."  As publicly disclosed in a Form 8-K filing prior to Defendants' June 12th report, no member of management, including Mr. Cummins, participated in the approval of these options.  The Board of Directors also did not choose a prior day's exercise price.  The Board of Directors used the prior day's closing price because that was required by Cyberonics' stock option plan.  Mr. Cummins' options were properly approved, priced, disclosed, and accounted for.

45.    It is also false to state that "management" granted these options after what Hazan and Block state was "undoubtedly the single greatest event in the company's history."  At the time Hazan wrote this report, he had been covering Cyberonics for almost two years as a financial analyst.  Hazan and Block knew that there were a number of other events prior to their report that were much

more significant than a non-binding FDA Advisory Panel's recommendation which 60 days later was rejected by the FDA in making its not-approvable decision including, but not limited to, FDA approval of Cyberonics' medical device for the treatment of epilepsy, FDA approval of Cyberonics' medical device for the treatment of depression, and Cyberonics' obtaining coverage policies, coding, and reimbursement approval for epilepsy treatments. Despite these more significant events, Hazan and Block chose to publish false statements.

46.     Finally, the options did not "yield" Mr. Cummins any type of profit on June 16th. The options could not be sold because they vested over a 5 year period. Knowing that the options could not be sold on June 16th and that they vested over a 5 year period, Hazan and Block again chose to publish a false statement about a non-existent profit from Mr. Cummins' June 15, 2004 option grant.

<u>Defamatory Statement No. 10</u>

47.     <u>Referring to the June 15 options, the Defendants say, "But by granting these options on the evening in question, this management knowingly abused that principle [of aligning management's interest more closely with its shareholders], acting in their own self interest with material information at a time when investors could not do so."</u> This statement is defamatory and false. This statement, among other things, falsely accuses Mr. Cummins of breaching his fiduciary duty and that he "acted" with regard to these June 15, 2004 stock options. Mr. Cummins did not abuse any principles nor did he act in his own self-interest to the detriment of shareholders. Regarding his June 15, 2004 options, Mr. Cummins did not "act" at all in the granting of his stock options. It was the Board of Directors who "acted" and granted Mr. Cummins the option and chose when to make the decision about Mr. Cummins' options. It was the Board of Directors and Compensation Committee of the Board that deferred the decision to grant that option from May 28

until June 15, 2004. Mr. Cummins did not participate in the Compensation Committee's or Board's actions. The June 15, 2004 option grant to Mr. Cummins was properly approved, priced, reported, and accounted for. Defendants do not mention that the options to Mr. Cummins did not vest immediately but over 5 years. Contrary to Defendants' false statement, the options to Mr. Cummins helped align his interests with the shareholders. Among other reasons, vesting over a period of time provides incentive to the executive to remain with the company and increase the value of the stock to the shareholder. Nor did the granting of the options require a cash outlay by the company.

## Defamatory Statement No. 11

48. <u>"While the exact letter of the law may very well have been followed, it seems clear to us that the very intent of the regulation was manipulated."</u> Among other things, this false and defamatory statement admits that the law had been followed on the one hand and then infers it was not and even if it was, the Defendants claim Cummins acted improperly because he "manipulated" the regulations to his personal benefit. Mr. Cummins did not act and he did not manipulate the granting of the June 15, 2004 stock option grants. There was nothing illegal or improper about the Board's option grant to Mr. Cummins on June 15, 2004.

## Defamatory Statement No. 12

49. <u>"Fully aware of the positive FDA Panel decision, this management team and its directors surely realized the 'fair' value of its equity was worth much more than the mere $19.58 share price prior to when this very controversial event took place . . . and improperly took advantage of this definition for their own benefit."</u> This statement is false. Among other things, Defendants continue to falsely accuse Mr. Cummins of questionable, illegal, or unethical conduct by stating it was "management" who made the decision to grant the option on June 15. It was the Board of

18

Directors who picked the June 15 date and granted the options – not Mr. Cummins. The price of the June 15, 2004 option was determined by Cyberonics' 1997 stock option plan on file with the SEC and publicly available. The June 15 stock option grant to Mr. Cummins was properly approved, priced, disclosed, and accounted for.

Defamatory Statement No. 13

50.     Management "manipulated the 'fair value' definition for their benefit, as the intent of the regulation is to get as close as possible to capturing the 'true' value of the stock." There was no price "manipulation," least of all by Mr. Cummins. Among other reasons, the Cyberonics stock plan requires that the options be priced as of the preceding trading day's closing price. Should the Board have chosen any other price, it would have been contrary to the terms of the plan. Mr. Cummins did not profit from the grant because the stock had not vested immediately. The Board acted, not management nor Mr. Cummins. Neither the fair value nor the pricing of Mr. Cummins' June 15, 2004 grant was manipulated by Mr. Cummins or anyone else. The grant was properly approved, priced and vested according to the terms of the 1997 Stock Plan on file with the SEC.

Defamatory Statement No. 14

51.     Defendants state "Credibility is the Real Issue." Among other things, even though Mr. Cummins did not participate in either the deferring or ultimate approval of his June 15, 2004 grant and even though the grant was properly approved, priced, disclosed and accounted for, Defendants repeatedly charge that Mr. Cummins is not credible based on the June 15, 2004 option grant – a serious and false slur.

19

<u>Defamatory Statement No. 15</u>

52.    <u>"Whether it results in regulatory violations or not . . . ."</u> The options Mr. Cummins was granted on June 15, 2006 did not violate any regulation. It is false to imply that they did.

<u>Defamatory Statement No. 16</u>

53.    <u>"Whether it results in regulatory violations or not, the actions appear **unethical** to us, and are akin 'in effect' to the broader stock option compensation **abuses** currently unfolding at a number of other companies."</u> (emphasis supplied)  Among other things, the false charge that Mr. Cummins is "unethical," and has "abused" stock options as unnamed "others" have done is false, reckless and malicious. Linking Mr. Cummins to stock option "abuses" "currently unfolding at a number of other companies" allows Defendants to smear Mr. Cummins by neither naming the companies nor distinguishing those companies whose option facts are different from those of Cyberonics.

<u>Defamatory Statement No. 17</u>

54.    <u>"The abuse unfortunately takes on a larger significance here due to existing credibility issues for this mgmt. It is increasingly evident that the value of CYBX is **discounted a good deal due to the current CEO**, and we believe stock appreciation will continue to be limited as a result."</u> (emphasis supplied)  Among other things, Defendants take another opportunity to make clear that the focus of their attack on "management" means Mr. Cummins and falsely blames him for the timing and pricing of the June 15 options.

<u>Defamatory Statement No. 18</u>

55.    <u>"[T]his management and board of directors granted the options with a prior day's (June 14) exercise price of $19.58. The stock rose 78% on June 16, yielding the executives a</u>

20

combined overnight paper profit of ~$2.5 million." The myth that it was "management" who granted themselves the options is continued here and throughout the June 8 and June 12 reports. The so-called "overnight profit of $2.5 million" simply did not happen. There is no profit, paper or otherwise, in unvested stock options which cannot be exercised and sold.

<u>Defamatory Statement No. 19</u>

56.    "But by granting the options on the evening in question, this management knowingly abused that principle, acting in their own self interest with material information at a time when their shareholders and investors could not do so." Having identified and charged Mr. Cummins as the principal executive "abusing" and "acting" with regard to the issuance of the June 15, 2004 option, the Defendants made false statements to the effect that Mr. Cummins acted by granting himself the options with material information that investors and shareholders could not act upon. Among other things, Mr. Cummins did not abuse any principle nor did he participate in either the deferring or granting of the June 15, 2004 options, much less act in his own self-interest except to accept the options awarded to him.

<u>Defamatory Statement No. 20</u>

57.    "If management had wanted to properly 'align' themselves with shareholders for the 60 month vesting period (as they claimed last week), they should have allowed the event to be factored into the share price." Among other things, management did not allow or disallow. It was not up to the management. The grant of the 2004 stock options to Mr. Cummins was a decision by the Board of Directors. If it had been up to Mr. Cummins, he would have obtained his options in May, 2006 at the same time the annual grants were made to the Board members and other officers. The options of June 15, 2004 vested over 5 years, so it was in the interest of Mr. Cummins to use

his best efforts to achieve the mission of the company and thereby build shareholder value over a five year period. The exercise price of the options granted to Mr. Cummins on June 15, 2004 was determined by the 1997 Stock Option plan, which was on file with the SEC and which the Board of Directors followed.

<u>Defamatory Statement No. 21</u>

58.    "... [T]he three executives, acting on the same information, are still 'in the money' by over 10%." Mr. Cummins and the other two executives did not act. The Board did.

<u>Defamatory Statement No. 22</u>

59.    "Credibility is the Real Issue. Whether the facts above (which have not been disputed) results in regulatory violations or not, these actions appear unethical to us .... While Cyberonics' abuse does not appear to be a regular systemic pattern, it unfortunately takes on a much larger significance when put into a historical context of credibility issues with this management team. Simply put, it has become increasingly evident to us that the value of CYBX common continues to be meaningfully discounted due to the presence of the current CEO, in our opinion. ... At the end of the day, shareholders will have to decide whether this management team and its board of directors have fulfilled their fiduciary duty. We are currently hard pressed to reach such a conclusion." Defendants continue their vicious assault on Mr. Cummins with false allegations of unethical conduct, lack of credibility, abuse, and breach of fiduciary duty for options granted to him by the Board of Directors, which were properly approved, priced, reported, and accounted for.

### The False and Defamatory Statements Defendants Made to the *New York Times*

#### Defamatory Statement No. 23

60.    The report by Hazan, Block, and SunTrust was repeated, in part, by the *New York Times* on June 9. Hazan made additional defamatory statements in an interview for the *New York Times* article.

61.    The *New York Times* confirmed that Robert P. Cummins was the focus of Hazan's and Block's report and criticism when it stated in its headline "Questions Raised on Another Chief's Stock Options." The article then points out "Yesterday, Cyberonics shares plunged nearly 16 percent when trading began, after Amit Hazan, a device industry analyst for SunTrust Robinson Humphrey, published an investor advisory about his concerns over the timing of those stock options, which were granted to Robert P. Cummins, Cyberonics' chairman and chief executive, and two of his lieutenants."

62.    The *New York Times* repeated one of Hazan's and Block's false and defamatory statements. "The analyst's report [referring to Hazan's report of June 8, 2006] criticized the option grant, saying it gave Mr. Cummins an instant paper profit of $2.3 million, and profit of $150,000 each for the other two executives, but did nothing for other shareholders."

63.    The articled continued "Mr. Hazan did not accuse Cyberonics of backdating the options to a day when prices were particularly low – a practice that has recently been reported among more than 30 companies and has become the subject of a Justice Department investigation. But, he (Hazan) wrote, 'the effect was exactly the same.'" The false and defamatory references to backdating are repeated.

64.     When Hazan was interviewed by the *New York Times*, he said "it's a perfect example of an abusive option." This statement by Hazan is false and defamatory. When Mr. Cummins stated that the options had been designed to conserve the company's cash and to serve as an incentive because they vested over a five-year period, Hazan, who had never disclosed the options vested over 5 years in his June 8 report, said "My problem is the timing of when they did this. The fact that it doesn't vest immediately doesn't mean it was ethical, and I haven't heard from one institutional investor today who disagrees with me." The references to the timing and ethical conduct are false and defamatory.

65.     The defamatory statements in the *New York Times* reached a wide audience in the United States including the financial and business community and the Securities and Exchange Commission.

### The False and Defamatory Statements Defendants Made to the *Houston Chronicle*

### Defamatory Statement No. 24

66.     The *Houston Chronicle* on June 14, 2006, repeated one of Hazan's and Block's false statements, that "<u>by granting the options when it did, the company gave Cummins a $2.3 million boost, at least on paper.</u>"

### Defamatory Statement No. 25

67.     Hazan told the *Houston Chronicle*, "<u>It was not correct or ethical for them to do what they did.</u>" Hazan further stated, "<u>It may be a microcosm of what's happening with this management team.</u>" Hazan repeated his false charges that Mr. Cummins had received a $2.3 million boost on paper and admitted that he had brought about an SEC investigation with his charges when he said the SEC saw enough merit in his charges to begin its own inquiry.

## The False and Defamatory Statements Defendants Made to *Bloomberg*

### Defamatory Statement No. 26

68.     Hazan in his statement to *Bloomberg* falsely claimed that Mr. Cummins was involved in unethical and illegal conduct with respect to the June 15 option grant: "It does not address our one hard claim we make, that it appears unjustified and unethical to issue those grants on the night of the single greatest event in the company's history . . . To this issue they have not responded." Hazan again repeats the false statement that the non-binding FDA panel decision was "the single greatest event in the Company's history" even though he was fully aware of much more significant events like FDA approval of Cyberonics' medical device for the treatment of epilepsy and depression.

## SunTrust and Amit Hazan Discussed these False Accusations with Institutional Investors the Week Prior to Issuing his June 8, 2006 Report

69.     Based on information and belief, during the week or more prior to publishing their June 8, 2006 report, Hazan made statements concerning the June 15, 2004 options and other matters to the Suntrust sales force, and to third parties, including institutional investors.

## Defendants' False Statements Have Irreparably Damaged Mr. Cummins

70.     All of the statements identified above are false and caused injury and damage to Mr. Cummins.

71.     Defendants' false and defamatory statements have been a proximate cause of substantial damage to Mr. Cummins.

25

## IV.  FIRST CLAIM AGAINST ALL DEFENDANTS FOR DEFAMATION

72.     Plaintiff incorporates by reference the statements and allegations contained in paragraphs 1 through 71 above.

73.     Despite the numerous false and misleading statements in their reports, the Defendants presented in their June 12th report that they had done a "broad investigation" and referred to the "facts" throughout their June 8 and June 12 reports.

74.     Defendants libeled and defamed Mr. Cummins.  Defendants published and caused to be published defamatory written statements in the June 8, 2006 and June 12, 2006 reports, the *New York Times* on June 9, 2006, the *Houston Chronicle* on June 14, 2006, and *Bloomberg* on June 9, 2006.  These defamatory statements and the reports, their inferences and innuendoes were false.

75.     Defendants' false statements in the June 8, 2006 and June 12, 2006 reports, and the reports as a whole, the *New York Times*, *Houston Chronicle,* and *Bloomberg* articles convey substantially a defamatory meaning and were written and published to the public.  Defendants negligently, maliciously, and with knowledge published these statements and reports, and knew and should have known that such statements would be republished and disseminated to other business executives, the business, financial and investment community, others with whom Mr. Cummins did business or might do business, and the public.  Defendants made these defamatory statements in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.  These statements, alone and in combination, expressly and by implication, constitute statutory libel, defamation, and defamation *per se.*

76.     Such statements seriously damaged Plaintiff Mr. Cummins in his occupation, business, community, including the financial and investment community, in his position as Chairman

and CEO of Cyberonics, and before the public. Among other things, these statements are substantially to the effect that Mr. Cummins engaged in conduct that was a breach of his fiduciary duty, manipulative, illegal, not credible, unethical, immoral, dishonest, disreputable, wrongful, irresponsible, and contrary to the shareholders' interest. They adversely affected his reputation and credibility and tended to and did disgrace and degrade Mr. Cummins, held him up to public contempt and reflected on his honesty, integrity, ethics in business dealings, his willingness to obey the law, his competence, and his job performance as CEO of Cyberonics.

77.     Defendants intentionally and maliciously made these statements with knowledge of their falsity or in reckless disregard for the truth. Defendants made these defamatory statements in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties. Defendants knew and should have known these statements were false. Mr. Cummins is not aware of the extent of this defamation by the Defendants and specifically reserves the right to add such additional defamatory statements as they may be discovered later.

78.     As a direct, substantial, or proximate result of the conduct of Defendants, Mr. Cummins has suffered damages and injury.

<u>Reputation</u>

79.     Mr. Cummins has suffered damages to his reputation in the past and future because of the wrongful conduct by the Defendants. Injury to the reputation of Mr. Cummins has been substantial and in all reasonable probability his reputation has been permanently impaired and damaged.

### Mental Anguish

80.     Mr. Cummins has also suffered disgrace, shame, embarrassment and humiliation as well as extreme emotional and mental anguish in the past.  Mr. Cummins will in all probability continue to suffer such disgrace, shame, embarrassment and humiliation in the future.

### Economic Loss

81.     Mr. Cummins has also suffered economic losses, including, but not limited to, loss of earnings and earning capacity in the past and in reasonable probability, his capacity to work and earn money in the future has been seriously impaired.  Defendants' conduct was a proximate cause of a series of events that ultimately resulted in Mr. Cummins' resignation from Cyberonics in November 2006 and makes it extremely difficult and unlikely that Mr. Cummins will obtain comparable employment with another employer.   Mr. Cummins has also been deprived of employment benefits including, but not limited to, past and future wages, bonuses, retirement benefits, insurance benefits, stock options, and social security benefits.  Plaintiff has suffered other consequential damages.

82.     Mr. Cummins also seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the market place or, alternatively, the statutory rate of interest because of the delay in receiving the damages.

83.     Because Defendants' statements are defamatory *per se*, some damages are presumed.  Mr. Cummins specifically reserves the right to plead further with respect to damages.

## VI.  SECOND CLAIM AGAINST ALL DEFENDANTS FOR EXEMPLARY DAMAGES

84.     Mr. Cummins incorporates by reference the statements and allegations contained in paragraphs 1 through 83 above.

85.    The Defendants' conduct entitles Mr. Cummins to exemplary damages.  The acts of Defendants as described above were intentional, willful, grossly negligent, and malicious.  They were made with heedless and reckless disregard of the truth and/or with the requisite scienter entitling Mr. Cummins to exemplary damages.  Mr. Cummins is therefore entitled to recover punitive damages as the jury might award over and above the actual legal damages in an amount that will adequately and properly punish Defendants, that will serve as a deterrent to Defendants and others, and set an example to the community.

### VIII. JURY DEMAND

86.    Mr. Cummins respectfully requests a trial by jury on all issues.

WHEREFORE, PREMISES CONSIDERED, Mr. Cummins respectfully requests that this Court require Defendants to answer herein, that this case be set for trial, that a jury be duly empaneled, and that upon the trial of this case, Mr. Cummins recover from Defendants, actual damages, exemplary damages, pre-judgment and post-judgment interest at the highest legal rate, all costs of Court, and any further relief, at law and in equity, to which he is justly entitled.

Respectfully submitted,
Julius Glickman
(Texas State Bar No. 08030000)
Ashton Bachynsky
(Texas State Bar No. 24001673)
GLICKMAN & HUGHES, L.L.P.
909 Fannin, Suite 3800
Houston, Texas 77010
713.658.1122
713.658.0925 - FAX
-and-

Alan Heblack (AH 1219)
SNITOW KANFER HOLTZER & MILLUS
575 Lexington Avenue
New York, NY 10022-6102
212.317.8500
212.317.1308 - FAX
ATTORNEYS FOR PLAINTIFF



# SunTrust Robinson Humphrey℠

A Division of SunTrust Capital Markets, Inc

June 08, 2006

**Amit Hazan**
212-319-3915
amit_hazan@rhco.com

Jonathan Block
212-319-3687
jonathan_block@rhco.com

# Cyberonics, Inc

Rating: **Neutral**          Price Target: **NA**

Estimate Bias: **Neutral**      Risk Rank: **Speculative**

**CYBX:** Moving to Neutral on Option Grant Concerns &
Reimbursement Delays
Rating and Price Target Change

## Summary

- **Lowering From Buy to Neutral.** We are lowering our rating on CYBX due to: (1) concerns that the company's stock option grants in 2004 may face meaningful scrutiny in the current environment surrounding option grants, and (2) our recognition that national coverage policies for VNS for depression will face continued delays for the foreseeable future.

- **A Concern Over Option Grants.** In light of the recent wave of investigations / lawsuits surrounding timing of option grants, we performed an analysis for all our companies under coverage. As for CYBX, we found unusual activity in June 2004 (when an FDA Panel recommended approval with conditions for VNS Therapy for depression). Specifically, the stock closed at $19.58 on June 14th, and was then halted on June 15th during the FDA Panel proceedings (which resulted in a positive recommendation that day). Our analysis of public Form 4 documents reveals that stock options were issued to three executives on June 15th (immediately following the Panel decision), and we have confirmed with mgmt that a board meeting was held that night. Skip Cummins (CEO) received an option grant of 150,000 shares, and Richard Rudolph (VP, CMO) and Alan Totah (VP) each received grants of 10,000 options. All of these options carried the June 14th closing price of $19.58. Due to the positive Panel recommendation, CYBX jumped 78% to $34.81 on the first trading day, June 16th, yielding an overnight paper profit of ~$2.3 million for CEO Cummins and ~$150,000 each for Rudolph and Totah. As for Mr. Cummins, he subsequently sold ~350,000 options in Feb '05 at ~$40-45 per share (just days after CYBX received an FDA approvable letter for the same device). While it may be disputable whether "backdating" of options or other violations occurred under SEC regulations, we do note the grants resulted in "in the money" options that would require an immediate recording of compensation expense (which could possibly necessitate a restatement of FY05 results). Lastly, we were unable to locate all of the electronic Form 4's for the quarter in question (ending July 2004), as the 10/Q says 481,000 were granted, but only 304,000 were on Form 4's. We feel a Neutral rating is appropriate given these outstanding issues and the market's recent reactions to the topic.

| Fundamentals | | FYE - Apr | 2006 | 2007E | | 2008E | |
|---|---|---|---|---|---|---|---|
| Price (Jun 07, 2006) | $23.79 | EPS | Actual | Old | New | Old | New |
| 52-Week Range | $47.77-$19.84 | 1Q | ($0.76)A | ($0.15)E | ($0.15)E | NA | NA |
| Mkt. Cap. (mil.) | $594.8 | 2Q | ($0.88)A | ($0.07)E | ($0.07)E | NA | NA |
| Shares Out. (mil.) | 25.0 | 3Q | ($0.58)A | $0.02E | $0.02E | NA | NA |
| Float (mil.) | 19.4 | 4Q | ($0.21)A | $0.11E | $0.11E | NA | NA |
| Avg. Daily Trading Vol. (000) | 638 | Year | ($2.44)A | ($0.09)E | ($0.09)E | **NA** | **NA** |
| Book Value/Share | NA | P/E | NA | | NA | | NA |
| Dividend/Yield | $0.00/Nil | EV/EBITDA | NA | | NA | | NA |
| ROE | NA | Revenue (mil.) | $123.4 | $147.6 | $147.6 | NA | NA |
| Cash & Equiv (mil.) | $93.40 | Operating Margin | NA | NA | NA | NA | NA |
| Debt/Cap. | 100.0% | Mean EPS | ($2.44) | ($0.02) | ($0.02) | $0.57 | $0.57 |
| Est. 5-Year EPS Growth | NA | Short Interest (000) | | Estimate Changes | | 2007 | 2008 |
| Convertible | No | 5/06 | 5398 | 02/08/06 | ($0.09) | | |
| Major Index Membership | S&P 600 | 4/06 | 5352 | 08/19/05 | $0.57 | | |
| | | 3/06 | 5440 | 07/27/05 | $0.36 | | |
| | | 2/06 | 5411 | | | | |

**PLEASE SEE IMPORTANT DISCLOSURES STARTING ON PAGE 3**

## Comments

Effective June 8th, we are lowering our rating on CYBX from a Buy to a Neutral due to: (1) concerns that the company's stock option grants in 2004 may face meaningful scrutiny in the current environment surrounding option grants, and (2) our recognition that national coverage policies for VNS for depression will face continued delays for the foreseeable future. We have long believed that a positive policy decision will be the main factor needed to begin to shift sentiment for CYBX common.

## Increasing Concern Over Option Grants

In light of the recent wave of investigations / lawsuits surrounding timing of option grants, we performed an analysis for all our companies under coverage. Our broad investigation turned out to be quite benign, except for a few events at CYBX. We found unusual activity in June 2004 (when an FDA Panel recommended approval with conditions for VNS Therapy for depression). The facts are as follows:

1. June 14th, 2004 - the stock closed at $19.58.
2. June 15th, 2004 – the stock was halted for the entire day during FDA Panel proceedings for VNS therapy for depression (which resulted in a positive recommendation at about 4 p.m.).
3. June 15th (evening), 2004 - stock options were issued to three executives (immediately following the Panel decision), during a board meeting held that night. Skip Cummins (CEO) received an option grant of 150,000 shares, and Richard Rudolph (VP, CMO) and Alan Totah (VP) each received grants of 10,000 options. All of these options carried the June 14th closing price of $19.58.
4. June 16th, 2004 – on the first trading day following the positive FDA Panel recommendation, CYBX jumped 78% to close at $34.81, yielding an overnight paper profit of ~$2.3 million for CEO Cummins, and ~$150,000 each for Rudolph and Totah.
5. February 2005 - Mr. Cummins sold ~350,000 options at ~$40-45 per share (the selling began just days after CYBX received an FDA approvable letter for the same device). Both Rudolph and Totah sold options at around ~$36 per share since the Panel approval in June '04.

Because a backdated option results in the award of an "in the money" option, a compensation expense should be recorded at the time of the grant. Thus, for companies that discover that backdating occurred, restatements of financial statements may be necessary, with an adjustment of expenses, net income, tax deductions and earnings. While it may be disputable whether "backdating" of options or other SEC violations occurred under this scenario for CYBX (it appears to us that even if backdating by definition did not occur, the effect was exactly the same), it does seem clear these grants resulted in "in the money" options that would require an immediate recording of compensation expense (which could possibly necessitate a restatement of FY05 results).

Lastly, we were unable to locate all of the electronic Form 4's for the quarter in question (ending July 2004), as the 10/Q says 481,000 were granted, but only 304,000 were on Form 4's for that period. We are continuing to do diligence surrounding this issue.

In our discussions with institutional investors regarding Cyberonics over the past several years, it seems almost indisputable that management has been its own Achilles heel, drawing continued criticism over credibility. While it is possible that this option granting issue may never develop into a legal event for the company, we feel it is unfortunately another clear hit to this management's credibility. Legal or not, we are hard pressed to find a justifiable reason for the events that unfolded above.

## Moving to the Sidelines

While the options issue is a large part of our downgrade this morning, we also note our increasing acknowledgement that reimbursement wins for the depression indication will take longer to be approved than we had anticipated. As we had commented this entire year, we continue to believe that the addition of 3rd party payers on a national scale is the key catalyst for sentiment change surrounding CYBX. We feel more comfortable on the sidelines until such reimbursement is at hand, as we have found little to no hard evidence that this event is nearing. We continue to believe that VNS therapy for depression will find its place in the treatment paradigm over the long term.

## Company Description

Cyberonics is a neuromodulation company that designs, develops and markets implantable medical devices that provide therapy via vagus nerve stimulation (or VNS) for the treatment of epilepsy and other debilitating neurological and

psychiatric diseases / disorders. Until recently, VNS therapy had only been approved for use adjunctively in reducing the frequency of seizures in patients that are "refractory" (or resistant) to antiepileptic drugs (AEDs). Recently, the FDA approved the same device for the treatment-resistant depression indication as well. Cyberonics was founded in 1987 and is headquartered in Houston, Texas.

## Analyst Certification

I, Amit Hazan, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject company(ies) and its (their) securities. I also certify that I have not been, am not, and will not be receiving direct or indirect compensation in exchange for expressing the specific recommendation(s) in this report.

## Important Disclosures

• SunTrust Capital Markets, Inc. makes a market in the following companies at the time of this report: Cyberonics, Inc

Analyst compensation is based upon stock price performance, quality of analysis, communication skills, and the overall revenue and profitability of the firm, including investment banking revenue.

As a matter of policy and practice, the firm prohibits the offering of favorable research or a specific research rating as consideration or inducement for the receipt of business or compensation. In addition, analysts and associated persons preparing research reports are prohibited from owning securities in the subject companies.



Cyberonics Inc.
May 30, 2003 - Jun 1, 2006
U.S. Dollar

Data Source: Prices / ExshareSource: FactSet Research Systems

| Rating And Price Target History (CYBX) | | | |
|---|---|---|---|
| Date | Rating | Target | Closing |
| 09/30/2004 | Neutral | NA | $20.46 |
| 02/04/2005 | Buy | $47.00 | $39.78 |
| 03/21/2005 | | $50.00 | $39.21 |
| 07/18/2005 | | $56.00 | $44.98 |
| 02/08/2006 | | $45.00 | $28.31 |
| 05/30/2006 | | $38.00 | $25.00 |

On February 27, 2004, STRH implemented its current rating system (defined below). On that date we also reinstated the use of price targets that had been discontinued on December 3, 2002.

## Definition of Ratings

SunTrust Robinson Humphrey assigns one of three ratings to stocks covered by our Research Department:  **Buy, Neutral, Reduce.**

In addition, we assign a risk rank to each stock based on a combination of fundamental and stock volatility factors:
**Low** = Low stock price volatility reflected by high predictability of financial results.
**Moderate** = Moderate stock price volatility reflected by medium predictability of financial results.
**High** = High stock price volatility reflected by inconsistent predictability of financial results.
**Speculative** = Greatest stock price volatility reflected by low predictability of financial results.
**Venture** = Recommended only for maximum risk oriented and well-diversified portfolios.

Our ratings are a function of the risk ranking (higher return expectations for higher risk) and the absolute expected total return (price appreciation plus dividends) that result in our estimated 12-month price target. Please refer to the grid below for additional detail.

| Performance Definition Scale | | | | |
|---|---|---|---|---|
| *Total return (capital gain/loss + dividends) expected over the next 12 months* | | | | |
| Rating | Low Risk | Moderate Risk | High Risk | Speculative |
| Buy | Over 10% | Over 15% | Over 20% | Over 25% |
| Neutral | -5% to 10% | -5% to 15% | -5% to 20% | -5% to 25% |
| Reduce | -5% or Worse | -5% or Worse | -10% or Worse | -10% or Worse |

Deviations from expected price ranges/targets due to price movement and/or volatility will be reviewed by the analyst and research management on a timely basis. Price targets are only required on Buy rated stocks; The analyst may choose to have price targets on Neutral or Reduce rated stocks, but it is not required. Action taken by an investor should be based upon their personal investment objectives and risk tolerance compared to a stock's expected performance and risk ranking.

Estimate Bias: While current annual estimates are our best judgment at this time, we assign an "Up", "Neutral" or "Down" bias based on our expectation for fundamental changes over the next 12 months.

SunTrust Robinson Humphrey ratings distribution as of  6/8/2006:

| Coverage Universe | | | | Investment Banking Clients Past 12 months | | |
|---|---|---|---|---|---|---|
| Rating | Count | Percent | | Rating | Count | Percent* |
| Buy | 141 | 50% | | Buy | 24 | 17% |
| Neutral | 131 | 47% | | Neutral | 14 | 11% |
| Sell/Reduce | 8 | 3% | | Sell/Reduce | 2 | 25% |

*Percentage of Investment Banking clients in Coverage Universe by rating

## Other Disclosures

Information contained herein has been derived from sources believed to be reliable but is not guaranteed as to accuracy and does not purport to be a complete analysis of the security, company or industry involved. This report is not to be construed as an offer to sell or a solicitation of an offer to buy any security. SunTrust Capital Markets, Inc. and/or its

officers or employees may have positions in any securities, options, rights or warrants. The firm and/or associated persons may sell to or buy from customers on a principal basis. Investors may be prohibited in certain states from purchasing some over-the-counter securities mentioned herein. Opinions expressed are subject to change without notice. The information herein is for persons residing in the United States only and is not intended for any person in any other jurisdiction.

SunTrust Capital Markets, Inc. is a registered broker-dealer. It is owned by SunTrust Banks, Inc. ("SunTrust") and affiliated with SunTrust Investment Securities, Inc. SunTrust Robinson Humphrey is a service mark of SunTrust Capital Markets, Inc. Despite this affiliation, securities recommended, offered, sold by, or held at SunTrust Capital Markets, Inc. and at SunTrust Investment Securities, Inc. (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including SunTrust); and (iii) are subject to investment risks, including the possible loss of the principal amount invested. SunTrust may have a lending relationship with companies mentioned herein.

© SunTrust Capital Markets, Inc. 2006. All rights reserved. Reproduction or quotation in whole or part without permission is forbidden.

**ADDITIONAL INFORMATION IS AVAILABLE** at our website, www.suntrustrh.com, or by writing to: SunTrust Robinson Humphrey, Research Department, 3333 Peachtree Road N.E., Atlanta, GA 30326-1070

B

# SunTrust Robinson Humphrey℠

A Division of SunTrust Capital Markets, Inc

June 12, 2006

**Amit Hazan**
212-319-3915
amit_hazan@rhco.com

Jonathan Block
212-319-3687
jonathan_block@rhco.com

# Cyberonics, Inc

Rating: **Neutral**  Price Target: **NA**

Estimate Bias: **Neutral**  Risk Rank: **Speculative**

**CYBX:** SEC Launches Informal Probe into Option Grants

## Summary

- **SEC Contacts CYBX.** According to a report in the *Wall Street Journal*, the SEC has launched an informal probe into CYBX stock option practices. The move highlights a concern we raised last week (*see note dated 6/8/06: "Moving to Neutral on Option Grant Concerns & Reimbursement Delays"*) regarding stock option grants to three executives on the evening of June 15, 2004 (just hours after a positive FDA Panel). We recap the facts again in the body of this note.
- **We Fully Stand by Our Claim.** To clarify our claim, it breaks down into two issues: (1) the timing of the option grants, and (2) their exercise price. First, we remind investors that the very spirit of stock option grants is to align mgmt's interests more closely with its shareholders. But by granting these options, we feel this mgmt knowingly abused that principle and acted in their own self interest with material information at a time when investors could not do so. Secondly, mgmt's response to this issue last week claims the June 14th exercise price of $19.58 was "fair market value," because the rules allow using the most recent day's closing price. While the exact letter of the law may well have been followed, it seems clear to us that the very intent of the regulation was manipulated. Fully aware of the positive FDA Panel decision, mgmt surely realized the "fair" value of its equity was worth much more than the $19.58 share price a day prior to when this very controversial event took place. If so, then they manipulated the "fair value" definition for their benefit, as the intent of the regulation is to get as close as possible to capturing the "true" value of the stock. If mgmt wanted to properly align themselves with shareholders for the 60 month vesting period (as they have claimed), they should have first let the event be factored into the share price. Incidentally, investors who bought shares on the morning after the FDA Panel have lost 35% of their investment to date (two years on), but the three executives acting on the same information are still "in the money" by over 10%.
- **Credibility is the Real Issue.** Whether it results in regulatory violations or not, the actions appear unethical to us, and akin "in effect" to the broader stock option compensation abuses currently unfolding elsewhere. The abuse unfortunately takes on a larger significance here due to existing credibility issues for this mgmt. It is increasingly evident that the value of CYBX is discounted a good deal due to the current CEO, and we believe stock appreciation will continue to be limited as a result.

| Fundamentals | | FYE – Apr | 2006 | 2007E | | 2008E | |
|---|---|---|---|---|---|---|---|
| | | EPS | Actual | Old | New | Old | New |
| Price (Jun 09, 2006) | $22.69 | 1Q | ($0.76)A | ($0.15)E | ($0.15)E | NA | NA |
| 52-Week Range | $47.77-$19.84 | 2Q | ($0.88)A | ($0.07)E | ($0.07)E | NA | NA |
| Mkt. Cap. (mil.) | $567.3 | 3Q | ($0.58)A | $0.02E | $0.02E | NA | NA |
| Shares Out. (mil.) | 25.0 | 4Q | ($0.21)A | $0.11E | $0.11E | NA | NA |
| Float (mil.) | 19.4 | Year | ($2.44)A | ($0.09)E | ($0.09)E | **NA** | **NA** |
| Avg. Daily Trading Vol. (000) | 637 | | | | | | |
| Book Value/Share | NA | P/E | NA | | NA | | |
| Dividend/Yield | $0.00/Nil | EV/EBITDA | NA | | NA | | NA |
| ROE | NA | Revenue (mil.) | $123.4 | $147.6 | $147.6 | NA | NA |
| Cash & Equiv (mil.) | $93.40 | Operating Margin | NA | NA | NA | NA | NA |
| Debt/Cap. | 100.0% | Mean EPS | ($2.44) | ($0.02) | ($0.02) | $0.57 | $0.57 |
| Est. 5-Year EPS Growth | NA | Short Interest (000) | | Estimate Changes | | 2007 | 2008 |
| Convertible | No | 5/06 | 5398 | 02/08/06 | ($0.09) | | |
| Major Index Membership | S&P 600 | 4/06 | 5352 | 08/19/05 | $0.57 | | |
| | | 3/06 | 5440 | 07/27/05 | $0.36 | | |
| | | 2/06 | 5411 | | | | |

**PLEASE SEE IMPORTANT DISCLOSURES STARTING ON PAGE 3**

## Comments

- **SEC Contacts CYBX.** According to a report in the *Wall Street Journal*, the SEC has now launched an informal probe into CYBX stock option practices. The move highlights a concern we raised last week (see note dated 6/8/06: *"Moving to Neutral on Option Grant Concerns & Reimbursement Delays"*) regarding stock option grants to three executives on June 15, 2004. Specifically, 170,000 options were granted that night, just a few hours after a very underlined(controversial) FDA Panel voted to approve VNS therapy for depression. With a full understanding of the materiality of the event (this was undoubtedly the single greatest event in the company's history), this management and board of directors granted the options with a prior day's (June 14th) exercise price of $19.58. The stock rose 78% on June 16, yielding the executives a combined overnight paper profit of ~$2.5M.

- **We Fully Stand by Our Claim.** To further clarify our claim, it breaks down into two issues: (1) the timing of the option grants, and (2) their exercise price. As to the first issue, we understand the very spirit of stock option grants to be an alignment of managers' interests more closely with those of its shareholders (sharing alike in events that unfold). But by granting the options on the evening in question, this management knowingly abused that principle, acting in their own self interest with material information at a time when their shareholders and investors could not do so. Secondly, management's response to this issue in an 8-K filing last week claims the June 14th exercise price of $19.58 was "fair market value," because the rules do allow using the most recent day's closing price. We don't agree. While the exact letter of the law may very well have been followed, it seems clear to us that the very intent of the regulation was manipulated. Fully aware of the positive FDA Panel decision, this management team and its directors surely realized the "fair" value of its equity was worth much more than the mere $19.58 share price prior to when this very controversial event took place? If so, then we believe they improperly took advantage of this definition for their own benefit, as the intent of the regulation is to come as close as possible to capturing the "true" value of the stock. If management had wanted to properly "align" themselves with shareholders for the 60 month vesting period (as they claimed last week), they should have allowed the event to be factored into the share price. Incidentally, investors who bought shares on the morning after the FDA Panel have now lost 35% of their investment value to date (two years on), but the three executives acting on the same information are still "in the money" by over 10%.

- **Credibility is the Real Issue.** Whether the facts above (which have not been disputed) results in regulatory violations or not, these actions appear unethical to us, and are akin "in effect" to the broader stock option incentive compensation abuses currently unfolding at a number of other companies. While Cyberonics' abuse does not appear to be a regular systemic pattern, it unfortunately takes on a much larger significance when put into a historical context of credibility issues with this management team. Simply put, it has become increasingly evident to us that the value of CYBX common continues to be meaningfully discounted due to the presence of the current CEO, in our opinion, and we believe that stock appreciation will continue to be limited by this factor. At the end of the day, shareholders will have to decide whether this management team and its board of directors have fulfilled their fiduciary duty. We are currently hard pressed to reach such a conclusion.

- **Reiterate Neutral Rating.**

## Company Description

Cyberonics is a neuromodulation company that designs, develops and markets implantable medical devices that provide therapy via vagus nerve stimulation (or VNS) for the treatment of epilepsy and other debilitating neurological and psychiatric diseases / disorders. Until recently, VNS therapy had only been approved for use adjunctively in reducing the frequency of seizures in patients that are "refractory" (or resistant) to antiepileptic drugs (AEDs). Recently, the FDA approved the same device for the treatment-resistant depression indication as well. Cyberonics was founded in 1987 and is headquartered in Houston, Texas.

## Analyst Certification

I, Amit Hazan, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject company(ies) and its (their) securities. I also certify that I have not been, am not, and will not be receiving direct or indirect compensation in exchange for expressing the specific recommendation(s) in this report.

## Important Disclosures

- SunTrust Capital Markets, Inc. makes a market in the following companies at the time of this report:  Cyberonics, Inc

Analyst compensation is based upon stock price performance, quality of analysis, communication skills, and the overall revenue and profitability of the firm, including investment banking revenue.

As a matter of policy and practice, the firm prohibits the offering of favorable research or a specific research rating as consideration or inducement for the receipt of business or compensation.  In addition, analysts and associated persons preparing research reports are prohibited from owning securities in the subject companies.



Data Source: Prices / ExshareSource: FactSet Research Systems

| Rating And Price Target History (CYBX) | | | |
|---|---|---|---|
| Date | Rating | Target | Closing |
| 09/30/2004 | Neutral | NA | $20.46 |
| 02/04/2005 | Buy | $47.00 | $39.78 |
| 03/21/2005 | | $50.00 | $39.21 |
| 07/18/2005 | | $56.00 | $44.98 |
| 02/08/2006 | | $45.00 | $28.31 |
| 05/30/2006 | | $38.00 | $25.00 |
| 06/08/2006 | Neutral | NA | $23.79 |

On February 27, 2004, STRH implemented its current rating system (defined below). On that date we also reinstated the use of price targets that had been discontinued on December 3, 2002.

## Definition of Ratings

SunTrust Robinson Humphrey assigns one of three ratings to stocks covered by our Research Department: **Buy, Neutral, Reduce.**

In addition, we assign a risk rank to each stock based on a combination of fundamental and stock volatility factors:
**Low** = Low stock price volatility reflected by high predictability of financial results.
**Moderate** = Moderate stock price volatility reflected by medium predictability of financial results.
**High** = High stock price volatility reflected by inconsistent predictability of financial results.
**Speculative** = Greatest stock price volatility reflected by low predictability of financial results.
**Venture** = Recommended only for maximum risk oriented and well-diversified portfolios.

Our ratings are a function of the risk ranking (higher return expectations for higher risk) and the absolute expected total return (price appreciation plus dividends) that result in our estimated 12-month price target. Please refer to the grid below for additional detail.

| Performance Definition Scale | | | | |
|---|---|---|---|---|
| *Total return (capital gain/loss + dividends) expected over the next 12 months* | | | | |
| Rating | Low Risk | Moderate Risk | High Risk | Speculative |
| Buy | Over 10% | Over 15% | Over 20% | Over 25% |
| Neutral | -5% to 10% | -5% to 15% | -5% to 20% | -5% to 25% |
| Reduce | -5% or Worse | -5% or Worse | -10% or Worse | -10% or Worse |

Deviations from expected price ranges/targets due to price movement and/or volatility will be reviewed by the analyst and research management on a timely basis. Price targets are only required on Buy rated stocks; The analyst may choose to have price targets on Neutral or Reduce rated stocks, but it is not required. Action taken by an investor should be based upon their personal investment objectives and risk tolerance compared to a stock's expected performance and risk ranking.

Estimate Bias: While current annual estimates are our best judgment at this time, we assign an "Up", "Neutral" or "Down" bias based on our expectation for fundamental changes over the next 12 months.

SunTrust Robinson Humphrey ratings distribution as of 6/11/2006:

| Coverage Universe | | | | Investment Banking Clients Past 12 months | | |
|---|---|---|---|---|---|---|
| Rating | Count | Percent | | Rating | Count | Percent* |
| Buy | 147 | 49% | | Buy | 26 | 18% |
| Neutral | 141 | 47% | | Neutral | 15 | 11% |
| Sell/Reduce | 9 | 3% | | Sell/Reduce | 2 | 22% |

*Percentage of Investment Banking clients in Coverage Universe by rating

## Other Disclosures

Information contained herein has been derived from sources believed to be reliable but is not guaranteed as to accuracy and does not purport to be a complete analysis of the security, company or industry involved. This report is not to be

construed as an offer to sell or a solicitation of an offer to buy any security. SunTrust Capital Markets, Inc. and/or its officers or employees may have positions in any securities, options, rights or warrants. The firm and/or associated persons may sell to or buy from customers on a principal basis. Investors may be prohibited in certain states from purchasing some over-the-counter securities mentioned herein. Opinions expressed are subject to change without notice. The information herein is for persons residing in the United States only and is not intended for any person in any other jurisdiction.

SunTrust Capital Markets, Inc. is a registered broker-dealer. It is owned by SunTrust Banks, Inc. ("SunTrust") and affiliated with SunTrust Investment Securities, Inc. SunTrust Robinson Humphrey is a service mark of SunTrust Capital Markets, Inc. Despite this affiliation, securities recommended, offered, sold by, or held at SunTrust Capital Markets, Inc. and at SunTrust Investment Securities, Inc. (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including SunTrust); and (iii) are subject to investment risks, including the possible loss of the principal amount invested. SunTrust may have a lending relationship with companies mentioned herein.

© SunTrust Capital Markets, Inc. 2006. All rights reserved. Reproduction or quotation in whole or part without permission is forbidden.

**ADDITIONAL INFORMATION IS AVAILABLE** at our website, www.suntrustrh.com, or by writing to: SunTrust Robinson Humphrey, Research Department, 3333 Peachtree Road N.E., Atlanta, GA 30326-1070

C

C1

FRIDAY, JUNE 9, 2006

# The New York Times

# Business Day

## Questions Raised on Another Chief's Stock Options

### By BARNABY J. FEDER

New accusations of corporate stock option abuse were leveled yesterday, this time against Cyberonics, a medical device maker that is no stranger to controversy.

The company's board approved stock option grants for top executives one evening in June 2004, a few hours after receiving positive news about the regulatory prospects for a promising product. When trading began the next morning, Cyberonics shares soared, and along with them, the value of the options.

Yesterday, Cyberonics shares plunged nearly 16 percent when trading began, after Amit Hazan, a device industry analyst for SunTrust Robinson Humphrey, published an investor advisory about his concerns over the timing of those stock options, which were granted to Robert

### A board vote creates almost instant paper profit of $2.3 million.

P. Cummins, Cyberonics' chairman and chief executive, and two of his lieutenants.

The analyst's report criticized the option grant, saying it gave Mr. Cummins an instant paper profit of $2.3 million, and profit of $150,000 each for the other two executives, but did nothing for other shareholders.

Mr. Cummins and the company countered that because the option grant had been immediately reported to the public and that he and the other men had not yet exercised any

of the options, there was no cause for controversy. By the end of regular trading yesterday, the stock had regained most of its losses, closing down 20 cents at $23.59.

Mr. Hazan did not accuse Cyberonics of backdating the options to a day when prices were particularly low — a practice that has recently been reported among more than 30 companies and has become the subject of a Justice Department investigation. But, he wrote, "the effect was exactly the same."

A number of technology companies, most recently McAfee, which makes antivirus software, have announced the departures of senior executives as a result of questions about options dating. The Securities and Exchange Commission has been



Robert P. Cummins is chairman and chief executive of Cyberonics.

Brendan McDermid/Reuters

Continued on Page 4

# Yet Another Company's Stock Option Grants Are Raising Questions

## Continued From First Business Page

investigating issues surrounding dating for more than a year.

Mr. Hazan, who said he was surveying all the companies he follows for potential backdating issues, focused on Cyberonics options that were granted at a special board meeting on the evening of June 15, 2004. That was only hours after a Food and Drug Administration advisory panel recommended that the agency approve Cyberonics's request to market its implantable nerve stimulator as a treatment for severe chronic depression.

Mr. Cummins received options on 150,000 shares at an exercise price of $19.58, the closing price the day before the F.D.A. panel's recommendation. The chief medical officer, Dr. Richard L. Rudolph, and the vice president for regulatory affairs, Alan D. Totah, who played pivotal roles in winning the panel's backing, each received options on 10,000 shares at that price.

The shares soared when trading resumed the next day, June 16, closing at $34.81, as investors bet that Cyberonics might soon be selling a new approach to treating the most severe forms of depression, a condition that affects millions of Americans annually.

"The board acted on an event before investors were able to do so," Mr. Hazan said yesterday in an interview. "It's a perfect example of an abusive option. Options are supposed to be an incentive to align executives' interests with shareholders. This was just a reward."

Mr. Hazan said that because the options were priced below what would become the market value the instant that trading resumed, they should have been accounted for as compensation in that quarter. Because the company did not do so, it might have to restate its earnings for that fiscal year, he said.

Mr. Cummins, an imposing and combative executive already known for prickly relations with critical analysts and skeptical investors,

e-mailed Mr. Hazan yesterday, sarcastically thanking him for "a completely uninformed note" about "a nonissue," Mr. Hazan said.

Mr. Cummins said in a telephone interview that all the options had been legally priced, properly reported and approved by the company's auditors and lawyers. He acknowledged that the options had been priced lower but said that they had been designed to conserve the company's cash and to serve as an incentive because they vested over a five-year period. The only way to benefit from them, Mr. Cummins said, would be to "create and sustain value over time."

Mr. Hazan said that the company's response did nothing to change his attitude. "My problem is the timing of when they did this," Mr. Hazan said. "The fact that it doesn't vest immediately doesn't mean it was ethical, and I haven't heard from one institutional investor today who disagrees with me."

The options granted to the executives in June 2004 are now 38 percent vested. At yesterday's closing price for Cyberonics, the value of the vested options was $601,500 to Mr. Cummins and $40,100 each to the others.

Mr. Cummins and the company said he exercised options on 350,000 shares in February 2005 and sold them at prices ranging from $40 to $45, but those options had been granted earlier: in October 1997, March 1999 and June 2001. He has been chief executive of Cyberonics since 1995.

### Volatility at Cyberonics

The VNS Therapy System, a Cyberonics device approved for the treatment of epilepsy and chronic depression, has had an uphill battle at the Food and Drug Administration. An analyst has questioned options granted to the company's chief executive, Robert P. Cummins, just after a positive development in the F.D.A. process.



$50 CYBERONICS SHARE PRICE

**① 6/16/04** Shares jump to $34.81. Mr. Cummins's options have a paper profit of $2.3 million.

**② 6/15/04** An F.D.A. advisory panel, meeting while stock trading is suspended, recommends approval of VNS for depression. That night, Cyberonics grants 150,000 options to Mr. Cummins at the previous day's price of $19.58.

**③ 8/11/04** F.D.A. rejects panel recommendation; shares fall to $14.36 the following day.

**④ 2/3/05** After successfully lobbying the F.D.A., Cyberonics gets its approval, sending the shares to $39.01

**⑤ 6/8/06** An analyst questions the timing of the options grant and downgrades the stock.

2004   2005   2006

Source: Bloomberg Financial Markets

The New York Times

but no power turned on.

Mr. Cummins bitterly criticized the agency at the time. Through a combination of lobbying and additional data, Cyberonics got the F.D.A. to reverse its stance, with conditions, in February 2005. It received final approval last July to market VNS Therapy for depression, but not before the controversy led to an inquiry by the Senate Finance Committee into the tangled process.

Since then, Mr. Cummins spent much of his time battling insurers who label the therapy experimental and who are hesitant to pay for it as a depression treatment.

By the end of April, 1,100 patients had VNS implants for depression, and 1,200 more were appealing for insurance coverage, Cyberonics said.

Mr. Hazan, the analyst, said that he was optimistic about the longer term prospects for VNS but that assistance from insurers was another factor in his decision to downgrade his rating on Cyberonics yesterday to neutral from buy.

The company recently reported that it lost $5.2 million, or 21 cents a share, on revenue of $123.4 million in the fiscal year that ended April 28.

Cyberonics and analysts who favor the stock say much of the insurers' resistance stems from the focus on the original clinical trials on three-month results, too short a period to demonstrate an advantage. But more data, they say, has shown that the rates of remission of depression symptoms in VNS patients remain high in two-year follow-up data while those receiving other treatments suffer relapses.

Data presented last month at a scientific meeting in Toronto also suggested that rates of suicide and hospitalization drop steadily for patients on VNS Therapy for two years.

The pro-VNS argument received an indirect boost yesterday with the publication in The Journal of Clinical Psychiatry of research documenting the high failure rate of conventional drug and electroconvulsive therapies for patients suffering recurrent bouts of severe depression.

As it turned out, Cyberonics's price began falling soon after the June advisory panel meeting, and the day after the F.D.A. took the unusual step of ignoring the panel's recommendation and refusing to approve the application.

Cyberonics' implant, a battery-powered, pacemakerlike device that stimulates the vagus nerve just below the neck, has been used widely since 1997 as an F.D.A.-approved treatment for epilepsy. But the clinical trial data the F.D.A. considered in 2004 did not show conclusively that VNS Therapy, as the treatment is called, was effective for severe depression when compared with patients who had a device implanted

D



**Business: Loren Steffy**

June 14, 2006, 2:26AM
## Losing credibility not an option for most companies

By LOREN STEFFY
Copyright 2006 Houston Chronicle

Merit is in the eye of the shareholder. That's a concept that Cyberonics, the Houston medical device company, is having a little trouble with. It's part of the reason the company's shares have fallen almost 10 percent since late last week.

The drop came after Amit Hazan, an analyst with SunTrust Robinson Humphrey in New York, issued a report questioning Cyberonics' award of 170,000 stock options to Chief Executive Skip Cummins and two other executives.

Cyberonics issued the options on June 15, 2004, the day a panel of the U.S. Food and Drug Administration recommended approving the company's VNS Therapy device to treat depression. The options had a strike price of $19.58, the closing price of the previous day.

The problem is that Cyberonics' shares were halted that day, pending the FDA report. Other investors, in other words, couldn't have bought the stock at that price when they heard the news.

The next day, when trading resumed, Cyberonics' shares zoomed 78 percent. Hazan estimates by granting the options when it did, the company gave Cummins a $2.3 million boost, at least on paper, and about $150,000 each for the other two executives.

Cyberonics' response to all this has been to trash the analyst. His report was "inaccurate and without merit" the company said last week.

The Securities and Exchange Commission saw enough merit to begin its own inquiry, which the company confirmed on Monday.

The market apparently is worried that Cyberonics will get drawn into the burgeoning "options timing" scandal, which so far has ensnared more than 30 companies, according to the Wall Street Journal.

With options timing, directors award executives options at a low point in the market, perhaps by backdating them. The tactic makes the options worth more if the stock rises. That didn't happen with Cyberonics. As the company is quick to point out, the options it granted in June 2004 were disclosed, they were awarded at the market price, and they haven't been exercised.

## Not all concerned

Not all analysts share Hazan's concerns. William Plovanic at First Albany Capital, who rates the stock a "buy," says management properly addressed the issue. Even so, he notes it's likely to hurt the stock in the short term.

A spokeswoman for the company, who didn't want to be quoted, directed me to the company's 2004 proxy statement, which showed that Cummins was awarded the same number of options on the same date a year earlier, June 15, 2003.

But Plovanic's report, which the company sent to me, says the 2004 options were awarded at a board meeting held by phone late on June 15, after the FDA panel's decision, to reward Cummins for the results.

That would seem to undercut the notion that the options were a routine grant.

Hazan, who rated the stock a "buy" before he lowered it to "neutral" last week, says all of that misses the point.

"It was not correct or ethical for them to do what they did," he told me in an interview. "It may be a microcosm of what's happening with this management team."

## Previous attacks

Cyberonics' dispute with Hazan isn't the first time it's trashed an analyst for research it didn't like. In October, it blasted Alex Arrow, an analyst with Lazard Capital Markets, for attempting to gauge the reaction of psychiatrists who attended meetings at which the company hawked its VNS device as a depression treatment.

Cyberonics sent an e-mail to institutional investors criticizing Arrow's tactics. Yet a few months later, the company reported slower-than-expected sales, as Arrow predicted, and cut its outlook because VNS sales for depression were less than it had forecast.

The lingering problem for Cyberonics is one of credibility. Options grants don't happen by themselves, and they aren't a perk that an executive can get without cooperation. For example,

they are awarded by the board.

Cyberonics says it complied with all securities laws, and so far no one has refuted that. That doesn't mean Hazan's concerns are without merit.

When a CEO gets favorable treatment, when a board puts his interests ahead of the interests of the investors it's supposed to represent, it should raise a red flag.

To Cyberonics, such concerns lack merit. In the eyes of investors, they don't.

*Loren Steffy is the Chronicle's business columnist. His commentary appears Sundays, Wednesdays and Fridays. Contact him at loren.steffy@chron.com. His blog is at blogs.chron.com/lorensteffy/.*



**ADVERTISING:** Contests | Fraudulent Ads | Information & Rates | Place An Ad | Singles In Houston | Yellow Pages

**CHRONICLE:** Subscribe Now | Subscriber Services | Buy Photos | Chronicle in Education | Corrections | Public Affairs | RSS Feeds 🔊 RSS

**SERVICES:** Copyright Notice & Privacy Policy | Help | Registration | Report a Problem | Site Map | News Alerts | Newsletters

Subscribe to the paper now! **REAL Cities**   Donate to Good Fellows

E

**Bloomberg.com**



## Cyberonics Disputes Analyst Comments on Option Grants (Update1)

By Robert Greene

June 9 (Bloomberg) -- Cyberonics Inc. said an analyst's report on the company's granting of stock options is ``inaccurate and without merit.''

The Houston-based maker of medical devices issued the response after analyst Amit Hazan at SunTrust Robinson Humphrey in New York yesterday downgraded Cyberonics shares, saying stock options granted two years ago may face U.S. scrutiny.

``The options were properly approved, priced and granted at fair market value,'' Cyberonics' chief financial officer, Pam Westbrook, said yesterday in an e-mail to investors that was disclosed in a regulatory filing today. ``The grants were promptly disclosed to the public and the grants were properly accounted for in the company's audited financial statements. None of the options have been exercised or sold.''

Hazan's report said that Chief Executive Officer Robert P. ``Skip'' Cummins earned ``an overnight paper profit of about $2.3 million'' on June 16, 2004. The options were issued on June 15, the same day that an advisory panel to the U.S. Food and Drug Administration had issued a favorable recommendation on the company's treatment for depression, known as vagus nerve stimulation, Hazan said. Trading was halted that day, he said.

Options were issued to Richard Rudolph, the vice president and chief medical officer, and Alan Totah, a vice president at the same time, according to the note he sent to clients.

Hazan said that he stands by his report and that the response from Cyberonics doesn't discuss his central point.

``It does not address our one hard claim we make, that it appears unjustified and unethical to issue those grants on the night of the single greatest event in the company's history,'' Hazan said in an e-mailed comment today. ``To this issue they have not responded.''

Cyberonics shares rose 16 cents to $23.75 as of 9:58 a.m. New York time in Nasdaq Stock Market composite trading.

To contact the reporter on this story: Robert Greene in Washington at **rgreene2@bloomberg.net** .

*Last Updated: June 9, 2006 10:03 EDT*



©2007 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks