UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT P. "SKIP" CUMMINS, | § § § | |
| Plaintiff, | § § | Case No. 07 CV 4633 (JGK) |
| vs. | § § | _____ |
| SUNTRUST CAPITAL MARKETS, INC., AMIT HAZAN, and JONATHAN BLOCK, | § § § | JURY DEMAND |
| Defendants. | § § § | |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1 of this Court, Defendants SunTrust Capital Markets, Inc. ("STCM"), Amit Hazan ("Hazan"), and Jonathan Block ("Block," together with STCM and Hazan, "SunTrust") present the following Statement of Material Facts ("SMF"), as to which there is no genuine issue to be tried, in support of their motion for summary judgment. In accordance with the requirements of Local Rule 56.1(d), each statement of material fact is followed by a citation to relevant evidence. All documents referenced as evidence have been lodged with the Court for filing under seal as provided for in the agreed amended protective order.

For the convenience and ease of the Court, the evidence citations utilized by Defendants below reference specific exhibits listed in the appended Summary Index of Exhibits. The individual statements put forth by the Defendants have also been organized by subject heading.

**A.    The Emergence of the Stock-Option Controversy.**

1.    Prior to 2006, academic work by legal and financial scholars suggested that improper stock option grants might be widespread in public companies, particularly from the start of the high-tech boom in the 1990s through the Sarbanes-Oxley Act of 2002. Sarbanes-Oxley, by forcing companies to report option grants within two days, left less leeway to retroactively date a grant. *See* SMF EXHIBIT #1A-T.

2.    The *Wall Street Journal* quoted Arthur Levitt, a former Chairman of the Securities and Exchange Commission (SEC) as saying that backdating "represents the ultimate in greed" and that "[i]t is stealing, in effect. It is ripping off the shareholders in an unconscionable way." *See* SMF EXHIBIT #1B.

3.    Corporate executives often denied that they had done anything improper with regard to their receipt of suspicious option grants. *See* SMF EXHIBIT #1A.

4.    In 2006, the *Wall Street Journal*, in its "Perfect Payday" series, reported on a number of companies that were suspected of option backdating and springloading, including the following: Affiliated Computer Services Inc.; Altera Corp.; Boston Communications Group; Brooks Automation Inc.; Caremark Rx; CNET Networks; Comverse Technology; Cyberonics, Inc.; F5 Networks; Jabil Circuit; Juniper Networks; KLA-Tencor Corp; Meade Instruments; Medarex; Mercury Interactive Corp.; Openwave Systems; Nyfix; Power Integrations Inc.; Sycamore Networks; Quest Software; Renal Care Group; RSA Security Inc.; SafeNet; Semtech; Trident Microsystems; UnitedHealth; Vitesse Semiconductor Corp; and many others. In the wake of these reports, newspapers, analysts and various branches of the government scrutinized thousands of companies and

- 2 -

exposed many instances of stock option manipulation. *See* SMF EXHIBIT #1A-T & SMF EXHIBIT #2.

5.      The *Wall Street Journal* reported in 2006 that legal and other problems could arise from "springloading" of stock options, "a practice in which companies grant executive options ahead of potentially market-moving news." The newspaper also extensively covered the legal and other problems that could arise from "backdating" of stock options, which it described as "deliberately moving the grant date [of an option] … to a more beneficial time when the [stock] price [is] lower," so as to "give[] the recipient an instant paper profit." *See* SMF EXHIBIT #1E & SMF EXHIBIT #1T.

6.      Delaware Courts, whose rulings govern Cyberonics' practices, have held that spring-loading can be a breach of fiduciary duty, stating that:

> Granting spring-loaded options, without explicit authorization from shareholders, clearly involves an indirect deception. A director's duty of loyalty includes the duty to deal fairly and honestly with the shareholders for whom he is a fiduciary. It is inconsistent with such a duty for a board of directors to ask for shareholder approval of an incentive stock option plan and then later to distribute shares to managers in such a way as to undermine the very objectives approved by shareholders. This remains true even if the board complies with the strict letter of a shareholder-approved plan as it relates to strike prices or issue dates.
>
> The question before the Court is not, as plaintiffs suggest, whether spring-loading constitutes a form of insider trading as it would be understood under federal securities law. The relevant issue is whether a director acts in bad faith by authorizing options with a market-value strike price, as he is required to do by a shareholder-approved incentive option plan, at a time when he *knows* those shares are actually worth more than the exercise price. A director who intentionally uses inside knowledge not available to shareholders in order to enrich employees while avoiding shareholder-imposed requirements cannot, in my opinion, be said to be acting loyally and in good faith as a fiduciary.
>
> *See* SMF EXHIBIT #3 at pg. 592-593.

LEGAL02/30941795v1

**B.    Cyberonics' Investigation, Its Subsequent Restatements** ███████████

7.    As early as May 2006, there were rumors swirling in the investment community

that Cyberonics might be investigated for its stock options practices.  *See* SMF EXHIBIT

#4.

8.    On June 9, 2006, the SEC launched an internal investigation of Cyberonics ███████

███████████ *See* SMF EXHIBIT #2 & SMF EXHIBIT #5, at pg. F-7.

9.    On June 26, 2007, Cyberonics was subpoenaed by the United States Attorney's

Officer for the Southern District of New York regarding its option grants.  *See* SMF

EXHIBIT #2 & SMF EXHIBIT #5, at pg. F-7.

10.    On June 26, 2007, Cyberonics' Audit Committee, a subcommittee of its Board of

Directors, commenced an independent investigation and review of the company's stock

option grant practices and related accounting, and retained ██████████ Morgan,

Lewis & Bockius LLP ██████ securities team, which in turn retained FTI Consulting - a

forensic accounting firm.  *See* SMF EXHIBIT #5, at pg. F-7, F-35 & SMF EXHIBIT #6,

at pg. 2.

11.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████

*See* SMF EXHIBIT #6; SMF EXHIBIT #7, at 61:8-24 & 62:14-21; SMF EXHIBIT #12,

at 114:14-115:19.

LEGAL02/30941795v1

12.



*See* SMF EXHIBIT #5, at pg F-7-14, F-33-38; SMF EXHIBIT #6, at pg. 12, 19, 36, 87, 121-4; SMF EXHIBIT #7 85:3-87:22; SMF EXHIBIT #8; SMF EXHIBIT #10 at 90:17-91:18.

13.

*See* SMF EXHIBIT #6, at pg. 118-9 & SMF EXHIBIT #9, at 175:23-180:11 & 247:24-248:2.

14.

*See* SMF EXHIBIT # 6; SMF EXHIBIT #7, at 289:22-291:22; SMF EXHIBIT #10, at 119:19-23; SMF EXHIBIT #11.

15.

*See* SMF EXHIBIT #10, at 120:14-24.

LEGAL02/30941795v1

16. ███████████████████████████████████

███████████████████████ *See* SMF EXHIBIT #9, at 269:5-21; SMFEXHIBIT

#10 at 80:11-81:1.

17. ███████████████████████████████████

███████████████████████████████████

*See* SMF EXHIBIT #12, at 151:10-156:14.

18.    On November 20, 2006, Cyberonics publicly announced its need to restate over

ten million dollars of reported earnings because of improper accounting for options

grants.  On that same day, it also announced that, effective immediately, Cummins would

resign from his position as Chairman, CEO and President, and that Westbrook would

resign as CFO. *See* SMF EXHIBIT #8.

19.    Cummins' resignation, given at the same time as the announced financial

restatements, was reported on by the media as a forced resignation. *See* SMF EXHIBIT

#13.

20.    Cummins' resignation was linked to the broader options-dating scandal that was

described by *USA Today* in a special report on Cyberonics' option-granting practices as

"one of the biggest financial scandals in years . . . ." *See* SMF EXHIBIT #2; SMF

EXHIBIT #13; SMF EXHIBIT #14; SMF EXHIBIT #15.

21. ███████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████ *See* SMF EXHIBIT #6; SMF EXHIBIT #7, at 171:25-172:4 & 177:20-

23; SMF EXHIBIT #9, at 285:8-25; SMF EXHIBIT #12, at 116:23-117:17.

LEGAL02/30941795v1

22.     Kevin Moore, Tony Coelho and Dr. Stanley Appel all resigned from the

Cyberonics Board about two months after Cummins did, on January 29, 2007. *See* SMF

EXHIBIT #16.

23.     ████████████████████████████████████████

*See* SMF EXHIBIT #17, at 148:14-24.

24.     Cyberonics had to restate over $18 million due to improper accounting for option

grants. *See* SMF EXHIBIT #5, at pg. F-7-14.

**C.     The SunTrust Statements and Their Background.**

25.     At the time of the SunTrust Statements, Messrs. Hazan and Block were residents

of New York and equity research analysts at SunTrust. While at SunTrust, Hazan and

Block wrote reports about the companies they covered based on a variety of factors,

including their review of the companies' public financial reports and information; their

reading of newspaper articles and op-eds; their subjective assessment of the attributes of

the particular management teams; and their read on "chatter" among investors and other

analysts. The target audience for these reports was both investors and potential investors.

*See* SMF EXHIBIT #18, at ¶¶ 1-2 & SMF EXHIBIT #19, at ¶¶ 1-2.

26.     Messrs. Hazan and Block were asked by their manager at SunTrust, Rick Inskeep,

to investigate the companies that they covered for improper option grants, given the

importance of that issue to investors and the general public in mid-2006. *See* SMF

EXHIBIT #18, at ¶¶ 4-5; SMF EXHIBIT #19, at ¶¶ 6-7; SMF EXHIBIT #20.

27.     In their investigation, which turned up benign for most companies, Hazan and

Block uncovered suspicious activity at Cyberonics, Inc., most notably regarding options

dated June 15, 2004. *See* SMF EXHIBIT #18, at ¶¶ 5-18; SMF EXHIBIT #19, at ¶¶ 7-18; SMF EXHIBIT #21; SMF EXHIBIT #22.

28.    Mr. Hazan was aware of concerns in the investment community regarding the questionable Cyberonics June 15, 2004 option grants. *See* SMF EXHIBIT #18, at ¶ 6; SMF EXHIBIT #23.

29.    On June 14, 2004, Cyberonics' stock price at the close of trading was $19.58. *See* SMF EXHIBIT #18, at ¶ 7; SMF EXHIBIT #19, at ¶ 8; SMF EXHIBIT #21; SMF EXHIBIT #22.

30.    On June 15, 2004, NASDAQ trading in Cyberonics stock was suspended for the entire day during a Food and Drug Administration panel proceeding concerning VNS therapy for depression. The panel gave a positive recommendation for the therapy at approximately 4 p.m. EDT. *See* SMF EXHIBIT #17, at 295:9-297:6; SMF EXHIBIT #18, at ¶ 8; SMF EXHIBIT #19, at ¶ 9; SMF EXHIBIT #21; SMF EXHIBIT #22.

31.    On the evening of June 15, 2004, immediately following the FDA panel decision, 250,000 stock options were issued by Cyberonics. *See* SMF EXHIBIT #6, at pg. 85-6; SMF EXHIBIT #18, at ¶ 9; SMF EXHIBIT #19, at ¶ 10; SMF EXHIBIT #21; SMF EXHIBIT #22.

32.    All of the Cyberonics options issued on June 15, 2004 carried the June 14 closing price of $19.58. *See* SMF EXHIBIT #18, at ¶ 10; SMF EXHIBIT #19, at ¶ 11; SMF EXHIBIT #21; SMF EXHIBIT #22; SMF EXHIBIT #24.

33.    On June 16, 2004, which was the first day of public trading following the positive FDA panel recommendation, Cyberonics' share price jumped 78% to close at $34.81, yielding an overnight paper profit of around $2.3 million for Cummins and around

$150,000 each for his fellow executive team members - Richard Rudolph and Alan Totah. *See* SMF EXHIBIT #17, at 245:1-246:26; SMF EXHIBIT #18, at ¶ 11; SMF EXHIBIT #19, at ¶ 12; SMF EXHIBIT #21; SMF EXHIBIT #22.

34.     In February of 2005, Mr. Cummins sold approximately 350,000 options at around $40-45 per share. These stock sales began just days after Cyberonics received other favorable news, namely that the FDA had approved the VNS device for depression. *See* SMF EXHIBIT #18, at ¶ 12; SMF EXHIBIT #19, at ¶ 13; SMF EXHIBIT #21; SMF EXHIBIT #22; SMF EXHIBIT #25.

35.     Cummins was widely reported to have sold millions of shares in February of 2005, just after the release of good news that doubled the market value of Cyberonics stock. Investors raised questions about the appropriateness of these stock sales due to Cummins' position at Cyberonics. *See* SMF EXHIBIT #25; SMF EXHIBIT #26.

36.     Richard Rudolph and Alan Totah, employees of Cyberonics who were given options with a grant date of June 15, 2004 following the FDA panel decision, have subsequently sold options at around $36 per share since that time. *See* SMF EXHIBIT #18, at ¶ 14; SMF EXHIBIT #19, at ¶ 14; SMF EXHIBIT #21; SMF EXHIBIT #22; SMF EXHIBIT #27.

37.     ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

██████████████ *See* SMF EXHIBIT #6, at pg. 87, 123; SMF EXHIBIT #10, at 301:14-302:5.

38.     For the Cyberonics quarter that ended on July 2004, there were 481,000 stock options granted, but only 304,000 of the options were publicly disclosed. *See* SMF EXHIBIT #18, at ¶ 15; SMF EXHIBIT #19, at ¶ 15.

39.     Cyberonics' June 16, 2004 share price increase was the largest single day share price increase in Cyberonics' history. *See* SMF EXHIBIT #28.

40.     Prior to publication of the June 8 Note, Hazan and Block consulted with David Prince, Secretary and General Counsel of SunTrust Capital Markets (hereinafter "Prince"), and told him the facts regarding the June 15, 2004 option grants. *See* SMF EXHIBIT #18, at ¶¶ 16-18; SMF EXHIBIT #19, at ¶¶ 16-18; SMF EXHIBIT #29, at 133:21-173:10.

41.     David Prince was the General Counsel and chief lawyer of SunTrust Capital Markets, Inc.  Prince is also a published securities law expert, a former SEC enforcement attorney, and a long-time advisor to many investment research analysts. *See* SMF EXHIBIT #18, at ¶¶ 16-18; SMF EXHIBIT #19, at ¶¶ 16-18; SMF EXHIBIT #29, at 135:12-147:19.

42.     Prince, after hearing all of the facts as they were set out in SunTrust's June 8 Note, conveyed to Messrs. Hazan and Block prior to publication of any of the SunTrust Statements that he agreed that the option grants were improper, might invite SEC scrutiny, and could be a regulatory violation. *See* SMF EXHIBIT #18, at ¶¶ 16-18; SMF EXHIBIT #19, at ¶¶ 16-18; SMF EXHIBIT #29, at 151:1-154:25 & 153:5-162:13.

- 10 -

43.     Prince also consulted with outside counsel, another securities law specialist,
regarding the June 15, 2004 option grants and told that securities law specialist all of the
relevant facts regarding the grants.  This securities law specialist agreed with Prince that
the June 15, 2004 option grants were improper.  Prince also told Messrs. Hazan and
Block the securities law specialists' opinion prior to publication of the SunTrust
Statements. *See* SMF EXHIBIT #18, at ¶ 18; SMF EXHIBIT #19, at ¶ 18; SMF
EXHIBIT #29, at 165:7-168:11.

44.     Susan Venezia is and was a supervisory analyst at SunTrust who is and was
responsible for reviewing research analyst notes prior to their publication to ensure their
accuracy and compliance with internal guidelines.  She reviewed the SunTrust June 8 and
June 12 Notes in their entirety and approved of them without qualification. *See* SMF
EXHIBIT #30, at 22:22-23:16; SMF EXHIBIT #31.

45.     Rick Inskeep was the Director of Research at SunTrust Capital Markets at the
time of the publication of the SunTrust Statements, and currently is Director of Research
and Sales for SunTrust Capital Markets.  Mr. Hazan sought his input on a substantial
portion of the June 12 Note prior to its publication.  He cleared the portions of the June
12 Note that Mr. Hazan sent to him. *See* SMF EXHIBIT #32, at 95:21-96:24; SMF
EXHIBIT #33.

46.     Jonathan Block made no statements, defamatory or otherwise, to any newspaper
regarding the content of the June 8 and June 12 Notes. *See* SMF EXHIBIT #19, at ¶ 3.

47.     Messrs. Hazan and Block did not make any of the SunTrust Statements with
knowledge that any of the statements were false, or with reckless disregard of whether
any of the statements were false or not.  Messrs. Hazan and Block never had any degree,

- 11 -

much less a high degree, of awareness of any of the SunTrust Statements' probable

falsity, nor did they ever entertain doubts, much less serious doubts, about the truth of the

SunTrust Statements. *See* SMF EXHIBIT #18, at ¶¶ 21-26, 28-29; SMF EXHIBIT #19,

at ¶¶ 20-23.

48.    Messrs. Hazan and Block went to great lengths to ensure the accuracy and

appropriateness of the SunTrust Statements by clearing various portions of them with

Prince, Prince's securities law expert, Susan Venezia, and Rick Inskeep, as well as by

editing each others' work. *See* SMF EXHIBIT #18, at ¶¶ 21-26, 28-29; SMF EXHIBIT

#19, at ¶¶ 20-23; SMF EXHIBIT #29, at 148:15-150:19 & 155:1-158:10; SMF EXHIBIT

#30, at 22:22-23:16; SMF EXHIBIT #32, at 20:1-22:16; SMF EXHIBIT #34; SMF

EXHIBIT #35.

49.    Mr. Hazan believed that Cyberonics had a promising technology and future.

However, Mr. Hazan also believed, as did many others, that Cummins' bad temper,

tendency to overstate Cyberonics' future projections, and questionable stock transactions

damaged the credibility of both Cummins and Cyberonics, which subsequently damaged

the value of the company's stock price. *See* SMF EXHIBIT #18, at ¶ 23; SMF EXHIBIT

#36; SMF EXHIBIT #44; SMF EXHIBIT #45; SMF EXHIBIT #46; SMF EXHIBIT #47;

SMF EXHIBIT #48; SMF EXHIBIT #49; SMF EXHIBIT #54; SMF EXHIBIT #55;

SMF EXHIBIT #56; SMF EXHIBIT #59; SMF EXHIBIT #62.

50.    Neither Messrs. Hazan nor Block had any malice, ill will or spite towards

Cummins, and none of the SunTrust Statements were motivated by anything other than a

desire to inform investors and potential investors of their opinion on potential future

- 12 -

performance of Cyberonics stock. *See* SMF EXHIBIT #18, at ¶¶ 21-26, 28-29; SMF EXHIBIT #19, at ¶¶ 20-23.

51.    Messrs. Hazan and Block believe that more than anything else, their careers depend on people believing that they offer unbiased, reasonable, and thoughtful advice on the companies they cover. Such a belief, and nothing else, drove them to publish the SunTrust Statements. *See* SMF EXHIBIT #18, at ¶¶ 21-26, 28-29; SMF EXHIBIT #19, at ¶¶ 20-23.

52.    Messrs. Hazan and Block did not, and have never, issued any statements or notes (including the June 8 and June 12 Notes) that were written to help investors who "short" stocks (i.e., make money on stocks when the stock price of the company goes down). They have also never violated any disclosure rules or guidelines with respect to the SunTrust Statements. *See* SMF EXHIBIT #18, at ¶ 26; SMF EXHIBIT #19, at ¶ 24.

53.    Messrs. Hazan and Block are not and have never been Certified Public Accountants (CPAs). *See* SMF EXHIBIT #18, at ¶ 27; SMF EXHIBIT #19, at ¶ 25.

54.    The term "paper profit" is routinely defined as an "unrealized gain" in a stock (i.e., a "profit that has not yet been realized because the security is still held.") *See* SMF EXHIBIT #37.

55.    The term "management" is often used to refer to the board of directors of a company. *See* SMF EXHIBIT #38.

56.    The SunTrust Statements do not contain a single false statement of fact. *See* SMF EXHIBIT #5; SMF EXHIBIT #6; SMF EXHIBIT #8; SMF EXHIBIT #18, at ¶¶ 7-15; SMF EXHIBIT #19, at ¶¶ 8-15; SMF EXHIBIT #21; SMF EXHIBIT #22; SMF EXHIBIT #40; SMF EXHIBIT #42; SMF EXHIBIT #43.

57.    The SunTrust Statements are pure opinion and were described by Hazan and Block as reflecting "personal views about [Cyberonics] and its [] securities." *See* SMF EXHIBIT #18, at ¶ 30; SMF EXHIBIT #21; SMF EXHIBIT #22; SMF EXHIBIT #40; SMF EXHIBIT #42; SMF EXHIBIT #43.

58.    The SunTrust Statements are non-defamatory. *See* SMF EXHIBIT #18, at ¶ 30; SMF EXHIBIT #21; SMF EXHIBIT #22; SMF EXHIBIT #40; SMF EXHIBIT #42; SMF EXHIBIT #43.

**D.    <u>Cummins' Use of the Media to Refute the SunTrust Statements</u>**

59.     The *New York Times* published Cummins' denial of any wrongdoing with respect to the stock option grants. *See* SMF EXHIBIT #39; SMF EXHIBIT #40.

60.    In August 2006, Cummins conducted three interviews with Elliott Blair Smith, a reporter for *USA Today*, for an article the newspaper was doing on Cyberonics' option grant practices. *USA Today* published Cummins' August 2006 denial of wrongdoing and statement that "[w]e have nothing to hide." *See* SMF EXHIBIT #14.

61.     The response denied any wrongdoing whatsoever regarding the accounting of stock-option grants. *See* SMF EXHIBIT #41; SMF EXHIBIT #68.

62.    A number of newspapers wrote articles related to Cyberonics' published denial of wrongdoing. *See* SMF EXHIBIT #40; SMF EXHIBIT #42; SMF EXHIBIT #43.

63.  *See*

SMF EXHIBIT #6, at pg. 123, Row 13; SMF EXHIBIT #7, at 125:7-128:18; SMF

EXHIBIT #10, at 68:23-72:21; SMF EXHIBIT #17, at 476:23-478:21.

**E.     Statements Regarding Cummins**

64.     A *Securities Data Publishing* article published on September 18, 2000 reported on

an analyst that stated that "most investors are skeptical of [Cummins'] numbers.  I'll also

point out that Cyberonics has been unreliable in meeting its analyst estimates."  *See* SMF

EXHIBIT #44.

65. 

LEGAL02/30941795v1



*See* SMF EXHIBIT #45; SMF EXHIBIT #17, at 127:3-128:11

66.    In a February 6, 2004 Comtex News Network article, Cyberonics' statements regarding a timetable for FDA decision making turned out to be false. In turn, the article reported to "bring up issues on the Street about the credibility of Cyberonics management, not to mention the possibility of shareholder lawsuits." *See* SMF EXHIBIT #46.

67.    An August 17, 2004 *TheStreet.com* article reported that Cummins "tossed verbal grenades" at the FDA and blamed them for patient suicides. The author called Cummins' claim "[a]bsolute hogwash." *See* SMF EXHIBIT #47.

68.    An May 19, 2005 article by *TheStreet.com* entitled "Cyberonics CEO Seeing Red" reported that Cyberonics was being investigated by the Senate Finance Committee and reported that Cummins, in responding to the investigation, gave a "rambling" conference call in which he "lashed out at an assortment of people" including FDA scientists. *See* SMF EXHIBIT #48.

69.    In a *Medical Device Daily* article published May 20, 2005, Cummins was reported to be "[l]ashing out" in a tone that was "beyond angry" regarding a "leak" to the

LEGAL02/30941795v1

*Wall Street Journal* regarding the Senate Finance Committee investigation. *See* SMF EXHIBIT #49.

70.     In a class-action lawsuit filed on June 17, 2005 and widely reported upon, Cyberonics shareholders sued Cyberonics and Cummins individually for federal securities fraud. The shareholders alleged that Cyberonics' false statements induced shareholders to purchase company stock that, when the truth emerged, caused the stock value to plummet and shareholder investments to be destroyed. *See* SMF EXHIBIT #50; SMF EXHIBIT #51; SMF EXHIBIT #52.

71.     On June 28, 2005, a Cyberonics Board member, Ron Matricaria, publicly announced and was widely reported to have resigned his Cyberonics Board position because he could not "support the direction of the governance practices of the Cyberonics board, in particular its practices regarding [Cummins'] compensation and succession." *See* SMF EXHIBIT #51; SMF EXHIBIT #53.

72.     On October 8, 2005, the *New York Times* published an article in which it called actions by Cummins "loopy," called him a "hothead," said he "berates" people and said he "complain[s] about how Cyberonics' supposed enemies are leaking information to hurt the company." The article also reported that Cummins was aggressive toward reporters and offered a quote from television stock analyst James Cramer stating that he was "the most combative, most antagonistic CEO in America," who had "inflamed a lot of people." The *New York Times* article likewise reported that analysts suffer Cummins' "wrath" and that he was "promotional" and "not the most reliable imparter of information about the company." The author also stated that "it is quite likely that Cyberonics would

have a higher stock price if its C.E.O. weren't such a bully." In conclusion, the article also reported that Cummins was a "polarizing figure." *See* SMF EXHIBIT #54.

73.    The *International Herald Tribune* published an October 8, 2005 article entitled "The Price to Pay for Independent Research" that focused on the denouncing of an analyst by Cyberonics and its encouragement of others to "berate" the analyst. The article also reported that Cummins made false statements. It likewise stated that Cummins threatened the reporter who wrote the article. *See* SMF EXHIBIT #55.

74.    A February 24, 2006 *Inside Washington Publishers* article reports on the Senate Finance Committee's criticism of the FDA's relationship with Cyberonics. The Committee concluded that it had "concerns" regarding the "puzzling" approval of Cyberonics' VNS therapy device. *See* SMF EXHIBIT #56.

75.    On May 31, 2006, certain Cyberonics shareholders stated that they were commencing a shareholder revolt (called a "proxy battle") against existing leadership. In the course of that revolt, the Cyberonics shareholders, represented by three current members of the Cyberonics Board, published scathingly critical statements with the SEC regarding Cummins and Cyberonics management. Included in these statements were the following:

- The June 15, 2004 option grants were "spring-loaded" and "whether on not this was illegal . . . remains to be determined."
- The Cyberonics shareholders were "paying a heavy price" for "serious ethical lapses" by Cummins and the others running Cyberonics.
- Cyberonics stock had "significantly underperformed"
- There was a "lack of credibility of senior management that has continually overpromised and underdelivered"
- The three current Cyberonics Board members and their fellow shareholders "could not agree more" with the SunTrust Statements
- The June 15, 2004 option grants "raise serious questions about the Cyberonics Board's judgment and apparent disdain for the interests of shareholders."

*See* SMF EXHIBIT #57; SMF EXHIBIT #58.

76.    On June 9, 2006, a *New York Times* article focused, unlike the SunTrust

Statements, on Cummins.  The article had a photo of Cummins and a subheading that

stated that "[a] board vote creates an almost instant paper profit," which was not

attributed to SunTrust, Mr. Block or Mr. Hazan.  The article likewise quoted Mr. Hazan

on various issues related to Cyberonics, but those statements were substantively identical

to the topics discussed in the SunTrust statements at issue.  The article also had a chart

that was attributed to the *New York Times* that stated that "Mr. Cummins' options have a

paper profit of $2.3 million."  In addition, the author of the report stated that Cummins

was "an imposing and combative executive already known for prickly relations with

critical analysts and skeptical investors . . . ."  *See* SMF EXHIBIT #40.

77.    On June 10, 2006, the *Houston Chronicle* published an article calling the June 15,

2004 option grants a "problem" and another article reporting that the timing on the grants

was "opportunistic" and that Cummins "should give back the stock options in question."

In contrast, a June 9, 2006 article from the *Houston Chronicle* clearly illustrates that

Hazan was not "accusing the company of backdating" options and likewise quotes him as

proclaiming that "I'm not saying [Cyberonics management] broke any laws."  *See* SMF

EXHIBIT #59.

78.    In a June 13, 2006 research note, a Lazard Capital Markets analyst labeled the

June 15, 2004 option grants as something that "could be tantamount, we believe, to an

options *spring loading* offense, which would likely necessitate a significant

compensation charge to be taken in the June quarter of 2005."  He also stated that "GAAP

accounting rules, however, may still require a compensation charge, requiring a restatement . . . ." *See* SMF EXHIBIT #60.

79.    On June 26, 2006, *Business Week* published an article that called the June 15, 2004 option grants a "spring loading scandal." *See* SMF EXHIBIT #61.

80.    A September 10, 2006 article in the *New York Times* quoted Cummins as saying his mantra is "[m]aybe wrong but never in doubt" and likewise reported that "Mr. Cummins' us-against-the-world attitude [has] taken [its] toll on Cyberonics' stock price and on Wall Street's faith in the company." It also quoted an analyst as saying that "there are institutional investors who won't touch the company as long as [Cummins] is at the helm." *See* SMF EXHIBIT #62.

81.    On November 9, 2006, the *Houston Press* reported that Cummins berated his son on a football field, made his son cry in front of a crowd of people, and was criticized by people in the stand. *See* SMF EXHIBIT #63.

82.    In mid-2006, Cyberonics' shareholders were publicly disclosed to have filed suit in six separate derivative lawsuits, claiming that Cummins and others at Cyberonics breached fiduciary duties, engaged in gross mismanagement and corporate waste, were unjustly enriched, engaged in insider trading, and engaged in improprieties in the issuance of stock options. *See* SMF EXHIBIT #5 at pg. F-33-38.

83.    In an article published November 21, 2006, the *New York Times* reported that an analyst stated that "Skip was the biggest barrier to the company being sold." *See* SMF EXHIBIT #13.

84.    In a "Cramer Report" article published on November 21, 2006, stock analyst and host James Cramer stated the following:

- 20 -

- "Cummins was the one keeping the company's stock down."
- "[Cummins'] combativeness turned the company into a pariah. [Cummins'] was the biggest dead weight on the stock."
- Cummins was "the single worst thing about the company."

*See* SMF EXHIBIT #15.

85.    A November 21, 2006 article in *USA Today* entitled "Fortunate Ones" was published with the subheading "Insiders Made Nearly $50 Million Trading a Money-Losing Company's Stock" focuses on Cyberonics' option grants over a number of years, and described Cyberonics as "caught up in the nation's expanding stock-options scandal." It reported that Cummins "resigned after an internal investigation found that unnamed insiders had incorrectly reported the dates of company stock options for years" and that *USA Today*'s investigation "reveals that Cyberonics' board has engaged in a series of questionable practices to reward Cummins . . . almost from its inception as a public company." The author quotes Harvey Pitt, former chairman of the SEC, as having reviewed Cyberonics' option grants and stating that "[w]hat you have here, it seems to me, is a system of granting options that are opportunistically timed with ultimately almost a $50 million payout to insiders from a company that hasn't earned a penny." This scenario, he claimed, "look[ed], on its face, rather tawdry." The article also reported that Cummins, after a thorough investigation and after being challenged on his claim otherwise, conceded that he did not, in fact, find "his mother's body in her small apartment an estimated two weeks after her suicide." *See* SMF EXHIBIT #14.

86.    ████████████████████████████████████████████

████████████████████████████████████████ *See* SMF EXHIBIT #64, at 78:22-81:24.

87.    ████████████████████████████████████████

████████████████████████    *See* SMF EXHIBIT #10, at 202:23-203:5; SMF EXHIBIT

#65, at 141:1-145:23.

88.    A chart currently published on the *Wall Street Journal*'s website regarding

companies implicated by stock option grants and practices indicates that Cyberonics was

investigated by the SEC and Justice Department, had to take restatements/charges, and

"announced the resignation of [Cummins] and [its] CFO on the same day it said it saw

charges up to $10 million for options issues." The chart also shows that of the dozens of

companies under scrutiny, Cyberonics was one of only a handful of companies that had

been investigated by the SEC and DOJ, ousted executives, and had to take

restatements/charges. The chart also shows that the SEC absolved many companies

quickly. ████████████████████████    *See* SMF EXHIBIT #2.

89.    Articles from *Continental Magazine*, *Fast Company*, *ABC News*, and *Forbes*, all

specifically reported on Cummins and Cyberonics. *See* SMF EXHIBIT #66.

90.    Cummins was a frequent television guest on CNNFN and CNBC from 2000

through 2005. *See* SMF EXHIBIT #67.

- 22 -

Dated:          September 10, 2008

                                        /s/ Judson Graves

                                        _____

                                        JUDSON GRAVES
                                        Georgia Bar No. 305700
                                        ROBERT R. LONG
                                        Georgia Bar No. 141546
                                        ALSTON & BIRD LLP
                                        1201 West Peachtree Street
                                        Atlanta, Georgia 30309-3424
                                        Phone: (404) 881-7000
                                        Fax: (404) 881-7777

                                            -and-

                                        NELSON BOXER (NB2762)
                                        ALSTON & BIRD LLP
                                        90 Park Avenue
                                        New York, NY 10016
                                        Phone: (212) 210-9400
                                        Fax: (212) 210-9444

                                        *Counsel for Defendants*

LEGAL02/30941795v1

## DEFENDANTS' SUMMARY INDEX OF EXHIBITS TO THEIR STATEMENT OF UNDISPUTED MATERIAL FACTS



LEGAL02/30941795v1



SMF EXHIBIT #1K

SMF EXHIBIT #1L

SMF EXHIBIT #1M

SMF EXHIBIT #1N

SMF EXHIBIT #1O

SMF EXHIBIT #1P

SMF EXHIBIT #1Q

SMF EXHIBIT #1R

SMF EXHIBIT #1S

SMF EXHIBIT #1T

LEGAL02/30941795v1



SMF EXHIBIT #2

SMF EXHIBIT #3

SMF EXHIBIT #4

SMF EXHIBIT #5

SMF EXHIBIT #6

SMF EXHIBIT #7

SMF EXHIBIT #8

SMF EXHIBIT #9

SMF EXHIBIT #10

SMF EXHIBIT #11

SMF EXHIBIT #12

LEGAL02/30941795v1



LEGAL02/30941795v1



LEGAL02/30941795v1

**SMF EXHIBIT #34**



**SMF EXHIBIT #35**



**SMF EXHIBIT #36**



LEGAL02/30941795v1



**SMF EXHIBIT #37**

LEGAL02/30941795v1







SMF EXHIBIT #55

SMF EXHIBIT #56

SMF EXHIBIT #57

SMF EXHIBIT #58

SMF EXHIBIT #59

SMF EXHIBIT #60

SMF EXHIBIT #61

SMF EXHIBIT #62

SMF EXHIBIT #63

SMF EXHIBIT #64

SMF EXHIBIT #65

LEGAL02/30941795v1



**SMF EXHIBIT #66**



**SMF EXHIBIT #67**



**SMF EXHIBIT #68**

LEGAL02/30941795v1



LEGAL02/30941795v1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT P. "SKIP" CUMMINS, | § § § | |
| Plaintiff, | § § | Case No. 07 CV 4633 (JGK) |
| vs. | § § | |
| SUNTRUST CAPITAL MARKETS, INC., AMIT HAZAN, and JONATHAN BLOCK, | § § § | JURY DEMAND |
| Defendants. | § § § | |

## CERTIFICATE OF SERVICE

I hereby certify that on this day an unredacted copy of **DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT, BRIEF AND MEMORANDUM OF**

**LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY**

**JUDGMENT, AND DEFENDANTS' STATEMENT OF MATERIAL FACTS** have

been served upon the following counsel of record via e-mail and via UPS overnight

delivery addressed as follows:

Julius Glickman
Ashton Bachynsky
GLICKMAN & HUGHES, LLP
909 Fannin Street, Suite 3800
Houston, TX 77010

Alan Heblack
SNITOW KANFER HOLTZER & MILLUS, LLP
575 Lexington Avenue
New York, NY 10022-6102

This 10th day of September, 2008.

/s/ Judson Graves

JUDSON GRAVES
Georgia Bar No. 305700

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA, 30309-3424
Tel: (404) 881-7000
Fax: (404) 881-7777

- 2 -