UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT P. "SKIP" CUMMINS, | §§§§ | |
| Plaintiff, | §§ | Case No. 07 CV 4633 (JGK) |
| vs. | §§ | |
| SUNTRUST CAPITAL MARKETS, INC., AMIT HAZAN, and JONATHAN BLOCK, | §§§§ | JURY DEMAND |
| Defendants. | §§§ | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Prepared and submitted by:

JUDSON GRAVES
Georgia Bar No. 305700
ROBERT R. LONG
Georgia Bar No. 141546
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Phone: (404) 881-7000
Fax: (404) 881-7777

-and-

NELSON BOXER (NB2762)
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 210-9400
Fax: (212) 210-9444

*Counsel for Defendants*

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    FACTUAL OVERVIEW ......................................................................2
       A.   The Controversy At Issue – Stock Option Backdating.....................2
       B.   SunTrust's Interest In The Backdating Controversy. .......................4
       C.   Multiple Investigations Ensue. .........................................................7

III.   ARGUMENT AND CITATION OF AUTHORITY..............................9
       A.   Cummins' Defamation Claim Cannot Survive The Summary Judgment
            Burden. ...............................................................................................9
       B.   Cummins' Defamation Claims Fail Under New York And Texas Law..........10
       C.   Cummins Cannot Point To A Single Actionable Or False Statement Of
            Fact By SunTrust. .............................................................................10
            1.   The SunTrust Statements Must Be Viewed In Their Context. ....10
            2.   The SunTrust Statements Are Largely Not "Of And Concerning"
                 Cummins.................................................................................11
            3.   The SunTrust Statements Are Protected Opinion..........................12
            4.   The SunTrust Statements Were Reasonably Based On True Facts............14
            5.   The SunTrust Statements Are Not Capable Of Defamatory Meaning. ........17
            6.   Mr. Block Made No Statements To Any Newspapers. ................18
       D.   Cummins Is A Limited Purpose Public Figure Who Triggers The
            Application Of The Actual Malice Standard To This Case............................19
            1.   There Was A Widespread Public Controversy Regarding Option
                 Grants And Cummins. ..............................................................19
            2.   Cummins Had More Than A Trivial Role In The Controversy. .................20
                 a.   Cummins Voluntarily Placed Himself In A Public Position That
                      Risked Increased Exposure And Injury To His Reputation. ...............21
                 b.   Cummins Attracted Public Attention Over The Very Issues Raised
                      In the Public Controversy. .................................................21
                 c.   Cummins Was Heavily Involved In The Events That Created The
                      Controversy. ...................................................................24
                 d.   Cummins Had Access To National Media And Used It To Attack
                      The SunTrust Statements....................................................25
            3.   The SunTrust Statements Were Directly Related To The Public
                 Controversy Regarding Stock Option Grants And, To A Lesser Extent,
                 Cummins' Performance As A CEO.......................................................25
       E.   The "Common Interest" Privilege Protects The SunTrust Statements.............26
       F.   The Public Interest Privilege Protects The SunTrust Statements. ...................26
       G.   SunTrust Engaged In No Wrongdoing In Publishing The SunTrust
            Statements...........................................................................................27
            1.   SunTrust Did Not Act With Actual Malice. ................................27
            2.   SunTrust Did Not Act With Gross Irresponsibility Or Negligence With
                 Respect To The SunTrust Statements......................................................28
       H.   Cummins Cannot Show That The SunTrust Statements Caused
            Cummins Any Harm............................................................................29

IV.    CONCLUSION ...................................................................................30

i

## TABLE OF AUTHORITIES

**Cases**

*Abramson v. Pataki*, 278 F.3d 93, 102 (2d Cir. 2002)........................................................11

*Armstrong v. Simon & Schuster*, 721 N.Y.S.2d 340, 341 (N.Y. App. Div. 2001)............27

*Aronson v. Wiesman*, 483 N.E.2d 1138, 1139 (N.Y. 1985) .........................................10, 18

*Balderman v. American Broad. Cos.*, 738 N.Y.S.2d 462, 469 (N.Y. App. Div. 2002).....29

*Barbouti v. Hearst Corp.*, 927 S.W.2d 37, 48 (Tex. App. 1996) ...................................19

*Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 (Tex. App. 1980) ....26

*Berwick v. New World Network Int'l, Ltd.*, No. 06 Civ. 2641 (JGK), 2007 WL 949767, at *7-8 (S.D.N.Y. Mar. 23, 2007)................................................................10

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998) .....................................12

*Brewer v. Capital Cities/ABC, Inc.*, 986 S.W.2d 636, 638 (Tex. App. 1998).............13, 14

*Brueggemeyer v. American Broad. Cos.*, 684 F. Supp. 452, 455-8 (N.D. Tex. 1988)21, 22

*Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989)........................................................12

*Chapadeau v. Utica Observer-Dispatch*, 379 N.Y.2d 196 (1975)..................................29

*Chung v. Better Health Plan*, No. 96 Civ 7310 (JGK), 1997 WL 379706 (S.D.N.Y. July 9, 1997) ...................................................................................................................9

*Contemporary Mission, Inc. v. New York Times, Co.*, 665 F. Supp. 248 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 612 (2d Cir. 1988) ................................................................passim

*Cooper v. Hodge*, 814 N.Y.S.2d 447, 448 (N.Y. App. Div. 2006) ...................................15

*County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 317 F. Supp. 2d 383 (S.D.N.Y. 2004), *aff'd*, No.04-2982-CV, 2005 WL 3117211 (2d Cir. Nov. 22, 2005)...............................................................................................................................26

*Cyrus W. Scott Mfg. v. Millis*, 67 S.W.2d 885, 887 (Tex. App. 1933) ............................18

*Dillon v. City of New York*, 704 N.Y.S.2d 1, 6 (N.Y. App. Div. 1999) ...........................14

*Dooner v. Keefe, Bruyette & Woods, Inc.*, No. 00 Civ 572 (JGK), 2003 WL 135706 (S.D.N.Y. Jan. 17, 2003) .................................................................................................9

*Dunlop-McCullen v. Rogers*, No. 00 Civ. 3274 (JSR), 2002 WL 1205029, at *7 (S.D.N.Y. Feb. 21, 2002)...............................................................................................10

*Einhorn v. LaChance*, 823 S.W.2d 405, 411 (Tex. App. 1992) ......................................17

*El Khoury v. Kheir*, 241 S.W.2d 82, 85 (Tex. App. 2007) ..............................................10

*Ello v. Singh*, 531 F. Supp. 2d 552, 578 (S.D.N.Y. 2007).............................................17

*Evans v. Dolcefino*, 986 S.W.2d 69, 75 (Tex. App. 1999) ..............................................15

*Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 505 (Tex. App. 2008), *rev. denied* (May 17, 2008) ................................................................................................................30

*Fairley v. Peekskill Star Corp.*, 445 N.Y.S.2d 156, 159 (N.Y. App. Div. 1981)........14, 17

*Farias v. Bexar County Bd. Of Trustees for Mental Health Mental Retardation Servs.*, 925 F.2d 866, 878 (5th Cir. 1991) .....................................................................16

*Foster v. Churchill*, 665 N.E.2d 153, 158 (N.Y. 1996).................................................26

*Fotochrome, Inc. v. New York Herald Tribune, Inc.*, 305 N.Y.S.2d 168, 172 (N.Y. Sup. Ct. 1969)..........................................................................................................26, 28

*Fry v. McCall*, 945 F. Supp. 655 (S.D.N.Y. 1996)..........................................................9

*Gaeta v. New York News, Inc.*, 465 N.E.2d 802, 806 (N.Y. 1984) ..................................29

*Gatheright v. Swindle*, No. 06-CV-487, 2007 WL 2300782, *3-4 (E.D. Tex. Aug. 7, 2007)...............................................................................................................................25

*Goldblatt v. Seaman*, 639 N.Y.S.2d 438, 439 (N.Y. App. Div. 1996) ........................27

*Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) ........................15

*Guitar v. Westinghouse Elec. Corp.*, 396 F. Supp. 1042, 1053 (S.D.N.Y. 1975)
   *aff'd*, 537 F.2d 309 (2d Cir. 1976)..........................................................................9

*Handelman v. Hustler Magazine, Inc.*, 469 F. Supp. 1053, 1060 (S.D.N.Y. 1979)....29, 30

*Horowitz v. Mannoia*, 802 N.Y.S.2d 917 (N.Y. Sup. Ct. 2005)......................................24

*Hotchner v. Castillo-Puche*, 551 F.2d 910, 912-3 (2d Cir. 1977) ..................................27

*Houseman v. Publicaciones Paso Del Norte, S.A DE CV*, 242 S.W.3d 518, 523-24
   (Tex. App. 2007) ....................................................................................10, 11

*Howell v. Hecht*, 821 S.W.2d 627, 628 (Tex. App. 1991)..............................12, 13, 27

*Jefferson County Sch. Dist. v. Moody's Investor's Servs., Inc.*, 988 F. Supp. 1341,
   1345 (D. Col. 1997), *aff'd*, 175 F.3d 848 (10th Cir. 1999) ...............................12

*Kruglak v. Landre*, 258 N.Y.S.2d 550, 551 (N.Y. App. Div. 1965) ..............................29

*KTRK Television v. Felder*, 950 S.W.2d 100, 106 (Tex. App. 1997)..............................15

*Lapar v. Morris*, 501 N.Y.S.2d 82, 83 (N.Y. App. Div. 1986)......................................15

*Lee v. Cty. of Rochester*, 663 N.Y.S.2d 738, 769-70 (N.Y. Sup. Ct. 1997), *aff'd*, 677
   N.Y.S.2d 848 (N.Y. App. Div. 1998)...................................................................19

*Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136-7 (2nd Cir. 1984) .........................passim

*Lukashok v. Concerned Residents of North Salem*, 554 N.Y.S.2d 39, 40 (N.Y. App.
   Div. 1990)...........................................................................................................13

*Mann v. Abel*, 885 N.E.2d 884, 885 (N.Y. 2008) .........................................................12

*Marcone v. Penthouse Int'l, Ltd.*, 754 F.2d 1072, 1086 (3d Cir. 1985) ........................21

*McIlvain v. Jacobs*, 794 S.W.2d 14, 15-16 (Tex. 1990)...............................................15

*Musser v. Smith Protective Services, Inc.*, 723 S.W.2d 653, 654-5 (Tex. 1987) ........10, 18

*National Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627, 649 (D. Md. 1992)......12

*New Times, Inc. v. Wamstad*, 106 S.W.3d 916, 921-5 (Tex. App. 2003)........................25

*Newpapers, Inc. v. Matthews*, 339 S.W.2d 890, 894 (Tex. 1960).................................11

*O'Loughlin v. Patrolmen's Benevolence Ass'n of Cty of New York, Inc.*, 576
   N.Y.S.2d 858, 858-9 (N.Y. App. Div. 1991).......................................................13

*Parks v. Steinbrenner*, 520 N.Y.S.2d 374, 377 (N.Y. App. Div. 1987) ..........................12

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) ..............................9

*Prestige Brands Holding, Inc.*, No. 05 CV 06924 (CLB), 2006 WL 2147719, at *5
   (S.D.N.Y. July 10, 2006)....................................................................................23

*Rinaldi v. Holt, Rinehart & Winston*, 366 N.E.2d 1299, 1306 (N.Y. 1977).....................12

*Robertson v. Southwestern Bell Yellow Pages, Inc.*, 190 S.W.3d 899, 903 (Tex.
   App. 2006)..........................................................................................................12

*Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966).........................................................11, 19

*Rothman v. Sternberg*, 615 N.Y.S.2d 748, 750 (N.Y. App. Div. 1994)...........................12

*Silbowitz v. Lipper*, 299 N.Y.S.2d 564, 567 (N.Y. App. Div. 1969)...............................27

*Southwestern Bell Yellow Pages, Inc. v. Thomas*, No. 05-04-01722-CV, 2006 WL
   217665, at *3 (Tex. App. Jan. 30, 2006) ........................................................29, 30

*Swate v. Schiffers*, 975 S.W.2d 70, 75-6 (Tex. App. 1998)....................................21, 22

*Tatum v. Liner*, 749 S.W.2d 251 (Tex. App. 1988)......................................................30

*The Associated Press v. Cook*, 17 S.W.3d 447, 454 (Tex. App. 2000) .....................passim

*Trails West, Inc. v. Wolff*, 298 N.E.2d 52 (N.Y. 1973)..................................................26

*Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431 (5th Cir. 1987)..............19, 21, 22, 24

*Tyson Foods, Inc.*, 919 A.2d 563, 592-3 (Del. Ch. 2007) ................................................14

*Veilleux v. National Broad. Co.*, 206 F.3d 92, 113-4 (1st Cir. 2000)................................29

*Visentin v. Haldane Cent. Sch. Dist.*, 782 N.Y.S.2d 517 (N.Y. Sup. Ct. 2004) ................26

*Waste Distillation Tech. v. Blasland & Bouck Eng'rs, P.C.*, 523 N.Y.S.2d 875, 877
  (N.Y. App. Div. 1988)....................................................................................................29

*Weinstein v. Friedman*, No. 94 CIV. 6803 (LAP), 1996 WL 137313, at *10
  (S.D.N.Y. March 26, 1996) ...........................................................................................10

*Weiss v. Swanson*, 948 A.2d 433, 441 (Del. Ch. 2008)....................................................14

*WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) .............................19, 27

*White v. Berkshire-Hathaway*, 759 N.Y.S.2d 638, 640 (N.Y. Sup. Ct. 2003), *aff'd*,
  773 N.Y.S.2d 664 (N.Y. App. Div. 2004)...............................................................19, 25

*Wolf Street Supermarkets, Inc. v. McPartland*, 487 N.Y.S.2d 442, 448 (N.Y. App.
  Div. 1985)......................................................................................................................30

*Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex App. 1988) .............................12

**Statutes**

Tex. Civ. Prac. & Rem. Code § 73.001 ..........................................................................17

Tex. Civ. Prac. & Rem. Code § 73.005 ..........................................................................14

## I.    **INTRODUCTION**

This is a defamation action brought by Robert P. "Skip" Cummins, the
controversial former President, Chief Executive Officer, and Chairman of the Board of
Cyberonics, Inc. ("Cyberonics"), ████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

█████████████████████████████████

████████████████████████████████

████████████

        ██████████████████████████

██████████████████████████

██████████████████████████████

███████████████████████████████

█████████████████████████████

████████████████

Defendants are SunTrust Capital Markets, Inc., a subsidiary of the seventh largest
bank holding company in the nation, and Amit Hazan and Jonathan Block, two of its
research analysts (collectively "SunTrust").  Back in June of 2006, these SunTrust
analysts discovered and reported on potential Cyberonics stock option improprieties in
two analyst reports which are the subject of this action. ████████████████

████████████████████████████

████████████████

Cummins contends that certain statements by SunTrust were defamatory (hereinafter the "SunTrust Statements"). SunTrust will show in its defenses that the SunTrust Statements (1) are largely not "of or concerning" Cummins; (2) are protected statements of opinion; (3) are true; (4) are non-defamatory; (5) were not made with any degree of fault; and (6) caused no damage to Cummins.

## II.    FACTUAL OVERVIEW[1]

### A.    The Controversy At Issue – Stock Option Backdating.

The public exposure of corporate executive self-dealing that led to the collapse of such companies as WorldCom and Enron sparked widespread concern about internal corporate governance in general, and executive compensation in particular. (SMF ¶ 1). This led to an increased focus on these issues, including Congress's enactment of the Sarbanes-Oxley Act, aimed at curtailing illicit executive compensation practices. (SMF ¶ 1).

These same issues fueled a debate within academia concerning a fascinating trend detected with respect to the issuance of stock option grants to corporate executives. (SMF ¶ 1). Academics carefully tracked stock performance in the market and discovered that many executives, against extraordinary odds, had received stock options right before the market value of their company's stock shot up, giving executives an instant paper profit on those options. (SMF ¶ 1). The academic debate was whether what seemed like incredible luck in timing was instead some sort of sophisticated corporate manipulation through practices such as option "backdating" and "spring-loading." (SMF

---

[1]    The details of and evidentiary support for this overview are set out in the movants' Statement of Material Facts ("SMF"), filed concurrently with Defendants' Motion for Summary Judgment and this Memorandum.

¶ 1).  Backdating occurs when a company awards stock options with an effective grant date earlier in time than the true grant date, giving the recipient a more favorable "strike price" when exercising those options.  (SMF ¶¶ 5 & 6).  Spring-loading occurs when a company awards executive stock options just prior to the release of favorable news that the Company's management expects to increase its stock price.  When this happens, the earlier determined strike price becomes highly favorable to the recipient when the good news drives the stock price up.  (SMF ¶¶ 5 & 6).  Both practices are, in effect, like betting on the winner of a game that had already been played.

In March of 2006, about three months before publication of the SunTrust Statements, the Wall Street Journal brought this debate to the national stage with what would become a Pulitzer-prize winning series of investigative articles on these kinds of suspicious stock option practices within numerous corporations.  The series was called "Perfect Payday."  (SMF ¶¶ 1-5).  In the wake of the Wall Street Journal's reporting, newspapers, analysts, the SEC, and U.S. attorneys scrutinized thousands of companies suspected of option dating improprieties.  (SMF ¶¶ 4 & 88).  This scrutiny exposed stock option manipulation at many companies.  (SMF ¶¶ 4 & 88).  Many executives responsible for and involved in such manipulation were forced to resign, and in some egregious cases, there were criminal prosecutions.  (SMF ¶¶ 4 & 88).

██████████████████████████████████

████████████████████████████████████

███████████████████ Cummins' tenure as CEO had been highly controversial. (SMF ¶¶ 64-75).  He has been the subject of numerous significant newspaper articles during his tenure at Cyberonics, including coverage in the *New York Times*, *Forbes*, *The*

*Wall Street Journal*, the *International Herald Tribune*, *USA Today*, and *ABC News*, and he has made a number of television appearances, including appearances on CNN and CNBC. (SMF ¶¶ 64-85, 89 & 90).

Cummins' suitability to be CEO of a public company was long a topic of national debate. (SMF ¶¶ 64-85, 87). While Cummins was described as tenacious and passionate, he was also widely reported by such media as the *New York Times* as having a tendency to "lash out" and to "bully" those who questioned him, to exaggerate the prospects for Cyberonics' financial success, and to engage in controversial stock trading transactions. (SMF ¶¶ 64-85). These tendencies damaged the credibility of Cummins and Cyberonics in the eyes of many investors, ██████████████████ as well as from market analysts and the general public. (SMF ¶¶ 64-66, 73, 75-78, 80, 82-85).

**B.    SunTrust's Interest In The Backdating Controversy.**

Like many other banks and investment firms, SunTrust produces analyst reports, called "Notes," that are, in effect, Op-Ed pieces concerning the stock of the public companies it follows. (SMF ¶¶ 25 & 57). SunTrust's Notes offer investment opinions and advice based on public information available about a company, a subjective assessment of the attributes and abilities of the management team, and "chatter" among investors and other analysts about what is going on within the company. (SMF ¶ 25). The target audience is investors and potential investors. (SMF ¶ 25).

With the emergence of the stock option backdating controversy, SunTrust directed its analysts to investigate all companies they covered for possible irregularities in their option grants. (SMF ¶ 26). In doing so, Hazan and Block discovered what they felt to be suspicious activity at Cyberonics, a company they followed, as to option grants

dated June 15, 2004 that had already been the subject of concern within the investment and analyst community. (SMF ¶¶ 7, 27-28).

Hazan and Block determined that the Cyberonics Board had granted the options in question during a nighttime, telephonic board meeting held shortly after a June 15, 2004 U.S. Food and Drug Administration ("FDA") panel voted to recommend approval of a Cyberonics therapy for treatment-resistant depression.  By all accounts this was an extremely favorable decision for Cyberonics which would dramatically affect its stock price.  (SMF ¶¶ 30, 32-33).  In fact, the NASDAQ exchange had suspended trading in Cyberonics stock that day because of the importance of the FDA panel's deliberations to the stock price.  (SMF ¶ 30).  That same evening, the Cyberonics Board held a late-night meeting, with full knowledge of the positive FDA news, and voted to issue 250,000 stock options — 150,000 to Cummins and another 100,000 for Cummins to issue to other key employees.  (SMF ¶¶ 31-32).

Because the Cyberonics Board voted to issue the options that night, they could, under a technical loophole in the existing stock-option rules, issue them at an exercise price, called the "strike price," that was the *previous days' stock price*, a value far lower than the actual value at the time they were granted.  (SMF ¶¶ 21, 31-33).  Under these unusual circumstances, the stock options were already worth much more than the strike price because the FDA panel decision was so favorable.  Indeed, when trading opened to the public the next day, Cyberonics' share price shot up almost 78%, the largest one-day gain in Cyberonics' history.  (SMF ¶¶ 33-39).  The stock option recipients, including Cummins, thus got an instant "paper profit" of millions of dollars in just one day.  (SMF ¶¶ 33-54).

████████████████████████████

SunTrust decided to publish a Note on this subject, given the expanding controversy over option granting improprieties and the possibility it might ensnare the already controversial Cyberonics management. (SMF ¶¶ 26-28). SunTrust published its first Note on the subject on June 8, 2006 (the "June 8 Note"), after Hazan and Block had submitted their ideas to their supervisor and two securities law experts (including the General Counsel of SunTrust Capital Markets). (SMF ¶¶ 40-44, 48). SunTrust published a second, follow-up Note on the issue on June 12, 2006 (the "June 12 Note"), which was also prepared by Hazan and Block, who again submitted their ideas to two of their supervisors. (SMF ¶¶ 40-41, 43-45, 48). Hazan was also quoted on the issue in various newspapers, though the substance of those statements was essentially the same as that in the Notes themselves. (SMF ¶¶ 62, 76, 77). Collectively, the Notes and some of Hazan's quotes to newspapers are the source of the SunTrust Statements at issue in this case.

Both Cummins and Cyberonics vigorously disputed the SunTrust Statements in the media. (SMF ¶¶ 59-63). However, news organizations such as the *New York Times*, *Bloomberg.com*, *The Houston Chronicle*, *USA Today*, *The Wall Street Journal*, and *Business Week* also found the spring-loaded June 15, 2004 option grants newsworthy and did independent reporting on those and other Cyberonics option grants. (SMF ¶¶ 62, 76-77, 79-85). Unlike the SunTrust Statements, newspapers such as the *New York Times* and *USA Today* focused specifically on Cummins. (SMF ¶¶ 76-77, 85). Sophisticated Cyberonics investors, including three who would later become Cyberonics Board members after a successful proxy battle, also independently and publicly accused

6

Cyberonics in SEC filings of spring-loading, possible illegality, and breach of fiduciary duty in connection with its stock option practices. (SMF ¶ 75).

## C.    **Multiple Investigations Ensue.**

██████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

On June 9, 2006, the day after the first SunTrust Note, ██████████████████

████████████████████████████████████████████████████

██████████████████████████████ On June 20, 2006, the Justice Department, through the U.S. Attorney for the Southern District of New York, issued its subpoena ███ ████████████████████████████████ Then on June 26th, the Cyberonics' Audit Committee, a subcommittee of the Cyberonics Board of Directors, launched its own internal investigation of the option practices within the company. (SMF ¶ 10). For the internal investigation, the Audit Committee retained █████████████████████ Morgan Lewis and Bockius LLP, assisted by a forensic accountant team from FTI Consulting. (SMF ¶ 10). ████████████████████████████████ ██████████████████████████████

On November 20, 2006, Cyberonics publicly announced that it had completed its internal investigation and uncovered years' worth of improper stock option grants resulting in earnings overstatements in the tens of millions of dollars. (SMF ¶ 18). Cyberonics further announced that Cummins and its Chief Financial Officer, Pam Westbrook, were resigning, effective immediately. (SMF ¶¶ 17-18). Numerous newspapers, including the *New York Times, Wall Street Journal,* and *USA Today* covered

Cummins' resignation in detail and linked it to the broader options dating scandal which

was continuing to expand. (SMF ¶¶ 19-20).



███████████████████████████████████████

███████████

On June 1, 2007, Cummins brought this action claiming that the SunTrust

Statements were defamatory.  After extensive discovery, SunTrust, Hazan and Block

have moved for summary judgment because there are not any genuine issues of material

fact, and movants are therefore entitled to judgment as a matter of law.

## III.    ARGUMENT AND CITATION OF AUTHORITY

### A.    Cummins' Defamation Claim Cannot Survive The Summary Judgment Burden.

"Because of the importance of free speech, summary judgment is the rule, and not

the exception, in defamation cases."[3]  In defamation actions at the summary judgment

stage, Cummins bears the burden of showing falsity and fault,[4] especially given that the

SunTrust Statements address matters of public concern.[5]  Cummins must also

demonstrate actual malice and, even at the summary judgment stage, "the judge must

view the evidence presented through the prism of the substantive evidentiary burden,

namely the 'clear and convincing' standard."[6]  This requires "clear and convincing proof"

---

[3]    *See Guitar v. Westinghouse Elec. Corp.*, 396 F. Supp. 1042, 1053 (S.D.N.Y. 1975) *aff'd*, 537 F.2d 309 (2d Cir. 1976); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (applying "clear and convincing" standard to defamation suit at summary judgment stage).  Indeed, defamation cases are often dismissed prior to trial.  *See generally Fry v. McCall*, 945 F. Supp. 655 (S.D.N.Y. 1996) (Koeltl, J., granting motion to dismiss defamation claim); *Chung v. Better Health Plan*, No. 96 Civ. 7310 (JGK), 1997 WL 379706 (S.D.N.Y. July 9, 1997) (Koeltl, J., granting motion to dismiss defamation claim); *Dooner v. Keefe, Bruyette & Woods, Inc.*, No. 00 Civ. 572 (JGK), 2003 WL 135706 (S.D.N.Y. Jan. 17, 2003) (Koeltl, J., granting motion to dismiss defamation claim).

[4]    *Contemporary Mission, Inc. v. New York Times, Co.*, 665 F. Supp. 248, 258-9 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 612 (2d Cir. 1988) (Koeltl, J., as attorney for Defendant) (quoting *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986)).

[5]    *Philadelphia Newspapers, Inc.*, 475 U.S. at 767.  Thus, plaintiffs must have evidence — not mere speculation — that the SunTrust Statements are false.  *Id.*

[6]    *Contemporary Mission*, 842 F.2d at 621 (internal citations omitted) (Koeltl, J., as attorney for Defendants).

that the "defendant realized that his statement was false or that he subjectively entertained serious doubts as the truth of his statement."[7]

**B.    Cummins' Defamation Claims Fail Under New York And Texas Law.**

Texas or New York law applies to Cummins' defamation claims because (1) the SunTrust Statements were written in the New York office of STCM by Hazan and Block, both New York residents, and (2) Cummins, who claims harm, was a Texas resident.[8] (SMF ¶ 25). As demonstrated below via citations to both Texas and New York law, summary judgment is proper under either states' law (and the First Amendment of U.S. Constitution) because Cummins cannot demonstrate, as he must, that the SunTrust Statements were (1) false; (2) defamatory; (3) statements of fact, (4) "of or concerning" Cummins, (5) with the requisite degree of fault; (6) that caused damage to Cummins.[9]

**C.    Cummins Cannot Point To A Single Actionable Or False Statement Of Fact By SunTrust.**

1.    The SunTrust Statements Must Be Viewed In Their Context.

The Court "construes [the alleged defamatory statements] in the context of the entire statement or publication as a whole . . . ."[10] Cummins has excerpted the SunTrust

---

[7]    *Contemporary Mission*, 842 F.2d at 621 (Koeltl, J., as attorney for Defendants). "[P]roving actual malice is a heavy burden." *Dunlop-McCullen v. Rogers*, No. 00 Civ. 3274 (JSR), 2002 WL 1205029, at *7 (S.D.N.Y. Feb. 21, 2002).

[8]    *See Berwick v. New World Network Int'l, Ltd.*, No. 06 Civ. 2641 (JGK), 2007 WL 949767, at *7-8 (S.D.N.Y. Mar. 23, 2007) (Koeltl, J.) (finding that New York applies in a defamation case in which the statements were made in New York, but noting that the law of the jurisdiction where the alleged harm was felt is often the applicable law).

[9]    *Houseman v. Publicaciones Paso Del Norte, S.A DE CV*, 242 S.W.3d 518, 523-4 (Tex. App. 2007); *Weinstein v. Friedman*, No. 94 CIV. 6803 (LAP), 1996 WL 137313, at *10 (S.D.N.Y. March 26, 1996).

[10]    *Aronson v. Wiesman*, 483 N.E.2d 1138, 1139 (N.Y. 1985); *Musser v. Smith Protective Services, Inc.*, 723 S.W.2d 653, 654-5 (Tex. 1987) (holding that in determining whether words are capable of defamatory meaning, the court "construes the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement..."); *see also El Khoury v. Kheir*, 241 S.W.2d 82, 85 (Tex. App. 2007); *Lapar v. Morris*, 501 N.Y.S.2d 82, 83 (N.Y. App. Div. 1986).

Statements from SunTrust's June 8 and June 12 Notes, as well as from only a portion of statements Hazan made to the media. As shown below, when viewed in their proper context, the SunTrust Statements are not actionable.

> 2.    The SunTrust Statements Are Largely Not "Of And Concerning" Cummins.

Defamatory statements "must point to the plaintiff and no one else."[11] The SunTrust Statements do not point solely to Cummins, but instead reflect SunTrust's concerns and criticisms regarding the circumstances surrounding Cyberonics' June 15, 2004 stock options grant. Cummins was only tangentially mentioned in the SunTrust Statements and (notably) is not joined in this suit by Cyberonics, Pam Westbrook, Alan Totah and Dr. Richard Rudolph (the two other recipients of the June 15, 2004 option grants named in the Notes), or any other Cyberonics executive or Board member.

At most, Cummins can point to four statements that are "of and concerning" him: (1) that he was granted and accepted some of the June 15, 2004 option grants; (2) that he had a "paper profit" of around $2.3 million on those grants on June 16, 2004; (3) that he sold around 350,000 options at around $40-45 per share in February 2005; and (4) that Cyberonics stock was meaningfully discounted due to his presence.[12] For reasons discussed in Sections III-C(3)-(5) below, these four statements are not actionable.

---

[11]    *Houseman*, 242 S.W.3d at 525; *Newpapers, Inc. v. Matthews*, 339 S.W.2d 890, 894 (Tex. 1960) ("The settled law requires that the false statement point to the plaintiff and to no one else."); *see also Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966) ("There must be evidence showing that the attack was read as specifically directed at the plaintiff."); *Abramson v. Pataki*, 278 F.3d 93, 102 (2d Cir. 2002) ("[A]n individual plaintiff must be clearly identifiable to support a claim for defamation.").
[12]    *See, e.g.*, Complaint ¶¶ 31, 34, 54, 58 & 66.

3.　　The SunTrust Statements Are Protected Opinion.

The SunTrust Statements are pure opinion protected by the First Amendment.[13] Whether statements are fact or opinion is a question of law for the court,[14] and a long line of cases hold that advice on buying and selling stocks, such as the SunTrust Statements, is constitutionally protected opinion.[15] And SunTrust makes it clear that the Notes reflect "personal views about [Cyberonics] and its [] securities" and that "[o]pinions expressed are subject to change without notice." (SMF ¶ 57).

The SunTrust Statements are also protected statements of criticism. General statements of criticism are subjective and thus non-actionable.[16] The following statements of criticism have been found to be protected:

- That a police officer was a "blight on law enforcement" that had "caused unbelievable problems" and that his departure from the police department was "a culmination of a lot of things, too numerous to discuss";[17]
- That a judicial candidate for the Supreme Court of Texas was "widely considered an embarrassment to the judiciary" that had been "reprimanded for misrepresenting facts in a divorce case";[18]
- That a scientist was a "quack," a "hoke artist," and "fearmonger," "lack[ed] solid credentials" and "expresse[d] incomprehensible mumbo jumbo";[19]
- That a professional baseball umpire was "ludicrous," and that he "doesn't measure up" to his peers";[20]
- That selected police officers "[were] a disgrace" to the police force;[21] and

---

[13]　　*Rinaldi v. Holt, Rinehart & Winston*, 366 N.E.2d 1299, 1306 (N.Y. 1977); *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989) ("Under the First Amendment there is no such thing as a false idea.").

[14]　　*The Associated Press v. Cook*, 17 S.W.3d 447, 454 (Tex. App. 2000); *Mann v. Abel*, 885 N.E.2d 884, 885 (N.Y. 2008); *Rinaldi*, 366 N.E.2d at 1306.

[15]　　*See Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998) (dismissing stock analyst article defamation suit); *see also Jefferson County Sch. Dist. v. Moody's Investor's Servs., Inc.*, 988 F. Supp. 1341, 1345 (D. Col. 1997), *aff'd*, 175 F.3d 848 (10th Cir. 1999) (holding that investment advice article stating that the outlook on the plaintiff's financial situation was "negative" is an expression of opinion protected by the First Amendment); *National Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627, 649 (D. Md. 1992) (investment "tips" in newsletter may not have been actionable as defamation because they were "opinion").

[16]　　*Robertson v. Southwestern Bell Yellow Pages, Inc.*, 190 S.W.3d 899, 903 (Tex. App. 2006); *Rothman v. Sternberg*, 615 N.Y.S.2d 748, 750 (N.Y. App. Div. 1994).

[17]　　*Cook*, 17 S.W.3d at 452-3.

[18]　　*Howell v. Hecht*, 821 S.W.2d 627, 628 (Tex. App. 1991).

[19]　　*Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex App. 1988).

[20]　　*Parks v. Steinbrenner*, 520 N.Y.S.2d 374, 377 (N.Y. App. Div. 1987).

- That a real estate developer pursued "malicious method" and committed "terrorism" in his business practices.[22]

Each one of the SunTrust Statements is protected opinion under this law. SunTrust is entitled to express its measured, reasonable opinion that the improper June 15, 2004 option grants (1) were unethical; (2) were motivated by self-interest; (3) damaged management's credibility; (4) were a compensation abuse; (5) did not legitimately fulfill the proper purpose of option grants to incentivize recipients; (6) were akin to stock options abuses unfolding at other companies and were a perfect example of an abusive option; (7) were akin to and had an effect exactly the same as backdating; (8) were problematic in their timing; (9) seemed a manipulation of the intent of stock option regulations and the term "fair value"; (10) if granted with knowledge that the share price might increase, would be taking advantage of the "fair value" definition for Cyberonics' management's own benefit; (11) could possibly require earnings restatements; (12) might lead to investigations; (13) might be a breach of fiduciary duty; (14) did not appear to have a justifiable reason; (15) were not correct; (16) may have been a microcosm of what was happening with the management team; and (17) would, if improper, require an immediate recording of compensation expense by Cyberonics.[23]

SunTrust was also entitled to state its opinion that (1) it was disputable whether the grants were backdated (given that the option-grant scandal was still emerging); (2) the letter of the law may very well have been followed; (3) that the June 15, 2004 FDA approval was the "single greatest event" in Cyberonics history (given that it resulted in

---

[21]    *O'Loughlin v. Patrolmen's Benevolence Ass'n of Cty of New York, Inc.*, 576 N.Y.S.2d 858, 858-9 (N.Y. App. Div. 1991).

[22]    *Lukashok v. Concerned Residents of North Salem*, 554 N.Y.S.2d 39, 40 (N.Y. App. Div. 1990).

[23]    *Compare* Complaint ¶¶ 27, 30, 31, 34, 35, 39, 40, 41, 44, 47, 48, 49, 50, 51-59, 62-64, 66, 67, & 68 *with Cook*, 17 S.W.3d at 452-53; *Howell*, 821 S.W.2d at 629; *Brewer v. Capital Cities/ABC, Inc.*, 986 S.W.2d 636, 638 (Tex. App. 1998).

the largest one-day stock jump in its history); (4) that management of Cyberonics had been its own Achilles heel; and (5) that Cummins' presence as CEO devalued Cyberonics' stock.[24] Likewise, SunTrust was entitled to express its opinion that Cummins' controversial sale of 350,000 shares of stock in February 2005, just after the release of other good news that significantly increased the stock's value, was further evidence of improper compensation practices at Cyberonics.[25]

Further, as discussed in more detail in Section III-D below, relevant case law, a number of other media sources, shareholders, and three current members of the Cyberonics Board have all publicly agreed with the SunTrust Statements. For example, the Delaware Court of Chancery, whose rulings govern acts of Cyberonics and its management, has stated in an unrelated opinion that spring-loaded stock options (such as the June 15, 2004 Cyberonics grants) involve "deception," are "inconsistent" with the "duty to deal fairly and honestly with the shareholders," involve "bad faith" and "undermine[] the very objectives approved by shareholders . . . **even if the board complies with the strict letter of a shareholder-approved plan . . . .**"[26]

4.    The SunTrust Statements Were Reasonably Based On True Facts.

The SunTrust Statements had a reasonable basis and were based on true facts. "The truth of the statement in the publication on which an action for libel is based is a defense to the action"[27] and SunTrust's showing of substantial truth is sufficient for

---

[24]    *Compare* Complaint ¶¶ 27, 30, 39, 41, 48, 52, 54, 59, 63 *with Cook*, 17 S.W.3d at 452-3; *Howell*, 821 S.W.2d at 629; *Brewer*, 986 S.W.2d at 638.

[25]    *See* Complaint ¶ 34.

[26]    *In re Tyson Foods, Inc.*, 919 A.2d 563, 592-3 (Del. Ch. 2007) (emphasis added); *see also Weiss v. Swanson*, 948 A.2d 433, 441 (Del. Ch. 2008).

[27]    Tex. Civ. Prac. & Rem. Code § 73.005; *Dillon v. City of New York*, 704 N.Y.S.2d 1, 6 (N.Y. App. Div. 1999); *Fairley v. Peekskill Star Corp.*, 445 N.Y.S.2d 156, 159 (N.Y. App. Div. 1981).

dismissal at summary judgment.[28] "If the underlying facts as to the gist of the defamatory charge are undisputed, then we can disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law."[29] "The implication of a true statement, however unfortunate, does not vitiate the defense of truth, and a plaintiff cannot assert a cause of action for libel by the implication of true facts."[30]

   The truth of the key facts concerning the June 15, 2004 Cyberonics option grants as they are set forth under the "fact" section of the June 8, 2006 Note is undisputed. (SMF ¶ 56). Cummins' arguments to the contrary are nothing more than quibbling. Major portions of the SunTrust Statements have proven to be totally and undeniably true based on subsequent events and the results of Cyberonics' own internal investigation. For example, it is undeniably true that (1) there had long been questions in the investment community about Cummins' credibility and suitability as a CEO; (2) there was an investigation launched on Cyberonics; █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[28]   *McIlvain v. Jacobs*, 794 S.W.2d 14, 15-16 (Tex. 1990); *Evans v. Dolcefino*, 986 S.W.2d 69, 75 (Tex. App. 1999); *Cooper v. Hodge*, 814 N.Y.S.2d 447, 448 (N.Y. App. Div. 2006); *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986).
[29]   *McIlvain*, 794 S.W.2d at 16; *KTRK Television v. Felder*, 950 S.W.2d 100, 106 (Tex. App. 1997); *Contemporary Mission*, 665 F. Supp. at 260 (Koeltl, J., as attorney for Defendant).
[30]   *Cook*, 17 S.W.3d at 452-3; *Contemporary Mission*, 665 F. Supp. at 260 (Koeltl, J., as attorney for Defendant).

████████████████████████████████  Finally, it is true that while

481,000 options were granted at Cyberonics during the relevant time period in 2004, only

304,000 of those options were publicly disclosed via Form 4s.[32]

Cummins instead quibbles over SunTrust's terminology. He cannot show, as he

must, that a reasonable reader would have interpreted the words in the way Cummins

argues they should be interpreted.[33] First, Cummins claims that SunTrust falsely stated

that Cummins made a "paper profit" of around $2.3 million when the stock went from

$19.58 on June 14, 2004 to $34.81 on the next day of trading, June 16, 2004.[34] Cummins

wrongly suggests that SunTrust's use of the word "paper profit" indicates Cummins made

an actual profit. But a "paper profit," as that term is widely used, is an unrealized gain on

stock that has not been sold, which is exactly what Cummins had when the Cyberonics

stock price soared on the day following his grant. (SMF ¶¶ 33 & 54).

Second, Cummins claims that SunTrust's statement that "management" granted

the June 15, 2004 options is false because "management" means the officers of a

company, and it was the Cyberonics Board, not the officers, who granted the June 15,

2004 options.[35] ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  Further, the term "management" in the SunTrust Statements

---

[31]     *Compare* Complaint ¶¶ 27, 30, 31, 34, 35, 39, 40, 41, 44, 47, 48, 49, 50, 51-59, 62-64, 66, 67, & 68 *with* SMF ¶ 6.

[32]     *Compare* Complaint ¶ 35 *with* SMF ¶ 38.

[33]     *Contemporary Mission*, 665 F. Supp. at 260 (Koeltl, J., as attorney for Defendant) (holding that even though use of more precise words may have been more accurate, to hold broader words as false would be "elevating form over substance"). Cummins' opinion has no bearing on whether the terms used were defamatory. *Farias v. Bexar County Bd. Of Trustees for Mental Health Mental Retardation Servs.*, 925 F.2d 866, 878 (5th Cir. 1991).

[34]     *See, e.g.,* Complaint ¶¶ 31, 34, 44, & 55.

[35]     *See, e.g.,* Complaint ¶¶ 39, 40, 44, 47, 49, 50, 54-59, & 67.

generally refers to the Cyberonics Board, as they are the people who "manage" the company.  (SMF ¶ 55).

Third, Cummins claims SunTrust falsely stated that Cummins participated in the June 15, 2004 option grants.[36] 

None of these statements is even close to being legally actionable.

### 5.    The SunTrust Statements Are Not Capable Of Defamatory Meaning.

Cummins also cannot demonstrate that the SunTrust Statements "tend to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury."[38]  Apart from SunTrust's protected opinion that Cyberonics stock was discounted by Cummins' presence as CEO, there are no other negative statements directed at Cummins.  Read as Cummins asks the Court to read the following statements, it is not defamatory to state that (1) Cummins received a "paper profit"; (2) Cummins granted the June 15, 2004 options (as opposed to accepting them); (3) Cyberonics didn't

---

[36]    *See, e.g.,* Complaint ¶¶ 39, 40, 44, 47, 49, 50, 54-59, & 67.

[37]    Complaint ¶ 56.  Plaintiff also asserts that SunTrust failed to disclose (1) that its stock price declined to below the price of the June 15, 2004 stock options and (2) that the options vested over a 60 month period.  (Complaint ¶¶ 33, 37 & 46).  However, as SunTrust explained, whether Cummins ever made money on the options is irrelevant to SunTrust's central claim:  Cyberonics granted option to buy stock that would have had far less intrinsic value if they had been appropriately priced.  (SMF ¶ 85).

[38]    Tex. Civ. Prac. & Rem. Code § 73.001; *Einhorn v. LaChance*, 823 S.W.2d 405, 411 (Tex. App. 1992); *Ello v. Singh*, 531 F. Supp. 2d 552, 578 (S.D.N.Y. 2007) ("A statement will be found defamatory only if it 'tend[s] to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace…'") (quoting *Fairley*, 445 N.Y.S.2d at 158).

file all its Form 4s with the SEC; and (4) Cyberonics would have to record a compensation expense for the stock option grants.[39]

Cummins alleges that the SunTrust Statements assert or imply that management of Cyberonics engaged in illegal acts or breaches of fiduciary duty, but, when read in their entirety and not selectively edited by Cummins,[40] it is clear SunTrust made no such accusations. For example, Hazan flatly said: "I'm not saying they broke any laws," and he was widely reported *not* to be "accusing the company of backdating the options . . . ." (SMF ¶ 77). SunTrust also stated in the June 8 and 12 Notes that it had a problem with the June 15, 2004 option grants whether they were "[l]egal or not," and also stated that "it may never develop into a legal event for the company . . . ." (SMF ¶ 57). Further, SunTrust stated "the exact letter of the law may have been followed," and that "shareholders will have to decide whether this management team and its board of directors have fulfilled their fiduciary duty." (SMF ¶¶ 57-58). Finally, as for the Form 4s that SunTrust could not locate, they made clear that they were "still doing due diligence surrounding this issue."[41] Again, reading the SunTrust Statements in their entire context, none are capable of a defamatory meaning as to Cummins.

6.    Mr. Block Made No Statements To Any Newspapers.

Mr. Block made no statement to any newspaper, and thus he cannot be liable for the statements Hazan made to the newspapers.[42] (SMF ¶ 46).

---

[39]    *See* Complaint ¶¶ 27, 30, 31, 34, 35, 39, 40, 44, 47, 49, 54-59, & 67.

[40]    *Aronson v. Wiesman*, 483 N.E.2d 1138, 1139 (N.Y. 1985) (holding that alleged defamatory statements must be read in context); *Musser v. Smith Protective Services, Inc.*, 723 S.W.2d 653, 654-5 (Tex. 1987) (same).

[41]    Complaint ¶ 35.

[42]    See, e.g., *Cyrus W. Scott Mfg. v. Millis*, 67 S.W.2d 885, 887 (Tex. App. 1933).

**D.**    **Cummins Is A Limited Purpose Public Figure Who Triggers The Application Of The Actual Malice Standard To This Case.**

There is a three prong test to determine whether an individual is a limited purpose public figure: (1) the controversy at issue must be public in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) plaintiff must play more than a trivial role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.[43]  Whether an individual is a public figure is a matter of law for the court to decide.[44]

    1.    There Was A Widespread Public Controversy Regarding Option Grants And Cummins.

The SunTrust Statements expressed viewpoints on two very public controversies: the propriety of certain option grants, and Cummins' leadership of Cyberonics.   "To determine whether a controversy indeed existed ... the judge must examine whether persons were actually discussing some specific question. . . . [and] [t]he court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."[45]

---

[43]    While the "limited-purpose public figure" tests in New York and Texas vary in phrasing, they do not vary in substance.  *Compare WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) *with Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136-7 (2nd Cir. 1984); *Lee v. Cty. of Rochester*, 663 N.Y.S.2d 738, 769-70 (N.Y. Sup. Ct. 1997), *aff'd*, 677 N.Y.S.2d 848 (N.Y. App. Div. 1998). Both states' test must comply, however, with the minimum thresholds of the United States Constitution's First Amendment protections set out in such cases as *Contemporary Mission*, 842 F.2d at 617.

[44]    *Rosenblatt*, 383 U.S. at 83; *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir. 1987).

[45]    *WFAA-TV*, 978 S.W.2d, at 572; *Trotter*, 818 F.2d at 434-5 (where the public controversy at issue "captured the attention of a diverse and broadly-based audience," was "widely reported in the media," and was "the subject of legitimate public concern."  *See also Barbouti v. Hearst Corp.*, 927 S.W.2d 37, 48 (Tex. App. 1996) (holding that a public controversy must be an issue that "receives public attention because its ramifications will be felt by persons who are not direct participants."); *White v. Berkshire-Hathaway*, 759 N.Y.S.2d 638, 640 (N.Y. Sup. Ct. 2003), *aff'd*, 773 N.Y.S.2d 664 (N.Y. App. Div. 2004) (holding that a public controversy must be an issue which "affects the general public or some segment of it

Prior to publication of the SunTrust Statements, questionable stock option practices were the subject of widespread and intense public debate between corporate executives receiving certain grants, on the one hand, and the academics, national newspapers, governmental regulators, courts, analysts and shareholders who considered those option grants to be serious breaches of the public trust, on the other. (SMF ¶¶ 1, 4, 6 & 88). Executives such as Cummins asserted they had done nothing wrong. (SMF ¶¶ 3 & 61). Yet people such as Arthur Leavitt, former Chairman of the SEC, stated that the improper option grants "represents the ultimate in greed" and that "[i]t is stealing, in effect. It is ripping off the shareholders in an unconscionable way." (SMF ¶ 2).

Further, well before publication of the SunTrust Statements, Cummins' governance of Cyberonics was also a matter of very public debate. In 2005, his conduct was described the *New York Times* as "polarizing" and, as discussed in detail below, was the subject matter of numerous other national publications before the SunTrust Statements. (SMF ¶¶ 64, 66-69, 72-73).

2.     <u>Cummins Had More Than A Trivial Role In The Controversy.</u>

To determine whether Cummins had more than a trivial role in the controversy for purposes of being a limited purpose public figure, this Court must look to whether (1) Cummins voluntarily publicized himself and thus positioned himself for criticism; (2) issues similar to those raised in the SunTrust Statements were raised by others; (3) Cummins was heavily involved in the issues that were publicized; and (4) Cummins had

---

in an appreciable way."); *Lerman*, 745 F.2d at 138 (holding that a public controversy is "any topic upon which sizeable segments of society have different, strongly held views.").

access to media such that he could respond to the SunTrust Statements.[46]  While

Cummins meets all of these criteria, not all need to be present in order to determine that

Cummins had more than a trivial role in the controversy.[47]

      a.    *Cummins Voluntarily Placed Himself In A Public Position That Risked Increased Exposure And Injury To His Reputation.*

Both throughout and following his tenure as CEO of Cyberonics, Cummins was

the subject of a plethora of newspaper articles and he invited media attention by granting

interviews, posing for pictures in magazines, and appearing on television shows.[48]  (SMF

¶¶ 59-60, 64-85, 89-90).  He was written about in the *New York Times*, *Forbes*, *The Wall*

*Street Journal*, *International Herald Tribune*, *ABC News*, *Continental Magazine*,

*TheStreet.com*, *Fast Company*, *Medical Device Daily*, the *Houston Business Journal*, and

*Securities Data Publishing*, and he appeared on television shows on CNN and CNBC.

(SMF ¶¶ 64-85, 89-90).

      b.    *Cummins Attracted Public Attention Over The Very Issues Raised In the Public Controversy.*

Cummins played more than a trivial role in the controversies addressed in the

SunTrust Statements because he attracted public attention on the topics prior to the

---

[46]    *See Contemporary Mission*, 842 F.2d at 618-9 (Koeltl, J., as attorney for defendant) (finding plaintiffs met the first three factors, and finding that sufficient to demonstrate plaintiffs' limited-purpose public figure status); *Lerman*, 745 F.2d at 136-8.

[47]    *See, e.g., Marcone v. Penthouse Int'l, Ltd.*, 754 F.2d 1072, 1086 (3d Cir. 1985) (holding that courts must look at the relevant factors are taken in context as a whole).

[48]    *See Contemporary Mission*, 842 F.2d at 618-9 (where plaintiffs had a well-documented record of attracting media attention, making public statements and openly availing themselves to the press); *Lerman*, 745 F.2d at 136-8 (where plaintiff had a well-documented record of inviting public attention to her work and maintaining continuing access to the media); *Trotter*, 818 F.2d at 433-6 (where plaintiff business executive and his company received a great degree of media attention); *Swate v. Schiffers*, 975 S.W.2d 70, 75-6 (Tex. App. 1998) (where plaintiff physician received modest media attention for problems in his medical practice); *Brueggemeyer v. American Broad. Cos.*, 684 F. Supp. 452, 455-8 (N.D. Tex. 1988) (where plaintiff businessman had a well-established record of media commentary and public comment).

publication of the SunTrust Statements.[49]  As to the public controversy over whether

Cummins' was an appropriate Cyberonics CEO, that pre-existing controversy was

obviously due to his conduct.  Further, the issues that made Cummins controversial —

credibility and arguably inappropriate and excessive compensation — placed him in the

vortex of the option grant controversy.[50]

The debate over Cummins' credibility that existed prior to publication of the

SunTrust Statements stemmed from his much-discussed temper and his tendency to

exaggerate facts about Cyberonics.  He was reported to "lash out" at those who

questioned him, and he was also reported by the *New York Times* to be "the most

combative, most antagonistic CEO in America," a "hothead" and a "bully."  (SMF ¶ 72).

████████████████████████████████████████████████

████████████████████████  The author of the 2005 *New York Times* article stated (in

a statement later echoed by SunTrust):  "[I]t is quite likely that Cyberonics would have a

higher stock price if [Cummins] weren't such a bully."  (SMF ¶ 72).

As for his tendency towards exaggeration or being "promotional," the media

reported as early as 2001 that "most investors are skeptical of [Cummins'] numbers," that

"Cyberonics has been unreliable in meeting its analyst estimates," that that his attacks on

the FDA were "[a]bsolute hogwash" and that false reports regarding FDA timetables

damaged Cyberonics management's "credibility."  (SMF ¶ 67).  In 2005, the *New York*

---

[49]     *See Contemporary Mission*, 842 F.2d at 618-19 (plaintiffs were involved in conduct similar to that at issue in the defamatory statements); *Lerman*, 745 F.2d at 136-8 (plaintiffs were involved in conduct related to the allegedly defamatory statements); *Trotter*, 818 F.2d at 433-6 (where plaintiff business executive and his company received a great degree of media attention); *Swate*, 975 S.W.2d at 75-6 (plaintiffs' prior acts as a doctor were related to the alleged defamatory statements); *Brueggemeyer*, 684 F. Supp. at 455-8 (plaintiff businessman was involved in business practices similar to the conduct described in the allegedly defamatory statements).

[50]     A full account of the public accounts of Cummins' conduct is too voluminous to include in this Brief.  There is far more detail in the Statement of Material Facts and accompanying Exhibits.  (SMF ¶¶ 64-85, 89-90).

*Times* reported that Cummins "wasn't the most reliable imparter of information about the company — 'promotional' was a word I heard more than once." (SMF ¶ 72). Cummins was also a defendant in a widely reported lawsuit in 2005 where his own shareholders sued him for alleged federal securities fraud. (SMF ¶ 70). The shareholders alleged in public filings that Cyberonics' false statements induced shareholders to purchase Cyberonics stock that, when the truth emerged, caused the stock value to plummet and resulted in a significant loss to shareholders. (SMF ¶ 70).

Cummins' compensation was also a matter of substantial public debate. In 2005, questions arose among the Cyberonics investment community over Cummins' sale of approximately $14 million worth (23% of his total holdings) of Cyberonics shares just after Cyberonics publicly announced further favorable news regarding another FDA decision.[51] (SMF ¶¶ 34-35). Also in 2005, it was widely reported (including in SEC filings) that Ron Matricaria, a Cyberonics Board member, was resigning specifically over issues relating to Cummins' compensation. (SMF ¶ 71). █████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████

---

[51]     *In re Prestige Brands Holding, Inc.*, No. 05 CV 06924 (CLB), 2006 WL 2147719, at *5 (S.D.N.Y. July 10, 2006) (finding that sale of over 20% of stock may indicate insider trading). In fact, this same stock sale was actually mentioned in the June 8, 2006 SunTrust Note, and is incorrectly alleged by Cummins to be libelous. *See, e.g.*, Complaint ¶ 34.

c.    *Cummins Was Heavily Involved In The Events That Created The Controversy.*

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

███████████████████████████████

SunTrust was not alone in publishing statements about Cummins' heavy involvement in the stock option controversy. His involvement garnered a significant amount of media attention,[53] including:

- A *New York Times* article on the options issue that, unlike the SunTrust Statements, focused on Cummins, used his photograph, had an unsourced subheading referring to an "instant paper profit," had a *New York Times* chart indicating that Mr. Cummins made a "paper profit of $2.3 million" and made a statement that Cummins was "an imposing and combative executive already known for prickly relations with critical analysts and skeptical investors . . . ." (SMF ¶ 76).
- A *Houston Chronicle* article calling the June 15, 2004 option grants a "problem" and another article reporting that the timing on the grants was "opportunistic" and that Cummins "should give back the options in question." (SMF ¶ 77).
- A *Business Week* article describing the option grants as a "spring-loading scandal." (SMF ¶ 79).
- An analyst report from a different investment bank asserting the option grants could be a "spring loading offense." (SMF ¶ 78).

---

[52]    *See, e.g, Trotter*, 818 F.2d at 435-6 (where plaintiff executive was adjudged to be heavily involved in the controversy at issue because he had control over the "company's general policy" associated with the controversy); *Brueggemeyer*, 684 F. Supp. at 457-8 (where plaintiff businessman was held to heavily involved in the controversy at issue because his conduct "generated consumer complaints, government legal actions ... investigations, and media attention"); *Horowitz v. Mannoia*, 802 N.Y.S.2d 917 (N.Y. Sup. Ct. 2005) (where plaintiff real estate developers were considered heavily involved in the controversy due to their central decision making roles); *White*, 759 N.Y.S.2d at 638-41 (where plaintiff real estate developer was considered heavily involved in the controversy due to the fact that his business practices led to the numerous investigations at issue).

[53]    While SunTrust has set out important criticisms in the Brief, a far more fulsome set are in the Statement of Material Facts.

24

- A *USA Today* article focused on a thirteen-year history of "questionable," and "tawdry" stock grant practices at Cyberonics. (SMF ¶ 85).
- Public statements by shareholders and three current members of the Cyberonics Board calling the June 15, 2004 options "spring-loaded," "raising serious questions," and showing "a disdain for the interests of the shareholders." (SMF ¶ 75).

      d.   *Cummins Had Access To National Media And Used It To Attack The SunTrust Statements.*

Cummins availed himself of the media in the controversies, both through Cyberonics and by communicating directly with reporters.[54] ████████████

████████████████████████████████

████████████████ The denial was email-blasted to investors on June 8, publicly filed with the SEC on June 9, and generated national media coverage. (SMF ¶ 61 & 63). ████████████████

████████████████████████████

Cummins also conducted personal interviews with the *New York Times* and *USA Today*, in which he denied wrongdoing, ████████████████

████████████

      3.   <u>The SunTrust Statements Were Directly Related To The Public Controversy Regarding Stock Option Grants And, To A Lesser Extent, Cummins' Performance As A CEO.</u>

The SunTrust Statements concerned stock option grant irregularities at Cyberonics, and thus were directly related to the larger option grant controversy that was, as discussed at length above, widely controversial. Though the SunTrust Statements

---

[54]   *See, e.g., New Times, Inc. v. Wamstad*, 106 S.W.3d 916, 921-5 (Tex. App. 2003), *vacated for unreported reasons but not reversed* (holding that a "flamboyant" and "controversial" businessman was a limited purpose public figure who "voluntarily sought public attention" and utilized his "media access" to propound his point of view); *Gatheright v. Swindle*, No. 06-CV-487, 2007 WL 2300782, *3-4 (E.D. Tex. Aug. 7, 2007) (holding that a civil right consultant was a limited purpose public figure who used the media as a "vehicle to communicate information" and who often responded to media requests for statements); *White*, 759 N.Y.S.2d at 639-41 (holding that real estate developer was a limited purpose public figure who had a history of media coverage and who "took advantage of effective channels of communication.").

focused far less on Cummins than on Cyberonics' management in general, to the extent they mentioned Cummins' compensation and credibility, they directly concerned those much debated aspects of his tenure as CEO.

## E.    The "Common Interest" Privilege Protects The SunTrust Statements.

SunTrust is also entitled to the protection afforded by the "common interest" privilege because the goal of the SunTrust Statements was to offer information to investors and potential investors who shared a common interest in whether Cyberonics was engaged in improper business practices that would impact its financial performance and stock price.[55]  (SMF ¶¶ 50-51).

## F.    The Public Interest Privilege Protects The SunTrust Statements.

Each one of the SunTrust Statements addressed matters of legitimate public concern, and thus is protected by the public interest privilege.[56]  Here, as discussed in Section III-D above, the SunTrust Statements concerned matters of legitimate public concern because they addressed "failures or manipulations of a specific corporations in which thousand of people have invested their personal fortunes . . . ."[57]

---

[55]    *See Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 (Tex. App. 1980); *Foster v. Churchill*, 665 N.E.2d 153, 158 (N.Y. 1996); *County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 317 F. Supp. 2d 383 (S.D.N.Y. 2004), *aff'd*, No.04-2982-CV, 2005 WL 3117211 (2d Cir. Nov. 22, 2005).

[56]    *See Fotochrome, Inc. v. New York Herald Tribune, Inc.*, 305 N.Y.S.2d 168, 172 (N.Y. Sup. Ct. 1969).  It is long established that investment in the stock market is a matter of public concern.  *Id.*; *see also Trails West, Inc. v. Wolff*, 298 N.E.2d 52 (N.Y. 1973) (reports of such matters as bus safety); *Mahoney v. State*, 665 N.Y.S.2d 691 (N.Y. App. Div. 1997) (municipal project that was investigated as part of a building industry probe); *Visentin v. Haldane Cent. Sch. Dist.*, 782 N.Y.S.2d 517 (N.Y. Sup. Ct. 2004) (article about local teacher's dismissal).

[57]    *Fotochrome*, 305 N.Y.S.2d at 172.

**G.    SunTrust Engaged In No Wrongdoing In Publishing The SunTrust Statements.**

    1.    SunTrust Did Not Act With Actual Malice.

Limited purpose public figures such as Cummins must prove that SunTrust published a defamatory falsehood with actual malice.[58] A libel defendant is entitled to summary judgment "if it can negate actual malice as a matter of law."[59] "Actual malice ... does not include ill will, spite, or evil motive," but rather requires clear and convincing evidence that the defendant at least "entertained serious doubts as to the truth of his publication."[60] A libel defendant can negate actual malice by presenting evidence showing it did not publish the alleged defamatory statement with actual knowledge of any falsity or with reckless disregard for its truth.[61] Cummins cannot controvert SunTrust's evidence with evidence of personal animosity, ill will, evil motive, or spite.[62]

With regard to the SunTrust Statements, the evidence shows that Hazan and Block did not make them with knowledge that any of the statements were false, or with reckless disregard of whether any of the statements were false or not. Nor did Hazan and Block (1) ever have any degree, much less a high degree, of awareness of any of the SunTrust Statements' probable falsity, or (2) ever entertain doubts, much less serious doubts, about the truth of the SunTrust Statements. (SMF ¶¶ 40-45, 47 & 53). Hazan and Block's sole purpose in making the SunTrust Statements was to help investors make fully informed decisions about whether to invest in Cyberonics. (SMF ¶¶ 50-51).

---

[58]    *Lerman*, 745 F.2d at 139; *Contemporary Mission, Inc*, 842 F.2d at 621.

[59]    *Cook*, 17 S.W.3d at 458; *WFAA-TV, Inc.*, 978 S.W.2d at 574; *Armstrong v. Simon & Schuster*, 721 N.Y.S.2d 340, 341 (N.Y. App. Div. 2001).

[60]    *Howell*, 821 S.W.2d at 630 (Tex. App. 1991); *see also Cook*, 17 S.W.2d at 458; *McLemore*, 978 S.W.2d at 574; *Hotchner v. Castillo-Puche*, 551 F.2d 910, 912-3 (2d Cir. 1977); *Goldblatt v. Seaman*, 639 N.Y.S.2d 438, 439 (N.Y. App. Div. 1996).

[61]    *Cook*, 17 S.W.3d at 458.

[62]    *Cook*, 17 S.W.3d at 458-59; *Silbowitz v. Lipper*, 299 N.Y.S.2d 564, 567 (N.Y. App. Div. 1969).

While it was Hazan's professional opinion that Cyberonics' credibility was undermined by reports of Cummins' temper, tendency to exaggerate, and questionable stock transactions, neither Hazan nor Block has ever had ill will, spite, or malice towards Cummins. It is simply their jobs to research and publish opinions about companies and their management. (SMF ¶¶ 28, 49-51). Further, contrary to Cummins' allegations,[63] Hazan and Block never made any improper disclosures prior to or following its publication of the SunTrust Statements. (SMF ¶ 52).

Indeed, Hazan and Block exercised great caution to ensure the factual accuracy, fairness and reasonableness of the SunTrust Statements. As discussed in Section II-B above, the ideas behind the SunTrust Statements were reviewed in advance and cleared by (1) David Prince, a securities specialist and the chief lawyer at SunTrust Capital Markets, (2) a securities law specialist whom David Prince contacted, (3) Susan Venezia, a supervisory analyst at SunTrust Capital Markets, and (4) Rick Inskeep, Director of Analysts at SunTrust Capital Markets. Further, Hazan and Block double-checked each others' work to ensure the fairness and accuracy of the SunTrust Statements. (SMF ¶¶ 40-45, 48). As a matter of law, this behavior refutes any argument by plaintiff as to actual malice.

      2.    SunTrust Did Not Act With Gross Irresponsibility Or Negligence With Respect To The SunTrust Statements.

For the reasons set out in Section III-G(1) above, no reasonable jury could find that SunTrust acted with gross irresponsibility or negligence with respect to the publication of any of the SunTrust Statements.[64]

---

[63]    *See* Complaint ¶ 69.

[64]    *See Fotochrome*, 305 N.Y.S.2d at 172-3 (dismissing defamation suit at summary judgment stage for failure to demonstrate "gross irresponsibility"); *see also Chapadeau v. Utica Observer-Dispatch*, 379

**H.**   **Cummins Cannot Show That The SunTrust Statements Caused Cummins Any Harm.**

The SunTrust Statements did not damage Cummins in the manner he alleges.

First, the statements could not have damaged to Cummins' reputation. "A man may be grossly libeled, and still his character and reputation may be such that he suffers no injury . . . ."[65] As discussed in Section III-D above, questions about Cummins' credibility and his excessive executive compensation were already widely publicized, and his receipt of questionable option grants were all known prior to the SunTrust Statements and were widely and independently reported on in numerous far-reaching publications.[66]

Cummins also cannot demonstrate that the SunTrust Statements "proximately caused" any economic loss.[67] ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████  Therefore, the SunTrust Statements neither caused nor resulted in Cummins' resignation.

---

N.Y.2d 196 (1975); *Balderman v. American Broad. Cos.*, 738 N.Y.S.2d 462, 469 (N.Y. App. Div. 2002); *Gaeta v. New York News, Inc.*, 465 N.E.2d 802, 806 (N.Y. 1984). *See further Veilleux v. National Broad. Co.*, 206 F.3d 92, 113-4 (1st Cir. 2000) (dismissing defamation case as a matter of law on First Amendment grounds for failure to demonstrate negligence with regard to statements).
[65]    *Kruglak v. Landre*, 258 N.Y.S.2d 550, 551 (N.Y. App. Div. 1965); *Handelman v. Hustler Magazine, Inc.*, 469 F. Supp..1053, 1060 (S.D.N.Y. 1979) (citing *Kruglak*); *Southwestern Bell Yellow Pages, Inc. v. Thomas*, No. 05-04-01722-CV, 2006 WL 217665, at *3 (Tex. App. Jan. 30, 2006) (finding that even if statements were defamatory, reputation damages not available when they have not damaged a reputation).
[66]    *See* Section III-D, *supra*.
[67]    *See, e.g., Waste Distillation Tech. v. Blasland & Bouck Eng'rs, P.C.*, 523 N.Y.S.2d 875, 877 (N.Y. App. Div. 1988) (allegations of special damages inadequate where "plaintiff has failed to sufficiently allege that any losses incurred were causally related to" the SunTrust Statements).

Cummins also cannot demonstrate the SunTrust Statements (as opposed to all the other statements published about him) caused him mental anguish, which is defined as sustained mental pain and distress, not "mere worry, anxiety, vexation, embarrassment, or anger . . . ."[68]  Finally, Cummins is not entitled to exemplary damages because there is not a shred of evidence of a defamatory statement or malicious intent,[69] nor is there evidence, as is required for such damages, of economic loss.[70]

## IV.     **CONCLUSION**

For the foregoing reasons, movants respectfully request that this Court grant their Motion for Summary Judgment in its entirety.

---

[68]     *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 505 (Tex. App. 2008), *rev. denied* (May 17, 2008) (rejecting claim for mental anguish).
[69]     *Tatum v. Liner*, 749 S.W.2d 251 (Tex. App. 1988) ("Exemplary damages, by definition, are a form of punishment, and are not to be awarded unless it has been shown that there was malice."); *Handelman*, 469 F. Supp. at 1059.
[70]     *See Wolf Street Supermarkets, Inc. v. McPartland*, 487 N.Y.S.2d 442, 448 (N.Y. App. Div. 1985); *Southwestern Bell Yellow Pages, Inc. v. Thomas*, 2006 WL 217665, at *3 (Tex. App. 2006).

This 10th day of September, 2008.

/s/ Judson Graves
_____

JUDSON GRAVES
Georgia Bar No. 305700
ROBERT R. LONG
Georgia Bar No. 141546
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Phone: (404) 881-7000
Fax: (404) 881-7777

-and-

NELSON BOXER (NB2762)
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 210-9400
Fax: (212) 210-9444

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT P. "SKIP" CUMMINS,<br><br>Plaintiff,<br><br>vs.<br><br>SUNTRUST CAPITAL MARKETS,<br>INC., AMIT HAZAN, and<br>JONATHAN BLOCK,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 07 CV 4633 (JGK)<br>_____<br><br>JURY DEMAND |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day an unredacted copy of **DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT, BRIEF AND MEMORANDUM OF**

**LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY**

**JUDGMENT, AND DEFENDANTS' STATEMENT OF MATERIAL FACTS** have

been served upon the following counsel of record via e-mail and via UPS overnight

delivery addressed as follows:

Julius Glickman
Ashton Bachynsky
GLICKMAN & HUGHES, LLP
909 Fannin Street, Suite 3800
Houston, TX 77010

Alan Heblack
SNITOW KANFER HOLTZER & MILLUS, LLP
575 Lexington Avenue
New York, NY 10022-6102

This 10th day of September, 2008.

/s/ Judson Graves

JUDSON GRAVES
Georgia Bar No. 305700

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA, 30309-3424
Tel: (404) 881-7000
Fax: (404) 881-7777

LEGAL02/30940501v1