UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────

ROBERT P. "SKIP" CUMMINS,

                        Plaintiff,            07 Civ. 4633 (JGK)

          - against -                         Opinion and Order

SUNTRUST CAPITAL MARKETS, INC., et al.,

                        Defendants.
─────────────────────────────────────────

JOHN G. KOELTL, District Judge:

        This is an action for defamation arising out of two analyst

reports and related statements to the media criticizing the

issuance of certain options to Robert P. "Skip" Cummins, the

former Chief Executive Officer ("CEO") of Cyberonics, Inc.

("Cyberonics"), and other Cyberonics executives.  The gist of

the analyst reports and related statements was that the option

grants were timed to exploit information favorable to Cyberonics

that ordinary shareholders of the company could not exploit.

The analyst reports and related statements characterized the

option grants as unethical and self-interested, and compared

them in effect to illegal backdating.

        Mr. Cummins (the "plaintiff") brings this litigation

against the authors of the analyst reports, Amit Hazan and

Jonathan Block, and their employer, SunTrust Capital Markets,

Inc. (the "defendants"), alleging that the analyst reports

contained defamatory statements and were defamatory as a whole,

and that related statements made by defendant Hazan to the media were defamatory.  The defendants move for summary judgment.

I

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary
judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).

Summary judgment is appropriate if it appears that the non-
moving party cannot prove an element that is essential to the
non-moving party's case and on which it will bear the burden of
proof at trial. See Cleveland v. Policy Mgmt. Sys. Corp., 526
U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v.
Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004). In
determining whether summary judgment is appropriate, a court
must resolve all ambiguities and draw all reasonable inferences
against the moving party. See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United
States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also
Gallo, 22 F.3d at 1223. Summary judgment is improper if there
is any evidence in the record from any source from which a
reasonable inference could be drawn in favor of the nonmoving
party. See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37
(2d Cir. 1994). If the moving party meets its initial burden of
showing a lack of a material issue of fact, the burden shifts to
the nonmoving party to come forward with "specific facts showing
a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-
moving party must produce evidence in the record and "may not
rely simply on conclusory statements or on contentions that the

affidavits supporting the motion are not credible." <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993); <u>see also</u> <u>Scotto v. Almenas</u>, 143 F.3d 105, 114-15 (2d Cir. 1998); <u>Singh v. New York City Off-Track Betting Corp.</u>, No. 03 Civ. 5238, 2005 WL 1354038, at *1 (S.D.N.Y. June 8, 2005).


                              II


     The following facts are undisputed unless otherwise indicated.

     At the time of the analyst reports and the related statements to the media at issue in this case, defendants Hazan and Block were equity research analysts at SunTrust Capital Markets, Inc. ("SunTrust"), a subsidiary of a bank holding company.  (Defendants' Local Rule 56.1 Statement of Material Facts ("Defts.' 56.1 Stmt.") ¶ 25; Plaintiff's Local Rule 56.1 Statement of Material Facts ("Pl.'s 56.1 Stmt.") ¶ 25.)  In their capacity as analysts at SunTrust, defendants Hazan and Block wrote analyst reports about the companies they covered. (Defts.' 56.1 Stmt. ¶ 25; Pl.'s 56.1 Stmt. ¶ 25.)  One of those companies was Cyberonics, a company that designs, develops and markets implantable medical devices for the treatment of patients with chronic illnesses who have not responded to

                              4

traditional drugs and therapies.  (Defts.' 56.1 Stmt. ¶ 27;
Pl.'s 56.1 Stmt. ¶ 27.)

    In 2006, defendants Hazan and Block were asked by their
supervisor at SunTrust, Rick Inskeep, to investigate the
companies they covered for improper option grants.  (Defts.'
56.1 Stmt. ¶ 26; Pl.'s 56.1 Stmt. ¶ 26.)  On June 8 and June 12,
2006, SunTrust published two analyst reports written by
defendants Hazan and Block on the subject of certain option
grants at Cyberonics.  (Pl.'s Exs. 1 & 2.)  The core facts
surrounding those options grants are not in dispute.  On June
14, 2004, Cyberonics' stock price at the close of trading was
$19.58.  (Defts.' 56.1 Stmt. ¶ 29; Pl.'s 56.1 Stmt. ¶ 29.)  On
June 15, 2004, NASDAQ trading in Cyberonics stock was suspended
for the entire day.  June 15, 2004 was the date of a Food and
Drug Administration ("FDA") panel proceeding concerning a
therapy for depression developed by Cyberonics.  Late in the
day, the panel voted to recommend the therapy.  (Defts.' 56.1
Stmt. ¶ 30; Pl.'s 56.1 Stmt. ¶ 30.)  That same evening, while
trading was still suspended, Cyberonics held a previously
scheduled board meeting.  (Pl.'s 56.1 Stmt. ¶ 31; Tr. 35-36.)[1]
At that meeting, after the plaintiff excused himself from the
meeting, the Cyberonics board of directors granted 150,000 stock

_____

[1]    All citations to the transcript refer to the oral argument held on this
motion on April 3, 2009.

options to the plaintiff and 100,000 stock options to other executives they considered responsible for the positive panel recommendation. (Defts.' 56.1 Stmt. ¶ 31; Pl.'s 56.1 Stmt. ¶ 31; Tr. 35.) The plaintiff was informed that same evening of the award of stock options to him and to the other executives. (Tr. 35; Pl.'s Apr. 14, 2009 Letter Br. ¶ 2 ("The fact that Mr. Cummins was told after the June 15, 2004 board meeting that he was granted options and that he knew the stock price would go up by some amount . . . .").) The plaintiff was also given the responsibility of allocating the 100,000 stock options granted to the other executives among those executives. (Defts.' 56.1 Stmt. ¶ 31; Pl.'s 56.1 Stmt. ¶ 31.)

All of the stock options issued on June 15 carried the June 14 closing price of $19.58. (Defts.' 56.1 Stmt. ¶ 32; Pl.' 56.1 Stmt. ¶ 32.) The June 14 closing price was the most recent closing price because trading was suspended on June 15. The plaintiff knew, on the evening of June 15, that Cyberonics stock would rise the next day due to the favorable FDA panel recommendation. (Pl.'s Apr. 14, 2009 Letter Br. ¶ 2.) The share price did rise the next day by 78%, closing at $34.81. The value of the plaintiff's options, which had not yet vested,[2]

---

[2]     The plaintiff's options vested ratably over 60 months. (Pl.'s Ex. 10.)

increased by approximately $2.3 million.  (Defts.' 56.1 Stmt. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33.)

The circumstances of the June 15, 2004 option grants formed the primary subject of the June 8 and June 12, 2006 analyst reports written by defendants Hazan and Block and published by SunTrust.  (Pl.'s Ex. 1 & 2.)  The subject heading of the June 8 analyst report was: "CYBX: Moving to Neutral on Option Grant Concerns & Reimbursement Delays."  (Pl.'s Ex. 1.)[3]  The June 8 report indicated at the outset that the authors were lowering their rating on Cyberonics from "buy" to "neutral" because "the company's stock option grants in 2004 may face meaningful scrutiny in the current environment surrounding option grants . . . ."  The report contained a brief "Summary" section that was a summary and preview of a longer "Comments" section that developed everything that was included in the "Summary" section. The report characterized the June 15, 2004 option grants at Cyberonics as "unusual activity."  The authors presented the following information in a section of "facts" at the beginning of the "Comments" section:

1.   June 14th, 2004 – the stock closed at $19.58.

2.   June 15th, 2004 – the stock was halted for the entire day during FDA Panel proceedings for VNS therapy for depression (which resulted in a positive recommendation at about 4 p.m.).

_____

[3]     "CYBX" is the NASDAQ symbol for Cyberonics.

3.   June 15th (evening), 2004 – stock options were issued to three executives (immediately following the Panel decision), during a board meeting held that night.  Skip Cummins (CEO) received an option grant of 150,000 shares, and Richard Rudolph (VP, CMO) and Alan Totah (VP) each received grants of 10,000 options. <u>All of these options carried the June 14th closing price of $19.58</u>. [Emphasis in original.]

4.   June 16th, 2004 – on the first trading day following the positive FDA Panel recommendation, CYBX jumped 78% to close at $34.81, yielding an overnight paper profit of ~$2.3 million for CEO Cummins, and ~$150,000 each for Rudolph and Totah.

5.   February 2005 – Mr. Cummins sold ~350,000 options at ~$40-45 per share (the selling began just days after CYBX received an FDA approvable letter for the same device).  Both Rudolph and Totah sold options at around ~$36 per share since the Panel approval in June '04.

(Pl.'s Ex. 1.)

Following this presentation of "facts," the authors compared the "effect" of the June 15 options to the effect of backdated options, and suggested that it "seemed clear" that like backdated options, the June 15 options were "'in the money' options that would require an immediate recording of compensation expense (which could possibly necessitate a restatement of FY05 results)."  (Pl.'s Ex. 1.)[4]  The authors did not say that the options granted on June 15 were backdated,

_____

[4]    The plaintiff offers the following definition of "backdated" options, which the Court accepts for purposes of this dispute: "Stock options 'backdating' is a practice whereby a public company issues options on a particular date while falsely recording that the options were issued on an earlier date when the company's stock was trading at a lower price.  The options are purportedly issued with an exercise price equal to the market price on the date of the option grant.  But, in fact because the grant dates were falsified, the options were 'in the money' when granted."  (Pl.'s 56.1 Stmt. ¶ 2) (quoting <u>Desimone v. Barrows</u>, 924 A.2d 908, 918 (Del. Ch. 2007)).

noting that it was "disputable" and that "<u>it appears to us that
even if backdating by definition did not occur, the effect was
exactly the same</u>." (Pl.'s Ex. 1) (emphasis in original).

The authors proceeded to note that they were "unable to
locate all of the electronic Form 4's for the quarter in
question . . . [and] are continuing to do diligence surrounding
this issue." (Pl.'s Ex. 1.)

In the final paragraph about the June 15 options, the
authors asserted that the options reflected poorly on the
credibility of Cyberonics management, even though "this option
granting issue may never develop into a legal event for the
company." The authors stated that "we feel it is unfortunately
another clear hit to this management's credibility," and made
reference to preexisting criticism of the credibility of
Cyberonics management. The authors concluded that "[l]egal or
not, we are hard pressed to find a justifiable reason for the
events that unfolded above." (Pl.'s Ex. 1.)

On June 9, 2006, the Securities and Exchange Commission
(the "SEC") launched an internal investigation of Cyberonics.
(Defts.' 56.1 Stmt. ¶ 8; Pl.'s 56.1 Stmt. ¶ 8.) On June 12,
2006, SunTrust published a second analyst report by defendants
Hazan and Block. The subject heading of the June 12 report was:
"CYBX: SEC Launches Informal Probe into Option Grants." Like

the June 8 report, the June 12 report contained a "Summary" section that was a preview and summary of a longer "Comments" section that developed everything included in the "Summary" section.  The authors structured the discussion in the "Comments" section of the June 12 report into three parts, under the following subheadings: "SEC Contacts CYBX," "We Fully Stand by Our Claim," and "Credibility is the Real Issue."[5]  (Pl.'s Ex. 2.)

In the first part of the discussion, the authors noted that the SEC investigation into Cyberonics that began on June 9 "highlights a concern" raised in the authors' June 8 analyst report.  The authors then summarized the "facts" set forth in the June 8 report: "Specifically, 170,000 options were granted that night [of June 15, 2004], just a few hours after a very controversial FDA Panel voted to approve VNS therapy for depression.  With a full understanding of the materiality of the event (this was undoubtedly the single greatest event in the company's history), this management and board of directors granted the options with a prior day's (June 14th) exercise price of $19.58.  The stock rose 78% on June 16, yielding the executives a combined overnight paper profit of ~$2.5M."  (Pl.'s Ex. 2.)

---

[5]    This same structure, including the subheadings, is reflected in the "Summary" section.  (Pl.'s Ex. 2.)

In the second part of the discussion, the authors sought to "further clarify" the "claim" they made in the June 8 report. The authors explained that their claim was that the timing of the June 15 option grants (which occurred in the wake of favorable news for the company on a day when trading was frozen) and the exercise price of the options (which was the previous day's exercise price and did not incorporate the favorable news of the FDA Panel recommendation) reflected that Cyberonics management had acted out of self-interest by taking advantage of "material information at a time when their shareholders and investors could not do so." The authors characterized the behavior of Cyberonics management as "knowingly abus[ing]" the principle that the purpose of stock option grants is to align the interests of management with the interests of the shareholders. The authors did not accuse Cyberonics management of breaking any laws, noting that "the exact letter of the law may very well have been followed . . . ." The authors did say that it "seem[ed] clear to [them]" that the "intent" of the law had been "manipulated," because "the intent of the regulation is to come as close as possible to capturing the 'true' value of the stock," and in light of the FDA Panel recommendation the June 14th share price for Cyberonics was plainly not the true value of Cyberonics stock on June 15th when the options were granted.  (Pl.'s Ex. 2.)

In the third part of the discussion, the authors compared the June 15 option grants to "broader stock option incentive compensation abuses" occurring elsewhere, characterizing the June 15 option grants as "akin 'in effect'" to broader stock option abuses.  The authors reiterated that while the June 15 option grants may have been legal, they "appear unethical to us . . . ."  The authors also made reference to preexisting "credibility issues" with Cyberonics management and stated that "in our opinion," the value of Cyberonics stock is meaningfully discounted due to the presence of the plaintiff as CEO of the company.  The authors concluded by noting that "[a]t the end of the day, shareholders will have to decide whether this management team and its board of directors have fulfilled their fiduciary duty.  We are currently hard pressed to reach such a conclusion."  (Pl.'s Ex. 2.)

Mr. Hazan sent the June 8, 2006 analyst report to the New York Times.  (Pl.'s 56.1 Stmt. ¶ 8; Defts.' Reply 56.1 Stmt. ¶ 8.)  On June 9, 2006, the New York Times published an article in its Business Section about the June 15, 2004 issuance of options at Cyberonics.  (Pl.'s Ex. 3.)  The title of the article was: "Questions Raised on Another Chief's Stock Options," and the article contained a picture of the plaintiff with a caption identifying him as the CEO of Cyberonics.  The article quoted

Mr. Hazan saying: "My problem is the timing of when they [issued the options].  The fact that [the options do not] vest immediately doesn't mean it was ethical, and I haven't heard from one institutional investor today who disagrees with me." The article also quoted Mr. Hazan saying: "It's a perfect example of an abusive option."  (Pl.'s Ex. 3.)

On June 9, 2006, Bloomberg.com published an article to the effect that Cyberonics was disputing the June 8, 2006 analyst report.  (Pl.'s Ex. 5.)  The title of the article was: "Cyberonics Disputes Analyst Comments on Option Grants."  The article quoted Mr. Hazan saying in an email: "[I]t appears unjustified and unethical to issue those grants on the night of the single greatest event in the company's history."  (Pl.'s Ex. 5.)

Mr. Hazan also gave an interview to the Houston Chronicle. On June 14, 2006, the Houston Chronicle published an article about the June 15, 2004 option grants.  The article quoted Mr. Hazan saying, with respect to the option grants: "It was not correct or ethical for them to do what they did . . . . It may be a microcosm of what's happening with this management team." (Pl.'s Ex. 4.)  The article also summarized the circumstances surrounding the June 15 option grants that were presented as 'facts' in the June 8 analyst report (and reproduced at the

outset of the June 12 analyst report), and noted that "Hazan estimates by granting the options when it did, the company gave Cummins a $2.3 million boost, at least on paper, and about $150,000 each for the other two executives." (Pl.'s Ex. 4.)

Prior to the publication of the June 8 analyst report, defendants Hazan and Block consulted with David Prince, the chief legal officer at SunTrust. (Pl.'s Ex. 7 ("Prince Dep.") at 143, 149-54.) The substance of the consultation was the information presented in the section of 'facts' in the June 8 report, although Mr. Prince does not recall discussing the plaintiff's February 2005 sale of shares or the use of the term "paper profit" with defendants Hazan and Block. (Prince Dep. 158-59, 175-76.) The consultation took place over two telephone calls of approximately 11.5 and 5.5 minutes each. (Prince Dep. 49-50, 82-83.) Mr. Prince told defendants Hazan and Block that they had a reasonable basis to believe there were accounting issues with the June 15, 2004 options grants. (Prince Dep. 159-60.) He also told them that he felt the SEC would consider "what happened here improper," and he told them about a National Association of Securities Dealers ("NASD") regulation that was a catchall regulation that functions "almost like an ethical standard" and "underlies everything that a broker-dealer does."

(Prince Dep. 160-61.)[6]  Defendants Hazan and Block did not
consult with Mr. Prince about various statements made in the
June 8 analyst report that followed the section of 'facts,'
including the statements about whether the option grants should
require the immediate recording of compensation expense.
(Prince Dep. 176-77.)  Mr. Prince did not recall defendants
Hazan and Block consulting with him about the June 12 analyst
report.  (Prince Dep. 179-80.)[7]

On November 9, 2006, the Cyberonics board of directors
decided to ask the plaintiff to resign.  (Defts.' 56.1 Stmt. ¶
14; Pl.'s 56.1 Stmt. ¶ 14.)  The plaintiff resigned on November
20, 2006.  (Defts.' 56.1 Stmt. ¶¶ 18-19; Pl.'s 56.1 Stmt. ¶¶ 18-
19.)  The June 8 and June 12 analyst reports were not discussed
in the course of the November 9 board meeting at which the board
of directors reached the decision to ask for the plaintiff's
resignation.  (Defts.' 56.1 Stmt. ¶ 15; Pl.'s 56.1 Stmt. ¶ 15.)
However, the publicity generated by the analyst reports

---

[6]     NASD Conduct Rule 2110 provides: "A member, in the conduct of his
business, shall observe high standards of commercial honor and just and
equitable principles of trade."
[7]     The June 8 and June 12 analyst reports were also reviewed prior to
publication by Susan Venezia, a supervisory analyst at SunTrust responsible
for reviewing analyst reports prior to their publication to ensure their
accuracy and compliance with internal guidelines.  Ms. Venezia approved the
June 8 and June 12 analyst reports without qualification.  (Defts.' 56.1
Stmt. ¶ 44; Pl.'s 56.1 Stmt. ¶ 44.)  Ms. Venezia did not request any
supporting documents for the statements in the two reports or speak to
defendants Hazan and Block about the reports prior to her approval.  (Pl.'s
Ex. 17 ("Venezia Dep.") at 49-50.)

contributed to the decision to ask for the plaintiff's resignation.  (Pl.'s Ex. 23 ("Coelho Dep.") at 148-50.)

III

Pursuant to the Court's instructions, the plaintiff submitted a chart listing each allegedly defamatory statement in the analyst reports and the related statements to the New York Times, Bloomberg.com, and the Houston Chronicle, and explaining why each statement listed was defamatory.  The plaintiff identified thirty-seven (37) allegedly defamatory statements, many of which were overlapping or duplicative, and also alleged that the analyst reports were defamatory as a whole.  The arguments underlying many of the allegations of defamation include: the statement falsely implied that the plaintiff participated in issuing the June 15, 2004 options; the statement falsely implied that the plaintiff participated in illegally backdating the options; and the statement falsely indicated that the options had to be recorded immediately as a compensation expense.  The defendants submitted a responsive chart asserting specific defenses with respect to each of the 37 allegedly defamatory statements.  The defenses underlying much of the responsive chart include: the statement was substantially true; the statement was one of opinion rather than fact; and the statement was not "of and concerning" the plaintiff.

16

The Court has reviewed each of the allegedly defamatory statements in the context in which it was made, and all of the parties' arguments with respect to whether each statement was defamatory and whether the analyst reports were defamatory as a whole. The Court has also reviewed the voluminous submissions by both parties. For the reasons explained below, the statements identified by the plaintiff were not defamatory and summary judgment should be granted.

A

There is a threshold issue of determining what substantive law to apply to the plaintiff's claims. The plaintiff insists on the application of Texas law (Tr. 85-87) while the defendants argue for the application of New York law (Tr. 99-101.)

"A federal court sitting in diversity applies the choice of law rules of the forum state." Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999); see also Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Beth Israel Med. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 582 (2d Cir. 2006); Interstate Foods, Inc. v. Lehmann, No. 06 Civ. 13469, 2008 WL 4443850, at *2 (S.D.N.Y. Sept. 30, 2008). In determining the applicable law for tort claims, "New York applies the law of the state with the most significant interest in the litigation." Lee, 166 F.3d at 545; Padula v. Lilarn

Props. Corp., 644 N.E.2d 1001, 1002 (N.Y. 1994).  In weighing the

interests of the jurisdictions, New York distinguishes between

"conduct regulating" and "loss allocating" rules.  Lee, 166 F.3d

at 545; Schultz v. Boy Scouts of Am., Inc., 480 N.E.2d 679, 684-

85 (N.Y. 1985); see also Neumeier v. Kuehner, 286 N.E.2d 454,

457-58 (N.Y. 1972).  Where the rule at issue is primarily

conduct regulating, "the law of the jurisdiction where the tort

occurred will generally apply because that jurisdiction has the

greatest interest in regulating behavior within its borders."

Padula, 644 N.E.2d at 1002 (quoting Cooney v. Osgood Mach., 612

N.E.2d 277, 280 (N.Y. 1993)).  See also Berwick v. New World

Network Int'l, Ltd., No. 06 Civ. 2641, 2007 WL 949767, at *7

(S.D.N.Y. Mar. 28, 2007).

     "Discouraging defamation is a conduct regulating rule."

Lee, 166 F.3d at 545.  In cases involving allegations of

defamation, New York courts usually find that the state of the

plaintiff's domicile has the most significant relationship to

the case, "assuming that the defamation was published in the

plaintiff's state, because plaintiff's home state is where a

plaintiff's reputation is most likely damaged."  La Luna

Enters., Inc. v. CBS Corp., 74 F. Supp. 2d 384, 388 (S.D.N.Y.

1999).  However, this preference is not conclusive, and where

the allegedly defamatory material has been published in more

than one state, courts have looked to multiple factors to
determine the applicable law, including "the plaintiff's
domicile, the location of the plaintiff's activity which gave
rise to the alleged defamation, the defendants' domicile, and
the place from which publication of the allegedly defamatory
statements occurred." <u>Qureshi v. St. Barnabas Hosp. Ctr.</u>, 430
F. Supp. 2d 279, 286 n.3 (S.D.N.Y. 2006).

      In this case, the plaintiff's home state is Texas (Compl. ¶
3), the plaintiff represents that his employer, Cyberonics, is
located in Texas (Tr. 86), and Cyberonics itself represents that
it is headquartered in Texas (<u>see</u>
www.cyberonics.com/corporateprofile/ ("Headquartered in Houston,
Texas")).  Because the plaintiff's allegations of damages center
around the loss of his job at Cyberonics and injury to his
professional reputation (Compl. ¶¶ 79-81), the alleged
defamation in this case plainly has the biggest impact in Texas.
Moreover, the activity giving rise to the alleged defamation
took place in the course of a Cyberonics board meeting, although
the plaintiff appears to have participated in the meeting
telephonically.  In addition, there is no dispute that allegedly
defamatory statements were published in Texas.[8]

---

[8]    As discussed above, an article published by the Houston Chronicle on
June 14, 2006 summarized the "facts" presented in the June 8 and June 12
analyst reports, repeated in substance several of the specific statements

Based on these facts, and despite the fact that the defendants have connections to New York, Texas is the forum with the greatest interest in this litigation, and the law of Texas is the applicable substantive law in this case.  See, e.g., La Luna, 74 F. Supp. 2d at 389 (applying Florida law despite New York having "some interest in this litigation because defendants are citizens of New York"); cf. Berwick, 2007 WL 949767, at *7-8 (applying New York law over law of plaintiffs' home state in defamation suit where there was no allegation that any tortious statements were published in plaintiffs' home state; no allegation that any person or entity in plaintiffs' home state had ever heard or read disparaging remarks about plaintiffs; plaintiffs' relevant business dealings took place in New York; and plaintiffs' allegations of harm in their home state were "conclusory").

B

"To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public

---

made therein that were allegedly defamatory (including that the timing of the option grants "gave Cummins a $2.3 million boost, at least on paper") and quoted defendant Hazan criticizing the correctness and ethics of the option grants and assigning the blame for the option grants to Cyberonics management.  (Pl.'s Ex. 4.)

official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998); see also, e.g., Abdel-Hafiz v. ABC, Inc., 240 S.W.3d 492, 505 (Tex. Ct. App. 2007).  "Under Texas law, a statement is defamatory if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation."  Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc., 219 S.W.3d 563, 580 (Tex. Ct. App. 2007); see also Montemayor v. Ortiz, 208 S.W.3d 627, 651 (Tex. Ct. App. 2006).  "[A]llegedly [defamatory] statements must be construed 'as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement.'"  Cram Roofing Co., Inc. v. Parker, 131 S.W.3d 84, 90 (Tex. Ct. App. 2003) (quoting Musser v. Smith Protective Servs., Inc., 723 S.W.2d 653, 655 (Tex. 1987)); see also Bentley v. Bunton, 94 S.W.3d 561, 579 (Tex. 2002).

"Defamatory statements are 'published' if they are communicated orally, in writing, or in print to some third person capable of understanding their defamatory import and in such a way that the third person did so understand."  Wells v. Johnson, No. 11-99-72-cv, 2000 WL 34234888, at *1 (Tex. Ct. App.

Oct. 26, 2000) (collecting cases).  Defamation in written or
printed form is also known as "libel."  See, e.g., AccuBanc
Mortg. Corp. v. Drummonds, 938 S.W.2d 135, 147 (Tex. Ct. App.
1996).

     "Under . . . Texas law, an essential element of a
defamation claim is that the publication is 'of and concerning'
the plaintiff."  Houseman v. Publicaciones Paso del Norte, S.A.
de C.V., 242 S.W.3d 518, 526 (Tex. Ct. App. 2007) (internal
quotation marks omitted).  "A publication is 'of and concerning'
the plaintiff if persons who knew and were acquainted with him
understood from viewing the publication that the defamatory
matter referred to him."  Id. at 525.  "It isn't necessary that
the plaintiff be named in the publication."  Id.  However,
"[t]he false statement must point to the plaintiff and no one
else."  Id.; see also Newspapers, Inc. v. Matthews, 339 S.W.2d
890, 894 (Tex. 1960) ("The settled law requires that the false
statement point to the plaintiff and no one else."); Texas Beef
Group v. Winfrey, 11 F. Supp. 2d 858, 864 (N.D. Tex. 1998).

     The plaintiff in this case alleges that the defendants'
statements were defamatory per se.  "[S]tatements that are
defamatory per se are actionable without proof of injury."  Tex.
Disposal Sys., 219 S.W.3d at 580.  "A false statement will
typically be classified as defamatory per se if it injures a

person in his office, profession, or occupation, [or] charges a
person with the commission of a crime . . . ." Id. at 581
(internal citation omitted).  If statements are not classified
as defamatory per se, they "are actionable only upon allegation
and proof of damages." Id. at 580.  Moreover, "[e]ven if the
statements have been determined to constitute defamation per se,
proof of the actual injury suffered is required to recover
special damages such as lost profits, incurred costs, lost time
value, and future injury . . . ." Id. at 581 n.19.  The
plaintiff seeks damages of that nature in this case.  (See,
e.g., Compl. ¶ 81.)

C

The "substantial truth" of an allegedly defamatory
statement is sufficient to defeat a defamation claim.  See
Austin v. Inet Tech., Inc., 118 S.W.3d 491, 496 (Tex. Ct. App.
2003); see also McIlvain v. Jacobs, 794 S.W.2d 14, 15 (Tex.
1990).  Under the rubric of substantial truth, "[i]f a statement
has the same effect on the mind of the average reader as a true
statement, then it is not false.  If the article correctly
conveys the story's gist but relayed certain details
incorrectly, the article will be considered substantially true."
Pardo v. Simons, 148 S.W.3d 181, 186-87 (Tex. Ct. App. 2004)
(internal citation omitted); see also Hearst Newspaper P'ship,

LP v. Macias, 283 S.W.3d 8, 11 (Tex. Ct. App. 2009) ("The test used in determining whether a publication is substantially true involves considering whether the alleged defamatory statement was more damaging to the plaintiff's reputation, in the mind of the average reader or listener, than a truthful statement would have been.  Such an evaluation involves looking to the 'gist' of the publication.") (internal citations omitted).

Expressions of opinion do not give rise to liability for defamation.  See Brown v. Swett & Crawford of Texas, Inc., 178 S.W.3d 373, 383 (Tex. Ct. App. 2005) ("[T]he plaintiff must prove that the statements contained false, defamatory facts rather than opinions or characterizations.  Whether a statement is an opinion or an assertion of fact is a question of law.  An alleged defamatory statement of opinion requires an implication of undisclosed facts to be actionable.") (internal citations omitted).  There is no rigid dichotomy distinguishing statements of fact from expressions of opinion.  See Bentley, 94 S.W.3d at 580 (citing Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)).  Rather, whether allegedly defamatory statements are "statements of fact or expressions of opinion depends . . . on their verifiability and the context in which they were made." Bentley, 94 S.W.3d at 583 (citing Milkovich, 497 U.S. at 1); see also Linan v. Strafco, Inc., No. 13-05-27-cv, 2006 WL 1766204,

at *4 (Tex. Ct. App. June 29, 2006) ("The court must construe
the statement at issue as a whole, in light of surrounding
circumstances based upon how a person of ordinary intelligence
would perceive the entire statement."); Ridha v. Texas A&M Univ.
Sys., No. 08 Civ. 2814, 2009 WL 1406355, at *7 (S.D. Tex. May
15, 2009) ("When determining whether a statement is an
actionable statement of fact or a constitutionally protected
opinion, a court must consider whether the statement in question
makes or implies a factual assertion that is objectively
verifiable.  In so doing, the court is to consider the entire
context in which the statement was made.").

D

    The parties dispute whether the plaintiff is a public
figure for purposes of this litigation.  The plaintiff insists
that he is not a public figure, while the defendants argue that
he is a limited purpose public figure.  If the plaintiff is a
public figure, the plaintiff must establish that the allegedly
defamatory statements were published with the "actual malice"
standard defined in New York Times Co. v. Sullivan, 376 U.S.
254, 279-80 (1964).  See Gertz v. Robert Welsh, Inc., 418 U.S.
323, 342 (1974); Curtis Publ'g Co. v. Butts, 388 U.S. 130, 162-
63 (1967).  If the plaintiff is not a public figure, then the
plaintiff must establish that the statements were published

negligently.  Durham v. Cannan Comm'cns, Inc., 645 S.W.2d 845,
851 (Tex. Ct. App. 1982).

    "Whether a party is a public figure is a matter of
constitutional law for the court to decide."  Allied Mktg.
Group, Inc. v. Paramount Pictures Corp., 111 S.W.3d 168, 177
(Tex. Ct. App. 2003).  However, although whether a person is a
public figure "is a question of federal constitutional law and
Supreme Court rulings are controlling," in a diversity action
"resort to [the applicable state] case law is appropriate"
because "states are entitled to provide a broader, though no
more constricted, meaning to public figures" than federal law
provides.  Harris v. Quadracci, 48 F.3d 247, 250 n.5 (7th Cir.
1995) (applying Wisconsin state law to determine whether
plaintiff was public figure); see also Lee v. City of Rochester,
663 N.Y.S.2d 738, 769 (Sup. Ct. 1997), aff'd, 677 N.Y.S.2d 848
(App. Div. 1998) (consulting both state common law and federal
law in making public figure determination).  Therefore, the
Court considers federal law and Texas state law to determine
whether the plaintiff is a public figure.

    The Supreme Court has defined two classes of public
figures, general and limited.  Contemporary Mission, Inc. v. New
York Times Co., 665 F. Supp. 248, 262 (S.D.N.Y. 1987), aff'd,
842 F.2d 612 (2d Cir. 1988).  The class of general public

figures includes only those individuals who have achieved "general fame or notoriety in the community, and persuasive involvement in the affairs of society." Gertz, 418 U.S. at 352. The class of limited purpose public figures consists of individuals who "voluntarily inject[] [themselves] or [are] drawn into a particular public controversy and thereby become [] public figure[s] for a limited range of issues." Id. at 351. "In either case such persons assume special prominence in the resolution of public questions." Id.

The defendants concede that the plaintiff is not a general public figure, but argue that he is a limited purpose public figure. Under federal law as it has been interpreted in this Circuit, in order to establish that a plaintiff is a limited purpose public figure a defendant must show the plaintiff has: "(1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media." Contemporary Mission, Inc., 842 F.2d at 617. Texas state courts apply a slightly different test although both parties urge that it is substantially the same as the test used by federal courts

in this Circuit.  The test has three parts: "(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy."  WFAA-TV, 978 S.W.2d at 571.

The defendants argue that the plaintiff is a limited purpose public figure based on his involvement in two separate controversies: a national controversy over stock option backdating and a national controversy regarding the plaintiff's leadership of Cyberonics.  Neither argument supports a finding that the plaintiff is a limited purpose public figure.

At the time of the June 8 and June 12, 2006 analyst reports, the plaintiff was not involved in any public controversy regarding stock option backdating or, more broadly, improper option grants.  First, the record is far from clear that there existed any public controversy at the time regarding improper option grants.  "A public 'controversy' is any topic upon which sizeable segments of society have different, strongly held views."  Lerman v. Flynt Distrib. Co., Inc., 745 F.2d 123, 138 (2d Cir. 1984); see also WFAA-TV, 978 S.W.2d at 571.  The

defendants argue that a series of twenty newspaper articles in
The Wall Street Journal on the subject establishes that a public
controversy existed regarding improper option grants.  (Defts.'
Ex. 1.)  However, only three such articles were published before
the analyst reports at issue in this case.  The defendants
nowhere argue that those three articles from a single
publication were sufficient to establish a public controversy,
and indeed the number pales in comparison to the press coverage
found to establish a public controversy in other cases.  Cf.
Contemporary Mission, 842 F.2d at 618 ("Over 200 news articles
about [plaintiffs] from more than 60 different publications
located in over 15 different states . . . were submitted to the
district court . . . ."); Swate v. Schiffers, 975 S.W.2d 70, 74-
76 (Tex. Ct. App. 1998) (finding that plaintiff was public
figure based on 24 newspaper articles about the plaintiff on the
same subject of his medical practice that was the basis for the
alleged defamation); Brueggemeyer v. ABC, Inc., 684 F. Supp.
452, 456-57 (N.D. Tex. 1988) (listing newspaper articles).

      In any event, whether the three articles from the Wall
Street Journal establish any public controversy regarding
improper stock option grants is not a question the Court need
decide, because the plaintiff "at no time assumed any role of
public prominence in the broad question of concern about" option

29

grants.  Hutchinson v. Proxmire, 443 U.S. 111, 135 (1979).

Nothing in the record links the limited preexisting press

coverage of stock option practices to the plaintiff or

Cyberonics, and therefore the plaintiff was not a public figure

for purposes of comment on improper stock option practices.  Cf.

Pisani v. Staten Island Univ. Hosp., No. 06 Civ. 1016, 2008 WL

1771922, at *16 (E.D.N.Y. Apr. 15, 2008) ("Defendants have

failed to cite any facts showing that [plaintiff's] prominence

was related to the topic of the [allegedly defamatory]

statement."); Durham, 645 S.W.2d at 850-51 (finding that

plaintiff at forefront of public controversy surrounding alleged

mismanagement of public funds was not public figure for purposes

of comment on his alleged connection to other allegedly illegal

activities).  The existence of a broad public controversy

concerning stock option practices that was never tied to the

plaintiff or Cyberonics prior to the publication of the analyst

reports would not sufficiently implicate the plaintiff for

purposes of considering him a limited purpose public figure.

See Hutchinson, 443 U.S. at 134-36 (finding that plaintiff was

not limited purpose public figure for purposes of comment on his

receipt of federal funds on the basis of prevailing concern

"shared by most" about general public expenditures, and

explaining that plaintiff "at no time assumed any role of public

prominence in the broad question of concern about

expenditures"); see also Calvin Klein Trademark Trust v. Wachner, 129 F. Supp. 2d 248, 252 (S.D.N.Y. 2001) (framing public controversy inquiry in terms of whether there was public controversy specifically concerning defamation counterclaimant's conduct, rather than whether any controversy existed generally about conduct of that nature).  Finding the plaintiff to be a public figure on the basis of a broad public controversy about stock option practices, assuming such a controversy existed at the time, would effectively require finding that every executive receiving stock options was a public figure for purposes of critical comment concerning those options.  See Hutchinson, 443 U.S. at 134-36 ("If [the concern about public expenditures] were [sufficient to make the plaintiff a public figure], everyone who received or benefited from the myriad public grants for research could be classified as a public figure . . . .").

The defendants cite a bevy of cases to support the proposition that the existence of a general public controversy about stock option practices would render the plaintiff a public figure.  None of those cases supports that proposition.  In each of the cases cited by the defendants, the public controversy relative to which the plaintiff was considered a public figure featured the plaintiff in a far more prominent role than the plaintiff could be said to have played in this case.  Cf., e.g.,

Contemporary Mission, 842 F.2d at 618 ("Appellants were plainly limited purpose public figures with respect to the religious controversy surrounding them in the early 1970's."); Lerman, 745 F.2d at 137-38 (finding plaintiff to be limited purpose public figure in connection with controversy over relations between the sexes and public nudity where plaintiff "is today in the forefront of women writing about sex and what is perceived of as a continuing, double-standard in sexual mores . . . . Plaintiff . . . was such a willing participant in this public controversy."); WFAA-TV, 978 S.W.2d at 573 ("The record reflects that [the plaintiff] acted voluntarily to invite public attention and scrutiny on several occasions and in several different ways during the course of the public debate . . . ."); Swate, 975 S.W.2d at 74 ("[T]he earlier newspaper articles . . . describe conduct that would have ruined [the plaintiff's] reputation prior to the publication of [the defendants'] article."); Brueggemeyer, 684 F. Supp. at 456 ("The summary judgment evidence reflects that there was a public controversy concerning the bulk meat and freezer beef retail sales industry, in general, and [the plaintiff], in particular, prior to [the allegedly defamatory] broadcast . . . .").

The defendants' attempts to link the plaintiff specifically to a broader controversy concerning stock option practices are

unconvincing.  The defendants mainly rely on an email from the
plaintiff to Cyberonics investors explaining his February 2005
sale of option shares and a single news report covering that
sale.  The news report did not reflect any suspicion about the
sale for any reason and was simply reporting it as a neutral
fact.  (Defts.' Ex. 26.)  The email purported to explain the
plaintiff's decision to sell the option shares.  (Defts.' Ex.
25.)  There is nothing in the email to indicate that it was
responding to any allegation of improper stock option practices.
At most, the email could be interpreted as a response to
investor worries deriving from the fact that the CEO of the
company was seeking to diminish his stake in the company.
Moreover, the email appears only to have been sent to investors
in the company.  Both the email and the lone news report are far
removed from the alleged public controversy the defendants have
described over allegedly questionable option grants.

The defendants also rely on an email from someone named
Ryan Raunch that was sent only to the plaintiff and one other
Cyberonics executive.  The email stated that Mr. Raunch had
received two calls speculating that there was going to be an
investigation into the June 15, 2004 option grants.  (Defts.'
Ex. 4.)  The defendants argue that this statement reveals that
there were "rumors swirling" in the investment community that

the option grants were improper.  However, the statement about
the calls was hearsay and cannot be considered on a motion for
summary judgment.  See Nora Beverages, Inc. v. Perrier Group of
Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).  In any event, the
solitary email about two phone calls hardly constitutes swirling
rumors.

     For these reasons, the plaintiff is not a public figure on
the basis of any controversy surrounding improper option
practices.

     At the time of the analyst reports, the plaintiff was also
not involved in any public controversy concerning his leadership
of Cyberonics.  The defendants explain the nature of the alleged
controversy as a "debate over Cummins' credibility that existed
prior to publication of the SunTrust Statements."  (Defts.' Br.
22.)  Attempting to frame an issue as to which the plaintiff was
a limited purpose public figure at a level of such generality
would invite a finding that he was a general public figure which
he concededly was not.

     In any event, there was no public controversy over the
plaintiff's credibility or leadership of Cyberonics prior to the
publication of the analyst reports, and to the extent his
leadership of the company was criticized, there is no evidence
in the record that the plaintiff entered the debate or sought to

persuade others to his position.  The defendants point to a
handful of newspaper articles and litigation that criticized the
plaintiff and his leadership of Cyberonics.  (Defts.' 56.1 Stmt.
¶¶ 64-73; Pl.'s 56.1 Stmt. ¶¶ 64-73.)  However, the number and
nature of these articles do not reflect a debate in which
sizeable segments of society have taken strongly held positions.
Indeed, the defendants have not presented any evidence that the
plaintiff debated the articles; the defendants point out that
the plaintiff had appeared on television before the publication
of the analyst reports but provide no information as to what the
plaintiff said.  Moreover, there is no evidence that the analyst
reports about the stock options were germane to the prior
articles about the plaintiff's leadership of Cyberonics.

     For these reasons, the plaintiff is not a public figure on
the basis of any controversy surrounding allegedly improper
option practices.

     Because the plaintiff is not a public figure, the
negligence standard, rather than the actual malice standard,
applies to the allegedly defamatory statements in this case.
Pursuant to the negligence standard, a defendant is liable for
defamatory statements if he "knew or should have known that the
defamatory statement was false."  <u>Durham</u>, 645 S.W.2d at 851.

IV

The plaintiff alleges that the defendants made 37
defamatory statements in the course of the June 8 and June 12,
2006 analyst reports and related statements to the media, and
that the analyst reports were defamatory as a whole.  The
defendants deny that any of the statements identified by the
plaintiff were defamatory or that the analyst reports were
defamatory as a whole.  The Court analyzes each allegedly
defamatory statement in turn.

1.   "But by granting these options, we feel this mgmt knowingly
     abused that principle and acted in their own self interest
     with material information at a time when investors could
     not do so."  (June 12, 2006 analyst report lines 7-8)[9]

The plaintiff argues that this statement, which is taken
from the "Summary" section of the June 12 report, was defamatory
in three respects.  First, the statement falsely accused the
plaintiff, as the CEO and head of management, of participating
in the granting of options to himself, when in fact it was the
board of directors that granted the June 15, 2004 options.
Second, the statement falsely characterized the plaintiff's
participation in the June 15 option grants as self-interested
and an abuse of the principle that stock options should align

---

[9]   All emphases are the plaintiff's.  The prior sentence to which this
sentence plainly refers reads as follows: "First, we remind investors that
the very spirit of stock option grants is to align mgmt's interests more
closely with its shareholders."

the interests of management with those of the shareholders.
Third, the plaintiff quarrels with the negative implications of
the terms "knowingly abused" and "self-interest."

The plaintiff's arguments are without merit, even assuming
that in the context of this statement the term "management"
referred to the plaintiff with sufficient specificity that the
statement was "of and concerning" the plaintiff.  First, the
suggestion that management granted the June 15 options was
substantially true, even though it was actually the board of
directors, not management, that granted the options.  "A
statement is substantially true, and thus not actionable, if its
'gist' or 'sting' is not substantially worse than the literal
truth.  This evaluation requires us to determine whether, in the
mind of the average person who read the statement, the allegedly
defamatory statement was more damaging to the plaintiff's
reputation than a truthful statement would have been."
Gustafson v. City of Austin, 110 S.W.3d 652, 656 (Tex. Ct. App.
2003) (internal citations omitted).  In this case, the plaintiff
concedes that he knew the board was granting him the June 15
options with the June 14 share price following the board meeting
on the night of June 15.  He concedes that he knew the share
price for Cyberonics would rise the next day.  He plainly knew
that other Cyberonics shareholders, while privy to the favorable

news regarding the FDA panel recommendation, could not act on
that news on June 15 because trading was closed.  Thus there is
no dispute that the plaintiff voluntarily accepted the June 15
options with a full understanding of the circumstances
surrounding those options, namely that the share price for
Cyberonics stock would rise the following day and that ordinary
Cyberonics shareholders could not capitalize on that information
on June 15.  Moreover, he voluntarily accepted the
responsibility of distributing similarly priced options to other
executives at Cyberonics with that same understanding of the
surrounding circumstances.

     The plaintiff's complicity in the June 15 option grants
renders the statement that management granted the options
substantially true.  The sting of the alleged defamation was
that the plaintiff's conduct in connection with the option
grants was self-interested and abused the principle of aligning
the interests of management with those of the shareholders.  The
sting of the defamation did not hinge on the technicality of who
granted the options and who voluntarily accepted them with a
full understanding of the circumstances surrounding them.  That
detail does not affect the question of whether the plaintiff
acted out of self-interest and flouted the principle that the
interests of management should be aligned with those of the

38

shareholders.  The gist of the statement was the self-interest
in taking options at allegedly low prices that were unavailable
to shareholders, not a critique of the corporate governance
issue of whether management rather than the board of directors
has the power to grant options.  Therefore, the statement was
substantially true.  See Gustafson, 110 S.W.3d at 656-57
(finding statement that plaintiff's "instructor status [for CPR
classes] has been officially revoked by the [American Heart
Association]" to be substantially true regardless of whether his
status was actually officially revoked, because plaintiff was no
longer permitted to teach CPR classes that were AHA approved);
see also id. at 657 ("The disagreement over whether the AHA
officially revoked [the plaintiff's] instructor status is of
'secondary importance' because the gist of the email is not
substantially worse than the literal truth . . . . It is the AHA
certification that students taking CPR classes desire.")
(internal emphasis omitted) (quoting McIlvain v. Jacobs, 794
S.W.2d 14, 16 (Tex. 1990)); Slaughter-Cooper v. Kelsey Seybold
Med. Group P.A., 379 F.3d 285, 291 (5th Cir. 2004) (rejecting
defamation claims on substantial truth grounds where former
employer told plaintiff physician's former patients that
plaintiff had quit the practice of medicine or was unable to

practice medicine, when in fact plaintiff's employment had been terminated).[10]

Second, the characterization of the plaintiff's conduct as self-interested and knowingly abusing the principle of aligning management's interests with those of the shareholders was a non-actionable expression of opinion.  Whether the plaintiff's conduct was self-interested and inconsistent with the principle of aligning management and shareholder interests is a question of characterization and such a characterization cannot be proven true or untrue.  See Hadlock v. Texas Christian Univ., No. 2-07-290-cv, 2009 WL 485669, at *4 (Tex. Ct. App. Feb. 26, 2009) (rejecting defamation claim where faculty members characterized plaintiff's behavior as "hostile or disrespectful" and as violating University Statement on Professional Ethics); El Paso Times, Inc. v. Kerr, 706 S.W.2d 797, 799 (Tex. Ct. App. 1986) (rejecting defamation claim based on use of the term "cheating" and noting that "[i]n the case at bar, the word 'cheating' was used in a way that denotes opinion.  It would be impossible to look at the acts of [the plaintiff] . . . and determine if he was or was not 'cheating.'"); see also id. at 799 ("[Cheating]

_____

[10]     It is unnecessary to reach the defendants' argument that the term "management" encompassed the Cyberonics board of directors, thus making the suggestion that management granted the options literally true.  The authors did distinguish between management and the board of directors elsewhere in the analyst reports.

means different things to different people at different times and in different situations.").

Moreover, the characterization of the plaintiff's conduct did not imply the existence of undisclosed facts as the basis for the authors' opinion, as is required for an expression of opinion to be actionable for defamation. See Brown, 178 S.W.3d at 383. The authors plainly based their opinion on the facts disclosed in the June 12 analyst report – namely, the circumstances of the June 15 option grants. The context in which the statement at issue was made (both in the "Summary" section, which referred to a "recap" of the facts in the "Comments" section, and the "Comments" section) made clear that the opinion was based on the circumstances of the June 15 option grants that were set forth in both the June 8 and June 12 analyst reports. Therefore, the statement was a protected expression of opinion. See Hadlock, 2009 WL 485669 at *4 ("The Faculty did not express their opinion so as to imply the existence of facts to back up their opinion; rather, they set out verifiable assertions of fact and then stated that, from those asserted facts, they formed the opinion that [the plaintiff] had shown disrespect for his colleagues. Their opinions were purely subjective assertions.") (emphasis omitted); cf. Bentley, 94 S.W.3d at 584 (rejecting defendant's

argument that allegedly defamatory statements were expressions of opinion where defendant had "repeatedly insisted that evidence he had seen but not disclosed supported his assertions.").

Third, the plaintiff's complaint regarding the negative implications of the terms "self-interest" and "knowingly abused" are unavailing.  As explained above, those terms, in the context of the statement at issue and the June 12 analyst report, were non-actionable statements of opinion.

For the foregoing reasons, the first statement identified by the plaintiff does not support a defamation claim.

2.    "**SEC Contacts CYBX** . . . . The move highlights a concern we raised last week . . . regarding stock option grants to three executives . . . . We recap the facts again in the body of this note . . . . But by granting the options on the evening in question, this management knowingly abused that principle, acting in their own self interest with material information at a time when their shareholders and investors could not do so."  (June 12, 2006 analyst report lines 1-4, 34-[36])[11]

The plaintiff argues that this statement was defamatory because it implied that management granted the June 15 options, when in fact the board of directors granted the options.  For the reasons explained above, that argument is without merit.

---

[11]    The "principle" referred to is explained in the previous sentence: "[W]e understand the very spirit of stock option grants to be an alignment of managers' interests more closely with those of its shareholders (sharing alike in events that unfold)."

The plaintiff also appears to argue that the statement was
defamatory on account of its timing.  Specifically, the
plaintiff argues that the statement was defamatory because it
was made in the wake of the SEC contacting Cyberonics after the
June 8 analyst report was published.  According to the
plaintiff, this reflects the defendants' willingness to repeat
defamatory statements even with the knowledge that serious
consequences may result.  That argument is without merit. It
does not explain why the statement was false and there is no
contention that the SEC did not contact Cyberonics or that the
timing of the SEC inquiry was falsely stated.  For the reasons
explained above, the statement itself does not support a
defamation claim.

3.    "Fully aware of the positive FDA Panel decision, this
      management team and its directors surely realized the
      'fair' value of its equity was worth much more than the
      mere $19.58 share price prior to when this very
      controversial event took place?  If so, then we believe
      they improperly took advantage of this definition for their
      own benefit, as the intent of the regulation is to [come]
      as close as possible to capturing the 'true' value of the
      stock."  (June 12, 2006 analyst report lines 40-[45])

      The plaintiff argues that this statement was defamatory in
three respects.  First, the statement falsely suggested that the
plaintiff knew something no one else knew and took an improper
or illegal advantage of that knowledge for his own personal
benefit.  Second, the statement implied the existence of a

43

regulation of which the plaintiff took advantage.  Third, the
statement implied that the June 15 stock options were wrongfully
granted.

The plaintiff's arguments are without merit, even assuming
that the statement referred to the plaintiff with sufficient
specificity that the statement was "of and concerning" the
plaintiff.  The first argument misinterprets the meaning of the
statement, which was unambiguous.  Neither this statement nor
the June 12 analyst report anywhere else implied that the
plaintiff had secret information that he used to his advantage
in obtaining the June 15 options.  It is undisputed that the FDA
Panel recommendation was fully disclosed on June 15.  Rather,
the implication of the statement, and of the June 12 analyst
report, was that the plaintiff took advantage of the fact that
trading was closed on June 15 to obtain options on June 15 with
a below-market price – namely, the June 14 price, which did not
take into account the favorable news of the FDA Panel
recommendation.  See Ritzmann v. Weekly World News, Inc., 614 F.
Supp. 1336, 1339 (N.D. Tex. 1985) ("If the language of an
alleged libel is unambiguous, it is the duty of the court to
construe its meaning and determine whether it is libelous.").
For the reasons explained above, whether such conduct was fairly
characterized as self-interested is a matter of opinion, and the

authors' statement of their opinion in this regard is not
actionable.

The second argument fails because the statement that the
plaintiff "took advantage" of the letter of the law in a manner
that circumvented its "intent" was an expression of opinion.
The authors did not accuse the plaintiff of breaking the law.
Rather, the authors characterized the plaintiff's conduct as
taking advantage of the letter of the law.  Put another way, the
authors accused the plaintiff of conduct inconsistent with the
spirit of the law.  That is a non-verifiable characterization
that is not actionable.  See Falk & Mayfield LLP v. Molzan, 974
S.W.2d 821, 824 (Tex. Ct. App. 1998) (finding accusation that
plaintiff committed "lawsuit abuse" to be protected opinion
because it merely accuses plaintiff of "manipulating the [law] .
. . to gain an unfair advantage . . . . It is an individual
judgment that rests solely in the eye of the beholder.").

The plaintiff points out that the statement implied the
existence of a regulation the intent of which the plaintiff's
conduct in connection with the June 15 option grants could have
offended.  This criticism actually takes the disputed sentences
out of context.  The previous three sentences read as follows:
"[M]anagement's response to this issue in an 8-K filing last
week claims that June 14th exercise price of $19.58 was 'fair

45

market value,' because the rules do allow using the most recent
day's closing price.  We don't agree.  While the exact letter of
the law may very well have been followed, it seems clear to us
that the very intent of the regulation was manipulated."  The 8-
K that was referred to includes a response by Pam Westbrook to
the June 8, 2006 analyst report and includes the following
statements referring to "regulations": "Cyberonics has fully
followed securities and accounting regulations in the
administration of its stock option programs.  Stock options are
granted the day of approval and are priced at fair market value
on the date of grant.  Fair market value is considered to be the
closing price of the stock on the trading day prior to the date
of grant/approval."  (Defts.' Ex. 41.)

     In context, the authors acknowledged that the grant of the
options may very well have followed the letter of the law –
namely, the definition of "fair market value" indicated by the
securities and accounting regulations on which Cyberonics itself
relied and which measured such value by the closing price on the
last trading date.  The authors expressed their opinion that
using that price was a manipulation of fair value because it was
determined before the event that would have increased the price.
That statement was a non-actionable statement of opinion and
referring to the intent of "the regulation" does not make it

defamatory when that is the language that Cyberonics itself had

used and to which the report was responding.  The authors were

entitled to express an opinion that a closing price was not

"fair value" when corporate officials possessed material

information that the stock was worth more than that price

because of events that transpired after the closing of the

trading date prior to the grant of the options.

The plaintiff's third argument is essentially a rephrasing

of the argument that it was defamatory for the authors to

characterize the plaintiff's conduct as self-interested.  For

the reasons explained above, that argument is unavailing.

For the foregoing reasons, the third statement identified

by the plaintiff does not support a defamation claim.

4.   "Fully aware of the positive FDA Panel decision, mgmt
     surely realized the 'fair' value of its equity was worth
     much more than the $19.58 share price a day prior to when
     this very controversial event took place.  If so, then they
     manipulated the 'fair value' definition for their benefit,
     as the intent of the regulation is to get as close as
     possible to capturing the 'true' value of the stock."
     (June 12, 2006 analyst report lines 11-14)

The plaintiff argues that this statement was defamatory in

three respects.  First, the statement falsely accused the

plaintiff, as the head of management, of participating in the

granting of his own stock options.  Second, the statement

accused the plaintiff of "manipulat[ive]" conduct.  Third, the

statement implied the existence of a "regulation" the intent of which the plaintiff could have manipulated.

The plaintiff's arguments are without merit.  For the reasons explained above, the implication that the plaintiff participated in the June 15 option grants was substantially true, as was the implication regarding the existence of a regulation.[12]

With respect to the plaintiff's second argument, the term "manipulated" was not defamatory.  The statement that the plaintiff's conduct constituted a manipulation of the concept of fair value was plainly a non-actionable characterization rather than a statement of fact.  See Falk, 974 S.W.2d at 824.  The plaintiff quarrels with the negative implications of the term "manipulate," but no matter the force of such implications they did not transform the statement from an expression of opinion into a statement of fact.  See Byerly v. Ambrus, No. A14-88-847-cv, 1989 WL 128409, at *1 (Tex. Ct. App. Oct. 26, 1989) (finding statement that plaintiff police officer was "incompetent,"

---

[12]    It should also be noted that, like the prior statement, the plaintiff has taken this statement somewhat out of context.  The prior sentences make it clear that the defendants were commenting on Cyberonics' response to the prior June 8, 2006 analyst report which did refer to regulations, as explained above.  The prior sentences also make clear that the grant of the options may well have complied with the letter of the law.  Those sentences read as follows: "[M]gmt's response to this issue last week claims the June 14th exercise price of $19.58 was 'fair market value,' because the rules allow using the most recent day's closing price.  While the exact letter of the law may well have been followed, it seems clear to us that the very intent of the regulation was manipulated."

48

"unstable," and "had no business wearing a uniform" to be non-actionable characterization); see also Linan, 2006 WL 1766204, at *4-6 (finding comments that plaintiff employee was "cause" of cash problems at place of employment and was involved in attempted theft to be non-actionable "characterizations," although they may have been "false, abusive, unpleasant, or objectionable" to plaintiff) (internal quotation marks omitted). Moreover, the characterization of the plaintiff's conduct as manipulative did not imply any undisclosed objectively verifiable facts; rather, the context of the June 12 analyst report plainly shows that the characterization was based on the circumstances of the June 15 option grants set forth in the June 8 and June 12 analyst reports.

For the foregoing reasons, the fourth statement identified by the plaintiff does not support a defamation claim.

5.   "While the exact letter of the law may very well have been followed, it seems clear to us that the very intent of the regulation was manipulated." (June 12, 2006 analyst report lines 39-40)

The plaintiff argues that this statement was defamatory because it implied that management granted the options and that the intent of a regulation was manipulated.  For the reasons explained above, these arguments are unavailing.  The fifth statement identified by the plaintiff therefore fails to support a defamation claim.

6.    "Incidentally, investors who bought shares on the morning
      after the FDA Panel have lost 35% of their investment to
      date (two years on), <u>but the three executives acting on the
      same information are still 'in the money' by over 10%.</u>"
      (June 12, 2006 analyst report lines 16-17)

The plaintiff argues that this statement was defamatory

because it implied that management "act[ed]" by participating in

the grant of their own stock options, and because it implied

that the plaintiff was a dishonest CEO.  The plaintiff's

arguments are unavailing.  For the reasons explained above, the

implication that the plaintiff participated in the grant of the

June 15 options was substantially true.  The statement simply

does not say that the plaintiff was "dishonest."  The plaintiff

fails to explain how any factual statements in this sentence are

false.  The facts are fully set out and are not actionable.  It

should also be noted that on its face the statement was not "of

and concerning" the plaintiff because it referred to the three

executives collectively and could not be understood to refer to

the plaintiff "and no one else."  <u>Houseman</u>, 242 S.W.3d at 525.

For these reasons, the sixth statement identified by the

plaintiff does not support a defamation claim.

7.    <u>"Incidentally, investors who bought shares on the morning
      after the FDA Panel have now lost 35% of their investment
      value to date (two years on)</u>, but the three executives
      acting on the same information are still 'in the money' by
      over 10%." (June 12, 2006 analyst report lines 47-49)

The plaintiff does not allege that the percentages provided

in this statement were false.  (<u>See</u> Pl.'s Chart of Defamatory

Statements ("Pl.'s Chart") ¶ 7; see also Compl. ¶ 58.)  Rather,
the plaintiff alleges that the statement was defamatory because
it attempted to impute a quality of rapaciousness to the
plaintiff and suggested that he was a dishonest CEO.  Those
statements were not made and the factual statements that were
made have not been shown to be false.  Therefore, the seventh
statement identified by the plaintiff does not support a
defamation claim.

8.   "If mgmt wanted to properly align themselves with
     shareholders for the 60 month vesting period (as they have
     claimed), they should have first let the event be factored
     into the share price."  (June 12, 2006 analyst report lines
     14-16)

     The plaintiff argues that this statement was defamatory in
three respects.  First, it falsely suggested that the plaintiff
put his interests above the interests of the shareholders.
Second, it implied that the plaintiff had and used the authority
to refuse to allow the FDA Panel decision to be factored into
the share price.  Third, it accused the plaintiff of not wishing
to align his interests with the interests of Cyberonics
shareholders and characterized the June 15 stock options as not
properly aligning the plaintiff's interests with the interests
of Cyberonics shareholders.

     Each of the plaintiff's charges against this sentence fails
because the plaintiff conjures up alleged statements that were

simply not made.  The plaintiff cannot base a defamation claim
on alleged false statements of fact, when the statements do not
appear in the text.  To the extent that the plaintiff finds
implications, the implications the plaintiff finds are non-
actionable opinions based on the facts that are substantially
true.

The first and third arguments rehash the argument that the
plaintiff acted out of self-interest.  For the reasons explained
above, a statement that the plaintiff acted out of self-interest
was one of opinion and was not actionable.

The second argument is related to the argument that it was
defamatory to imply that the plaintiff participated in granting
the June 15 options because it was the board of directors that
granted the options.  The statement merely indicated that the
timing of the option grants did not allow for the favorable news
of the FDA Panel decision to be factored into the share price,
and that such timing belied the plaintiff's purported desire to
align his interests with those of the shareholders, because he
could have arranged the timing differently to "first let the
event be factored into the share price."  For the reasons
explained above, it was substantially true that the plaintiff
exercised control over the timing of the option grants that he
voluntarily and knowingly accepted and distributed with a full

understanding of the circumstances surrounding them, and the
characterization of the plaintiff's conduct as self-interested
was a non-actionable expression of opinion.

For the foregoing reasons, the eighth statement identified
by the plaintiff does not support a defamation claim.

9.    "If management had wanted to properly 'align' themselves
      with shareholders for the 60 month vesting period (as they
      claimed last week), they should have allowed the event to
      be factored into the share price."  (June 12, 2006 analyst
      report lines 45-47)

For the reasons explained above, the ninth statement
identified by the plaintiff does not support a defamation claim.

10.   "With a full understanding of the materiality of the [FDA
      Panel recommendation] . . . this management and board of
      directors granted the options with a prior day's (June 14th)
      exercise price of $19.58.  The stock rose 78% on June 16,
      yielding the executives a combined overnight paper profit
      of ~$2.5M."  (June 12, 2006 analyst report lines [27-30])

The plaintiff argues that the statement was defamatory
because it falsely accused the plaintiff of granting the
options.  For the reasons explained above, the statement was
substantially true.  Moreover, the statement referred to "the
management and board of directors" and thus was not "of and
concerning" the plaintiff because it could not be understood to
refer to the plaintiff "and no one else."  For these reasons,
the tenth statement identified by the plaintiff does not support
a defamation claim.

11.  "While it may be disputable whether 'backdating' of options
     or other violations occurred under SEC regulations, we do
     note the grants resulted in 'in the money' options that
     would require an immediate recording of compensation
     expense (which could possibly necessitate a restatement of
     FY05 results)."  (June 8, 2006 analyst report lines 15-18)

The plaintiff argues that this statement was defamatory

because it implied in the context of the June 8 analyst report

as a whole that the plaintiff participated in illegal backdating

or other SEC violations in connection with the June 15 option

grants.  The plaintiff also argues that the suggestion that "it

may be disputable whether 'backdating' . . . or other violations

occurred" was defamatory because it was devastating to a CEO in

the wake of a nationwide stock option scandal.

The plaintiff's arguments are without merit, even assuming

that the statement referred to the plaintiff with sufficient

specificity that it was "of and concerning" the plaintiff.  With

respect to the plaintiff's first argument, in the context of the

June 8 analyst report the statement did not accuse the plaintiff

of backdating options or otherwise violating the law.  Indeed,

on the contrary, the statement was a disclaimer acknowledging

that the authors could not say that the plaintiff had broken any

law.  The sting of the alleged defamation in this statement and

throughout the June 8 and June 12 analyst reports was that

regardless of whether the June 15 option grants complied with

the letter of the law, the authors thought they were improper.

In the context of the June 8 report, the statement that the authors could not say whether the options were backdated or otherwise violated the law was therefore a disclaimer that did not tend to injure the plaintiff's reputation.  Thus it was not defamatory.

Moreover, the statement was an expression of opinion and not an actionable assertion of fact, nor did it imply any objectively verifiable undisclosed facts.  The statement reflected the authors' opinion that based on the circumstances of the June 15 option grants disclosed in the "facts" section of the June 8 analyst report, they could not say whether the plaintiff's conduct with respect to the options was illegal. The modest, doubly qualified characterization of the plaintiff's conduct — namely, that the legality of the conduct was possibly ("may be") disputable — in the context of a disclaimer, plainly did not purport to represent a factual statement.  The mere mention of possible illegality in this context did not transform a non-actionable expression of opinion into an actionable assertion of fact.  See Linan, 2006 WL 1766204, at *5 (finding statement that "[i]t is my suspicion and belief that [the plaintiff] was involved in the attempted theft" to be an "opinion[] and characterization[]").  The cases cited by the plaintiff do not suggest otherwise.  Cf. Kelly v. Schmidberger,

806 F.2d 44, 48 (2d Cir. 1986) (finding statement by president
of a priestly society that plaintiffs placed church property "in
their own names" to be statement of fact); Whitney Info.
Network, Inc. v. Weiss, No. 06 Civ 6569, 2008 WL 731024, at *5
(E.D.N.Y. Mar. 18, 2008) (finding statements in email to be
actionable where email expressly stated that undisclosed facts
existed supporting statements at issue); Camp Summit of
Summitville, Inc. v. Visinski, No. 06 Civ. 4994, 2007 WL
1152894, at *11 (S.D.N.Y. Apr. 16, 2007) (holding that outright
accusation of illegal conduct was not opinion); Rinaldi v. Holt,
Rinehart & Winston, Inc., 366 N.E.2d 1299, 1307 (N.Y. 1977)
(noting that "outright charges of illegal conduct" were
statements of fact); Ocean State Seafood, Inc. v. Capital
Newspaper, 492 N.Y.S.2d 175, 178 (App. Div. 1985) (denying
summary judgment on grounds of protected opinion where
accusations that plaintiff was greedy and dealt in contraband
were based upon "sharp[ly] dispute[d]" facts).  But cf. Gross v.
New York Times Co., 623 N.E.2d 1163, 1168 (N.Y. 1993) (finding
accusation of "possibly illegal" conduct to be actionable).  It
should also be noted that none of the cases cited by the
plaintiff apply Texas law, which should be applied.

    With respect to the plaintiff's second argument, there is
no authority for the proposition that a protected expression of

opinion is actionable simply because it may damage the
plaintiff's reputation.

     For the foregoing reasons, the eleventh statement
identified by the plaintiff does not support a defamation claim.

12.  "Legal or not, we are hard pressed to find a justifiable
     reason for the events that unfolded above." (June 8, 2006
     analyst report lines 58-59)

     The plaintiff argues that this statement was defamatory
because it acknowledged the possibility that the plaintiff's
conduct was illegal, and because the characterization of the
June 15 option grants as unjustifiable painted the plaintiff in
a bad light.

     The plaintiff's arguments are without merit.  First, the
statement was not "of and concerning" the plaintiff.  The gist
of the statement was that there was no justifiable reason for
the June 15 option grants under the circumstances they were
granted (namely, their timing and exercise price).  The June 15
option grants plainly involved more people than the plaintiff
alone.  The statement could not be understood to refer to the
plaintiff "and no one else."

     In any event, the arguments would fail even if they were of
and concerning the plaintiff.  The first argument fails because
in the context of the June 8 analyst report, the phrase "[l]egal

or not" was a disclaimer acknowledging that the authors could
not say whether the June 15 option grants were illegal.  As
explained above, the disclaimer was not defamatory because the
gist of this statement, and the gist of the June 8 report as a
whole, was that regardless of whether the option grants were
technically legal, in the authors' opinion, they were improper.
That was the sting of the statement and of the report as a
whole.  Neither the statement nor the balance of the June 8
analyst report accused the plaintiff of illegal conduct.  In the
context of the June 8 report, the disclaimer that the authors
could not say whether the option grants were illegal was not
defamatory.  Moreover, as explained above, the suggestion –
heavily qualified throughout the June 8 report – that the option
grants may possibly have been illegal was a statement of opinion
based on fully disclosed facts.

The second argument fails because the characterization of
the option grants as unjustifiable was plainly a non-actionable
characterization, for the same reasons that the
characterizations of the option grants as self-interested and
inconsistent with the principle of aligning the interests of
management with the interests of shareholders, discussed above,
were non-actionable opinions.

For these reasons, the twelfth statement identified by the plaintiff does not support a defamation claim.

13. "While it may be disputable whether 'backdating' of options or other SEC violations occurred under this scenario for CYBX (it appears to us that even if backdating by definition did not occur, the effect was exactly the same) . . . ." (June 8, 2006 analyst report lines 47-49) [emphasis in original]

The plaintiff argues that this statement was defamatory because it "repeat[ed] . . . the backdating allegation" (Pl.'s Chart ¶ 13), compared the effect of the June 15 option grant to the effect of backdating, and suggested that the plaintiff was unfit to be a CEO.  The statement was not defamatory because it was not of and concerning the plaintiff.  The statement did not mention the plaintiff or management and could not be understood to refer to the plaintiff "and no one else."  The statement was a comparison of the effect of the June 15 options to the effect of backdated options.  It could not plausibly be read as a reference to conduct specific to the plaintiff.

In any event, the plaintiff's arguments fail for independent reasons.  As explained above, the June 8 and June 12 analyst reports contained no allegation of backdating or any other illegal conduct.  Indeed, this statement was a disclaimer that the authors could not say whether any "backdating" had occurred.  The gist of the statement was that whether backdating occurred did not matter because the effect of the June 15 option

grants was equivalent to the effect of backdated options.   In
that context the statement was not defamatory.

     The comparison of the effect of the June 15 option grants
to the effect of backdated options was plainly a statement of
opinion.   By commenting on the "effect" of the option grants the
authors characterized the grants on the basis of the
circumstances disclosed in the "facts" section of the June 8
report.   Characterizing the options as comparable in "effect" to
the effect of backdated options is no different from
characterizing the options as self-interested or as abusing the
principle that the interests of management and shareholders
should be aligned.   As explained above, such characterizations
were not actionable in the context of the analyst reports.   The
comparison did not assert any objectively verifiable fact and
did not imply the existence of undisclosed facts.   The statement
was a statement of opinion.   Indeed, the authors prefaced the
comparison with the qualifier, "it appears to us."

     The plaintiff reads into this statement an allegation that
the plaintiff was unfit to be CEO.   But such an allegation was
not made and any such implication was an expression of opinion
that was not actionable.   See Byerly, 1989 WL 128409, at *1.

     For the foregoing reasons, the thirteenth statement
identified by the plaintiff does not support a defamation claim.

14.  "Because a <u>backdated</u> option results in the award of an 'in the money' option, a compensation expense should be recorded at the time of the grant."  (June 8 analyst report lines 45-46)

The plaintiff argues that this statement was defamatory in three respects: it falsely implied that the June 15 options were "in the money" because they were backdated; it falsely suggested that the plaintiff could make money immediately even though the options vested over a five year period; and it portrayed the plaintiff as disloyal and self-interested.

The plaintiff's arguments are without merit.  The statement was not of and concerning the plaintiff.  The statement was a general statement about backdated options.  The entire paragraph from which the statement is taken neither mentioned the plaintiff nor referred even once to Cyberonics management. There was no statement that the plaintiff was responsible for the accounting treatment of the options or for reporting them. The gist of the statement was to explain that backdated options require the immediate recording of compensation expenses.  The paragraph from which the statement is extracted explained that for "companies that discover that backdating occurred, restatements of financial statements may be necessary . . . ." (Pl.'s Ex. 1.)  While the statement, in its context, implied that the June 15 option grants would require Cyberonics to record an immediate compensation expense and may require a

61

restatement of the company's financials, the statement did not
refer specifically to the plaintiff or implicate the plaintiff
in any way.  Certainly the statement could not be understood to
refer to the plaintiff "and no one else."  Indeed, at oral
argument plaintiff's counsel made clear that whether and how to
record the options as compensation expenses "were matters which
were handled by the lawyers and by the accountants," not by the
plaintiff.  (Tr. 73.)  Neither the statement at issue nor the
June 8 analyst report as a whole provided any reason for a
reader to believe otherwise, because the plaintiff was never
linked to the process of recording compensation expenses.  Put
another way, the June 8 report made clear that the plaintiff was
the CEO of Cyberonics and never suggested that he was an
accountant.[13]

        For these reasons, the fourteenth statement identified by
the plaintiff does not support a defamation claim by the
plaintiff.

15.   "[W]e do note the grants resulted in 'in the money' options
      that <u>would require an immediate recording of compensation
      expense</u> (which could possibly necessitate a restatement of
      FY05 results)."  (June 8, 2006 analyst report lines [16]-
      18)

        The plaintiff argues that this statement was defamatory
because it falsely stated that the options required an immediate

---

[13]    The statement was also a protected statement of the authors' opinion
with respect to how the options "should" be recorded.

recording of compensation expense and were not properly accounted for, and because in the context of the June 8 report the statement was tied to potential backdating and other SEC violations.

The plaintiff's arguments are without merit.  For the reasons explained above, the implication that the June 15 option grants would require Cyberonics to record an immediate compensation expense and that if they failed to do so after the options were granted, a restatement of the company's financials may be necessary, was not "of and concerning" the plaintiff. Nothing in the June 8 analyst report implicated the plaintiff in any accounting responsibilities or any failure to perform such responsibilities.  The sting of the alleged defamation against the plaintiff was the plaintiff's complicity in options grants that the authors characterized as self-interested, among other things, based on their timing and exercise price.  The sting of the alleged defamation against the plaintiff had nothing to do with how option grants must be recorded in the company's financials.[14]

For these reasons, the fifteenth statement identified by the plaintiff does not support a defamation claim.

---

[14]    This statement was also a protected statement of opinion as to proper accounting and the authors' opinion as to the possibility of a financial restatement.

16. "Because a backdated option results in the award of an 'in the money' option, <u>a compensation expense should be recorded at the time of the grant.</u>"  (June 8, 2006 analyst report lines 45-46)

For the reasons explained above, this statement was not "of and concerning" the plaintiff.  Therefore, the sixteenth statement identified by the plaintiff does not support a defamation claim.[15]

17. "**Credibility is the Real Issue.**  Whether it results in regulatory violations or not, the actions appear unethical to us, and <u>akin 'in effect' to the broader stock option compensation abuses</u> currently unfolding elsewhere."  (June 12, 2006 analyst report line[s] [18-19])

The plaintiff argues that this statement was defamatory in four respects.  First, by saying that "[c]redibility is the [r]eal [i]ssue," the statement cast doubt upon the plaintiff's honesty.  Second, by saying "whether it results in regulatory violations or not," the statement raised the specter that the options may have been illegal.  Third, by saying "the actions appear unethical to us," the statement implied that the plaintiff was dishonest and untrustworthy.  Fourth, the comparison of the plaintiff's conduct to the broader stock option incentive compensation abuses unfolding elsewhere was unwarranted.

---

[15]    The statement was also not a false statement of fact.  The plaintiff does not quarrel with the accounting proposition that is stated.  This particular sentence does not even state that any impropriety occurred with respect to the options awarded to the plaintiff.

None of the plaintiff's arguments has merit.  The first and third arguments fail because as explained above, the characterization of the plaintiff's complicity in the June 15 option grants as self-interested, dishonest and unethical was a non-actionable statement of opinion based on fully disclosed facts.  The second argument fails because, like the previously discussed instances in which the possibility of illegality was mentioned, this statement mentioned the possibility in the context of a disclaimer.  The authors mentioned the possibility of illegality by way of acknowledging that they could not say that the June 15 option grants were illegal.  The gist of the statement was that whether the option grants were illegal is immaterial because they were improper in any event.  In this context, for the reasons explained above, the statement was not defamatory because it was unrelated to the sting of the alleged defamation and did not tend to injure the plaintiff's reputation.  Moreover, as also explained above, the possibility that these were regulatory violations was a protected statement of opinion based on the disclosed facts surrounding the option grants.

The fourth argument fails because comparison of the "effect" of the June 15 option grants to the effect of stock

option abuses occurring elsewhere was a non-actionable statement
of opinion about the stock options based on disclosed facts.

For these reasons, the seventeenth statement identified by
the plaintiff does not support a defamation claim.

18. **Credibility is the Real Issue.**  <u>Whether the facts above</u>
    (which have not been disputed) results in regulatory
    violations or not, these actions appear <u>unethical</u> to us,
    and akin 'in effect' to the broader stock option
    [incentive] compensation <u>abuses</u> currently unfolding at a
    number of other companies." (June 12, 2006 analyst report
    lines 50-53)

This statement is not actionable for the reasons explained
with respect to the seventeenth statement.  The only new
argument the plaintiff makes in connection with this statement
is that the statement was defamatory because it indicated that
the preceding statements in the June 12 report that the
plaintiff complains were defamatory were "facts."  However, this
statement refers only to the undisputed facts about the June 15
options grants.  This is not a false statement facts.  <u>See</u>
<u>Ritzmann</u>, 614 F. Supp. at 1339 ("If the language of an alleged
libel is unambiguous, it is the duty of the court to construe
its meaning and determine whether it is libelous.").  To the
extent that the plaintiff is simply complaining about the same
issues raised in the seventeenth statement, those statements are
not actionable, for the reasons stated above.

For these reasons, the eighteenth statement identified by the plaintiff does not support a defamation claim.

19.   "At the end of the day, shareholders will have to decide whether this management team and its board of directors have fulfilled their fiduciary duty.  We are currently hard pressed to reach such a conclusion."  June 12 analyst report.  (June 12, 2006 analyst report lines 58-60)

The plaintiff argues that this statement was defamatory because it falsely accused the plaintiff of breaching his fiduciary duty.  The plaintiff's argument is without merit.  The statement was plainly an opinion based on the disclosed factual circumstances of the June 15 option grants, rather than an actionable assertion of a materially false fact.  The statement explicitly deferred to the judgment of the shareholders and presented a subjective opinion.  Therefore, the nineteenth statement identified by the plaintiff does not support a defamation claim.

20.   "Due to the positive Panel recommendation, CYBX jumped 78% to $34.81 on the first trading day, June 16th, yielding an overnight paper profit of ~$2.3 million for CEO Cummins and ~$150,000 each for Rudolph and Totah."  (June 8, 2006 analyst report lines 12-14)

The plaintiff argues that this statement was defamatory because it falsely accused the plaintiff of reaping an improper profit at the expense of the shareholders, when in fact the plaintiff never made any profit on the June 15 options because he never sold any of the options.  In connection with this

argument, the plaintiff argues that the phrase "paper profit"
was inaccurate as a technical matter because a "paper profit"
refers only to realizable gains, while the options in question
vested over a 60-month period.

The plaintiff's arguments are without merit because the
statement was substantially true.  The sting of the alleged
defamation with respect to this statement was that the share
price for Cyberonics rocketed the day after the plaintiff
obtained his options, making those options more valuable by $2.3
million "on paper."  Those facts are undisputed.  The statement
does not say that the options had vested, that the options had
been exercised or that the profit was immediately able to be
realized.  The authors stated that the "paper" value of the
plaintiff's options rose by $2.3 million the day after the
options were granted.  The term "paper" plainly alerted any
reader to the fact that the plaintiff had not realized a $2.3
million profit, but that the value of the options had increased
by $2.3 million.  The impact of the statement on the plaintiff's
reputation did not depend in any way on whether the increase in
the value of the options was immediately realizable.  Any such
impact would derive from inferences drawn from the combination
of the timing and exercise price of the options, a combination
which was not available to ordinary Cyberonics shareholders and

which resulted in the value of the options increasing by $2.3 million overnight on paper.

For these reasons, the twentieth statement identified by the plaintiff was substantially true and does not support a defamation claim.

21.  **"Increasing Concern Over Option Grants** . . . The facts are as follows: . . . . June 16th, 2004 – on the first trading day following the positive FDA Panel recommendation, CYBX jumped 78% to close at $34.81, yielding an <u>overnight paper profit of ~$2.3 million for CEO Cummins</u>, and ~$150,000 each for Rudolph and Totah."  (June 8, 2006 analyst report lines 27, 31, 39–41)

The plaintiff raises no new arguments in connection with this statement.  Therefore, the twenty-first statement identified by the plaintiff was not defamatory for the reasons explained above.

22.  "The stock rose 78% on June 16, yielding the executives a combined overnight paper profit of ~$2.5M."  (June 12, 2006 analyst report lines 29-30)

The plaintiff raises no new arguments in connection with this statement.  Therefore, the twenty-second was not defamatory for the reasons explained above.

23.  "As for Mr. Cummins, he subsequently sold ~350,000 options in Feb '05 at $[~]40-45 per share (just days after CYBX received an FDA approvable letter for the same device)."  (June 8, 2006 analyst report lines 14-15)

The plaintiff argues that this statement was defamatory because by juxtaposing the plaintiff's February 2005 sale of

options with the preceding discussion of the June 15, 2004
options, the authors left the impression that the options sold
in February 2005 were the same options that were granted on June
15, 2004, when in fact the options were entirely distinct.   The
plaintiff also argues that the statement was defamatory because
it falsely suggested that there was something improper or
illegal about the February 2005 sale.

        The plaintiff's arguments are without merit.   The literal
truth of the statement is not in dispute.   Therefore, the
plaintiff's second argument – that the statement falsely
suggested there was something wrong with the February 2005 sale
– is plainly unavailing, because the statement was true.   See
Scripps Texas Newspapers, L.P. v. Belalcazar, 99 S.W.3d 829, 835
(Tex. Ct. App. 2003) ("[A] defendant cannot be held liable for
presenting a true account of events regardless of what someone
might conclude from that account.").   The statement correctly
pointed to the sale of the options days after Cyberonics
received an FDA approval.

        The plaintiff's first argument accuses the authors of
defamation through misleading juxtaposition.   A publication may
through "misleading juxtaposition connote false facts even
though it does not state them directly."   Turner v. KTRK
Television, Inc., 38 S.W.3d 103, 116 (Tex. 2000); see also

Scripps, 99 S.W.3d at 835.  In the context in which this
statement was made, a reader may have inferred that the options
sold in February 2005 were the same options obtained on June 15,
2004, because the June 2004 options were the focus of the
analyst report.  However, the juxtaposition was not actionable
because it did not tend to injure the plaintiff's reputation.
The allegedly false implication was that the plaintiff sold the
options that he obtained on June 15.  But the sting of the
alleged defamation in the June 8 and June 12 analyst reports was
that the plaintiff effectively obtained the June 15 options at a
below market price, to his advantage and without affording the
same opportunity to ordinary Cyberonics shareholders.  The sting
of the defamation was complete in the allegation of effectively
obtaining the options at a below market price, and the
suggestion that the options were sold did not contribute to that
sting.  Selling the options would not make the plaintiff appear
any worse than he would appear for continuing to hold the
options, which indeed would give rise to the inference that he
was waiting to sell them at an opportune time.  The allegation
that the plaintiff obtained options at a below-market price
already encompassed the allegation that the plaintiff sought to
profit from the options.  Whether he subsequently sold the
options or continued to hold them would not affect the impact of
the allegation.  Therefore, the juxtaposition was not

actionable.  See Louis v. Mobil Chem. Co., 254 S.W.3d 602, 610-
11 (Tex. Ct. App. 2008) (rejecting defamation claim where
omission of fact from allegedly defamatory statement did not
make plaintiff look more culpable).  Cf. Scripps, 99 S.W.3d at
836 (observing that "Texas law precludes libel claims based on
factual inaccuracies that have no effect on the gist or sting of
the publication" but upholding defamation claim against summary
judgment motion where factual misstatement may have "cast
greater suspicion on [the plaintiff's] conduct and . . .
damage[d] his reputation more so . . . than the literal truth
would have done").

     For the foregoing reasons, the twenty-third statement
identified by the plaintiff does not support a defamation claim.

24.  **Increasing Concern Over Options Grants** . . . The facts are
     as follows: [. . .] February 2005 – Mr. Cummins sold ~
     350,000 options at ~$40-45 per share (the selling began
     just days after CYBX received an FDA approvable letter for
     the same device)."  (June 8, 2006 analyst report lines 27,
     31, 42-43)

     The plaintiff raises no new arguments with respect to this
statement.  For the reasons explained above, the twenty-fourth
statement identified by the plaintiff does not support a
defamation claim.

25.  "Lastly, we were unable to locate all of the electronic
     Form 4's for the quarter in question (ending July 2004) as
     the 10/Q says 481,000 were granted, but only 304,000 were
     on Form 4's."  (June 8, 2006 analyst report lines 18-19)

The plaintiff argues that this statement was defamatory because it falsely implied that certain SEC Form 4s regarding the June 15 option grants were intentionally not filed, and raised doubts about whether the plaintiff was hiding something by not filing the Form 4s.

The plaintiff's argument is without merit because the statement was not "of and concerning" the plaintiff.  The statement only mentioned the authors themselves and did not make any reference to the plaintiff or to management.  There was nothing linking the plaintiff to the filing or failure to file Form 4's.  The plaintiff's own argument with respect to why the statement was defamatory acknowledges that the plaintiff would not have been the only person required to file a Form 4 in connection with the option grants.  (See Pl.'s Chart ¶ 25.) Therefore by the plaintiff's own admission the statement could not be understood to refer to the plaintiff "and no one else." Indeed, the statement did not refer to the plaintiff at all. Any of the persons required to file Form 4's could have failed to do so, or the authors might simply have failed to find such forms.

For these reasons, the twenty-fifth statement identified by the plaintiff does not support a defamation claim.

26. **"Increasing Concern Over Option[s] Grants** . . . . Lastly,
    we were unable to locate all of the electronic Form 4's for
    the quarter in question (ending July 2004), as the 10/Q
    says 481,0000 were granted, but only 304,000 were on Form
    4's for that period.  <u>We are continuing to do diligence
    surrounding this issue</u>."  (June 8 analyst report lines 27,
    52-54)

The only new argument the plaintiff makes in connection

with this statement is that the use of the word "issue" was

defamatory because it suggested there was some issue concerning

the Form 4's when in fact the Form 4's were filed in a timely

manner.  The argument lacks merit because as explained above,

the statement was not "of and concerning" the plaintiff.

Moreover, the use of the word "issue" could hardly be considered

a false statement of fact.  For this reason, the twenty-sixth

statement identified by the plaintiff does not support a claim

for defamation.

27. "While Cyberonics' <u>abuse</u> does not appear to be a regular
    systemic pattern, it unfortunately takes on a much larger
    significance when put into <u>a historical context of
    credibility issues with this management team.</u>"  (June 12,
    2006 analyst report lines 53-55)

The only new argument the plaintiff raises with respect to

this statement is that the statement was defamatory because it

implied the existence of credibility issues concerning the

plaintiff.  However, the implication that there were historical

credibility issues concerning the plaintiff and his performance

as CEO was substantially true.  The evidence is unambiguous that

the plaintiff's credibility had been questioned in the press

before the publication of the analyst reports.  (<u>See</u> Defts.'
56.1 Stmt. ¶¶ 64-73; Pl.'s 56.1 Stmt. ¶¶ 64-73.)  The plaintiff
points out in another context that the content of the media
reports questioning the plaintiff's credibility is hearsay and
is largely disputed.  However, the existence of the media
reports questioning the plaintiff's credibility was the fact
that substantiated the statement that there were issues about
the plaintiff's credibility.  The substantial truth of the
statement was not dependent upon the truth of the media reports.
Rather, the media reports document the fact that credibility
issues had been raised with respect to the management team.

    For this reason, the twenty-seventh statement identified by
the plaintiff does not support a defamation claim.

28.  "The <u>abuse</u> unfortunately takes on a larger significance
     here due to <u>existing credibility issues</u> for <u>this mgmt.</u>  It
     is increasingly evident that the <u>value</u> of CYBX is
     discounted a good deal <u>due to the current CEO</u>, and we
     believe stock appreciation will continue to be limited as a
     result."  (June 12, 2006 analyst report lines 19-21)

    The only new argument the plaintiff raises in connection
with this statement is that the statement was defamatory because
it identified the plaintiff as a reason that the stock price of
Cyberonics was discounted.  That argument is without merit
because the statement was a statement of opinion.  The assertion
that the Cyberonics stock price was discounted on account of the
plaintiff amounted to a statement of opinion based on the

75

disclosed fact of credibility issues about the plaintiff.
Whether the company would be better off with a different CEO is
not an objectively verifiable assertion of fact.

The plaintiff argues that the statement was actionable
because it implied the existence of undisclosed objectively
verifiable facts. As explained above, however, it was
substantially true that there were preexisting issues with
respect to the plaintiff's credibility and performance as CEO.
It is unambiguous from the context of the statement that the
authors' opinion that the plaintiff was hurting the company was
based on the circumstances of the June 15, 2004 option grants as
presented in the June 8 and June 12 analyst reports and the
existence of credibility issues with respect to the plaintiff.
Because those factual bases were fully disclosed and
substantially true, the authors' opinion is not actionable.

For these reasons, the twenty-eight statement identified by
the plaintiff does not support a defamation claim.

29. "Simply put, it has become increasingly evident to us that
    the value of CYBX common continues to be meaningfully
    discounted due to the presence of the current CEO, in our
    opinion, and we believe that stock appreciation will
    continue to be limited by this factor." (June 12, 2006
    analyst report lines 55-58)

The plaintiff raises no new arguments with respect to this
statement. For the reasons explained above, the twenty-ninth

statement identified by the plaintiff does not support a
defamation claim.

30.  "In our discussions with institutional investors regarding
     Cyberonics over the past several years, it seems almost
     indisputable that <u>management</u> has been its own Achilles
     heel, drawing <u>continued criticism over credibility</u>.  (June
     8, 2006 analyst report lines 55-56)

     The only new argument the plaintiff raises in connection
with this statement is that the statement was defamatory because
it linked the plaintiff (as part of "management") to credibility
issues based on "undisclosed conversations with investors."
(Pl.'s Chart ¶ 30.)  The plaintiff's argument is without merit.
As explained above, the implication that there were credibility
issues surrounding the plaintiff and his performance as CEO was
substantially true.  Therefore, the implication is not
actionable.  The authors' reference to conversations with
institutional investors does not change the analysis.  The
reference only indicated that the authors had spoken to
institutional investors who reiterated that there were
credibility issues with respect to the plaintiff and his
performance as CEO.  The authors disclosed that they had the
conversations, and the only impact of mentioning the
conversations was to support the statement that there were
credibility issues regarding the plaintiff and his performance
as CEO.  Because that statement was substantially true

irrespective of anything the institutional investors said, whether the conversations actually took place would not affect the sting of the alleged defamation in this statement, which was that there were credibility issues concerning the plaintiff and his performance as CEO.  Therefore, to the extent the plaintiff argues that the mention of conversations with institutional investors was defamatory because the authors did not disclose sufficient information about the existence or content of such conversations, that argument is without merit.  See Louis, 254 S.W.3d at 610-11; cf. Scripps, 99 S.W.3d at 836.

For these reasons, the thirtieth statement identified by the plaintiff does not support a defamation claim.

31.   "While it is possible that this option granting issue may
      never develop into a legal event for the company, we feel
      it is unfortunately another clear hit to this management's
      credibility." (June 8, 2006 analyst report lines 56-58)

The plaintiff fails to raise any new argument with respect to this statement.  Therefore, the thirty-first statement identified by the plaintiff does not support a defamation claim.

32.   "The analyst's report criticized the option grant, saying
      it gave Mr. Cummins an instant paper profit of $2.3
      million, and profit of $150,000 each for the other two
      executives, but did nothing for other shareholders." (The
      New York Times, June 9, 2006 ("NYT June 9")

The plaintiff fails to raise any new argument with respect to this statement, which in any event was not made by the

defendants.  The portion of the report that is referred to is
not actionable for the reasons explained above.  Therefore, the
thirty-second statement identified by the plaintiff does not
support a defamation claim.

33.  "My problem is the timing of when they did this.  The fact
     that it doesn't vest immediately doesn't mean it was
     ethical, and I haven't heard from one institutional
     investor today who disagrees with me."  (NYT June 9)

     The plaintiff fails to raise any new argument with respect
to this statement.  The statement, like the similar statements
in the reports, is a statement of opinion.  Therefore, the
thirty-third statement identified by the plaintiff does not
support a defamation claim.

34.  "It's a perfect example of an abusive option."  (NYT June
     9)

     The only new argument the plaintiff raises with respect to
this statement is that the statement was defamatory because it
not only characterized the option grants as "abusive," but as a
"perfect example" of abusive options.  That argument is without
merit.  The strength of the characterization did not turn it
into an assertion of fact.  See Byerly, 1989 WL 128409, at *1.
The statement was a protected statement of opinion.  Therefore,
the thirty-fourth statement identified by the plaintiff does not
support a defamation claim.

35. "Hazan estimates by granting the options when it did, the
    company gave Cummins a $2.3 million boost, at least on
    paper . . . ." (June 14, 2006 Houston Chronicle Article
    "June 14 Chronicle"))

The plaintiff makes no new arguments in connection with

this statement.  The statement was substantially true because it

referred to a profit that existed only on paper.  Therefore, the

thirty-fifth statement identified by the plaintiff does not

support a defamation claim.

36. "It was not correct or ethical for them to do what they did
    . . . . It may be a microcosm of what's happening with this
    management team." (June 14 Chronicle)

The plaintiff fails to raise any new arguments in

connection with this statement.  The statement was plainly a

protected statement of opinion.  Therefore, the thirty-sixth

statement identified by the plaintiff does not support a

defamation claim.

37. "It does not address our one hard claim we make, that it
    appears unjustified and unethical to issue those grants on
    the night of the single greatest event in the company's
    history . . . ." (June 9, 2006 Bloomberg.com article)

The plaintiff fails to make any new argument in connection

with this statement.  The statement was plainly a protected

statement of opinion.  Therefore, the thirty-seventh statement

identified by the plaintiff does not support a defamation claim.

The plaintiff also alleges that the June 8 and June 12

analyst reports were defamatory as a whole.  For all of the

reasons explained above, the analyst reports were not defamatory and referring to them as a whole does not make them defamatory. The core facts about the June 15 options were indisputably true and the authors' conclusions were protected statements of opinion based on disclosed facts.

### CONCLUSION

The Court has considered all of parties' arguments.  To the extent not specifically addressed, such arguments are either moot or without merit.  For all of the foregoing reasons, the defendants' motion for summary judgment is **granted.**  The Clerk is directed to close Docket No. 32 and to enter judgment dismissing the complaint and closing this case.

**SO ORDERED.**

Dated:    New York, New York
          August 20, 2009

                                    John G. Koeltl
                                United States District Judge